<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE EASTERN DISTRICT OF PENNSYLVANIA</u>

DARRICK U. HALL,                    )
                                    )   Civil Action
                    Petitioner      )   No. 05-cv-02523
                                    )
        vs.                         )
                                    )
JEFFREY BEARD, Commissioner,        )
Pennsylvania Department of          )
Corrections;                        )
DAVID DiGUGLIELMO, Superintendent   )
of the State Correctional           )
Institution at Graterford; and      )
FRANKLIN J. TENNIS, Superintendent  )
of the State Correctional           )
Institution at Rockview,            )
                                    )
                    Respondents     )


                    *    *    *

APPEARANCES:

            CRISTI CHARPENTIER, ESQUIRE and
            JAMES J. MCHUGH, ESQUIRE
                On behalf of Petitioner

            CHRISTOPHER D. CARUSONE, ESQUIRE and
            GERALD P. MORANO, ESQUIRE
                On behalf of Respondents

                    *    *    *


                <u>O P I N I O N</u>

JAMES KNOLL GARDNER,
United States District Judge

**TABLE OF CONTENTS**                              <u>Page</u>

<u>SUMMARY OF DECISION</u>...............................................5

<u>PROCEDURAL HISTORY</u>................................................7

<u>CONTENTIONS OF THE PARTIES</u>......................................13

    <u>Petitioner's Contentions</u>....................................13

    <u>Respondents' Contentions</u>....................................14

<u>STANDARD OF REVIEW</u>...............................................16

<u>FACTS</u>............................................................17

<u>DISCUSSION</u>.......................................................19

    <u>Exhaustion of State Court Remedies</u>..........................19

    <u>Procedural Default and the Relaxed Waiver Rule</u>.............21

    <u>Cause and Prejudice</u>.........................................27

    <u>Sentencing Phase Claims</u>.....................................31

        <u>Trial Counsel's Failure to Present Mitigation Evidence</u>...............................................31

            <u>*Pennsylvania Court Decisions*</u>....................33

            <u>*Legal Standard for Ineffective Assistance of Counsel*</u>...........................36

                <u>*Strickland Standard*</u>.......................37

                <u>*Duty to Investigate Mitigating Evidence*</u>...............................39

                <u>*American Bar Association Guidelines*</u>.......45

            <u>*Mitigation Evidence Presented at Penalty Phase*</u>............................................48

            <u>*Mitigation Evidence Available at Time of Penalty Phase*</u>...................................50

            <u>*Trial Counsel's Deficient Performance*</u>..........63

            <u>*Prejudice*</u>......................................85

**Simmons** Instruction.................................91

Catch-All Mitigating Factor Instruction..............92

Grave Risk Aggravating Factor........................97

    *Trial Court Error*...............................98

    *Ineffective Assistance of Counsel*..............102

Proportionality Review..............................106

Victim Impact Testimony.............................111

    *PCRA Appeal*....................................113

    *Guilt Phase Claims*............................115

    *Sentencing Phase Claims*.......................115

**Guilt Phase Claims**....................................120

Prosecutorial Misconduct............................120

    *Exhaustion*.....................................123

    *Fifth Amendment Right Against Self-
    Incrimination*..................................129

    *Prejudicial and Inflammatory Statements in
    Violation of Due Process*.......................131

Failure to Present Exculpatory Statement of
Co-Defendant........................................135

Failure to Move In Limine to Redact Petitioner's
Confession..........................................141

Sufficiency of the Evidence.........................147

    *Exhaustion*.....................................148

    *Supreme Court of Pennsylvania Decision*........150

    *Merits Analysis*...............................153

Suppression of Post-Arrest Statements...............156

    *Waiver of Miranda Rights*......................157

        *Trial Court Findings of Fact*.............158

        *Direct Appeal*...........................161

        *Exhaustion*.............................163

        *Merits Analysis*..........................165

     *Ineffective Assistance of Counsel*.............171

        *Direct Appeal*...........................172

        *Merits Analysis*..........................173

   **Cumulative Effect of All Errors**........................177

**CONCLUSION**................................................179

      This matter is before the court on the Petition for Writ of Habeas Corpus filed by petitioner Darrick U. Hall on February 17, 2006.  Respondents are Jeffrey Beard, Commissioner of the Pennsylvania Department of Corrections; David Diguglielmo, Superintendent of the State Correctional Institution at Graterford, Pennsylvania; and Franklin J. Tennis, Superintendent of the State Correctional Institution at Rockview, Pennsylvania.

      Respondents filed an answer on May 30, 2006.[1] Petitioner filed a memorandum of law on October 6, 2006.[2] Respondents filed a memorandum of law on December 6, 2006.[3]

---

    [1]    Respondents' answer was titled Answer to Petition for Writ of Habeas Corpus.

    [2]    Petitioner's memorandum of law was titled Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus.

    [3]    Respondents' memorandum of law was titled Memorandum [of] Law in Support of the Commonwealth's Answer to Petition for Writ of Habeas Corpus.

Finally, petitioner filed a reply brief on January 8, 2007.[4]
Oral argument was conducted on the petition on May 17, 2007.

## SUMMARY OF DECISION

For the following reasons, I conclude that petitioner
is entitled to relief from his death sentence because trial
counsel was ineffective in failing to investigate and present
significant mitigating evidence at the penalty phase of
petitioner's trial.  I further conclude that petitioner is not
entitled to relief from his conviction.

Specifically, petitioner is entitled to a new
sentencing hearing based upon claim one[5] because trial counsel's
investigation and presentation of mitigating evidence at the
penalty phase of petitioner's trial fell below an objective
standard of reasonableness, and because petitioner suffered
prejudice as a result of trial counsel's deficient performance.

Petitioner's remaining claims are not meritorious.
Specifically, in claim three, I conclude that the trial court's
instruction on preponderance of the evidence given at the penalty
phase hearing was not constitutionally deficient.

Regarding claim four, the testimony of the
Commonwealth's expert witness regarding bullet ricochet was not
speculative, and its admission did not violate petitioner's

---

[4]     Petitioner's reply was titled Petitioner's Reply to Commonwealth's
Memorandum of Law in Support of Commonwealth's Answer to Petition for a Writ
of Habeas Corpus.

[5]     See Section titled Petitioner's Contentions, below, for an
enumeration of petitioner's thirteen claims.

constitutional rights.  Further, trial defense counsel's decision not to call a ballistics expert to rebut the Commonwealth's expert witness was a reasonable strategy and did not constitute ineffective assistance of counsel.

With respect to claim five, the prosecutor's statements during closing argument at the guilt phase of trial did not constitute prosecutorial misconduct which deprived petitioner of due process.

In claim six, the admission of the alleged victim impact statements did not deprive petitioner of fundamental fairness in his trial.  Furthermore, trial defense counsel was not ineffective in failing to move to exclude these statements because the reliability of the proceedings was not undermined by the admission of the statements.

Regarding claim eight, petitioner's constitutional rights were not violated by the failure to admit a co-defendant's statement because the statement was not necessarily exculpatory, and petitioner was not prejudiced by trial counsel's failure to move to admit the statement.

With respect to claim nine, trial counsel was not ineffective because there is no reasonable probability that the result of the proceedings would have been different had defendant's confession been redacted to exclude the phrase "white guy" in reference to the victim.

-6-

In claim ten, petitioner's due process rights were not violated because the evidence was sufficient to sustain a conviction for Murder of the first degree.

Regarding claim eleven, petitioner's Fifth Amendment rights were not violated by the trial court's failure to suppress petitioner's confession. In addition, trial defense counsel was not ineffective for failing to present additional witnesses at the suppression hearing because petitioner was not prejudiced by this decision.

Finally, petitioner's remaining claims two, seven, twelve, and thirteen are procedurally defaulted. Petitioner's claims are procedurally defaulted because the state court deemed claims two and seven waived, and because petitioner failed to exhaust his state court remedies regarding claims twelve and thirteen.

## PROCEDURAL HISTORY

The Commonwealth of Pennsylvania prosecuted petitioner Darrick U. Hall for the armed robbery of a Coatesville, Chester County, Pennsylvania laundromat and the shooting death of victim Donald Johnson. Petitioner was represented at his trial by retained counsel Robert E.H. Miller, Esquire.

On October 27, 1994, following a jury trial in the Court of Common Pleas of Chester County, Pennsylvania, petitioner was convicted by a jury of Murder of the first degree,[6]

---

[6]     18 Pa.C.S.A. § 2502(a).

Recklessly endangering another person,[7] Firearms not to be carried without a license,[8] Robbery,[9] and Criminal conspiracy to commit Robbery.[10]  Petitioner was acquitted of conspiracy to commit murder.[11]

The penalty phase began the following day and the jury returned a sentence of death on October 29, 1994.  The jury found the following two aggravating circumstances: (1) petitioner committed the killing while in the perpetration of a felony;[12] and (2) during the commission of the killing, petitioner knowingly created a grave risk of death to another person in addition to the victim.[13]

The jury found one mitigating factor pursuant to the catch-all category of "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense."[14]  Specifically, the jury found that the events leading up to the fatal shot included the possibility of a struggle.  Furthermore, the jury determined that the two aggravating factors outweighed the one mitigating factor.

---

[7]   18 Pa.C.S.A. § 2705.

[8]   18 Pa.C.S.A. § 6106.

[9]   18 Pa.C.S.A. § 3701.

[10]  18 Pa.C.S.A. § 903.

[11]  Id.

[12]  42 Pa.C.S.A. § 9711(d)(6).

[13]  42 Pa.C.S.A. § 9711(d)(7).

[14]  42 Pa.C.S.A. § 9711(e)(8).

On November 7, 1994, the trial court imposed the jury's death sentence on the charge of Murder of the first degree. With respect to petitioner's other convictions, the trial judge imposed the following sentences: not less than two-and-one-half years nor more than five years imprisonment, concurrent to the death sentence, for Firearms not to be carried without a license; not less than ten years nor more than twenty years imprisonment, consecutive to the death sentence, for Robbery; and not less than five years nor more than ten years concurrent to the Robbery sentence, for Criminal conspiracy to commit Robbery. The trial judge entered a verdict of guilty without further imposition of sentence for Recklessly endangering another person.

On November 14, 1994, Vincent P. DiFabio, Esquire was appointed by the Court of Common Pleas of Chester County to represent petitioner in his direct appeal to the Supreme Court of Pennsylvania. He filed a Notice of Appeal on November 28, 1994. On February 9, 1995, the trial court filed a Rule 1925(a) Opinion[15] in response to petitioner's statement of matters complained of on appeal.

On May 22, 1995 the parties filed a joint motion for remand for an evidentiary hearing on allegations of ineffective assistance of counsel. The Supreme Court of Pennsylvania granted the motion on June 29, 1995, and the trial court conducted a five-day evidentiary hearing on September 21, October 20, 25, 27

---

[15]   See Pennsylvania Rule of Criminal Procedure 1925(a).

and November 15, 1995.  On January 25, 1996 the trial court
issued its findings of fact and credibility determinations.

On September 17, 1997 the Supreme Court of Pennsylvania
affirmed the judgment of petitioner's sentence.  <u>Commonwealth v.
Hall</u>, 549 Pa. 269, 701 A.2d 190 (1997).

On January 8, 1998, pursuant to 42 Pa.C.S.A. § 9711(j),
then Pennsylvania Governor Thomas J. Ridge issued a death warrant
for petitioner's execution.  Petitioner, through counsel, Robert
Brett Dunham, Esquire, filed a motion with the Supreme Court of
Pennsylvania for a stay of execution.[16]  The Supreme Court of
Pennsylvania granted petitioner's stay of execution on
January 16, 1998 pending action by the United States Supreme
Court on his petition for certiorari from the court's ruling in
<u>Commonwealth v. Hall</u>, 549 Pa. 269, 701 A.2d 190 (1997).
<u>Commonwealth v. Hall</u>, 550 Pa. 190, 704 A.2d 127 (1998).

On April 20, 1998, the United States Supreme Court
denied certiorari.  <u>Hall v. Pennsylvania</u>, 523 U.S. 1082,
118 S.Ct. 1534, 140 L.Ed.2d 684 (1998).  Pursuant to
42 Pa.C.S.A. § 9711(j), Governor Ridge issued a second death
warrant on May 18, 1998 for petitioner's execution.

On May 26, 1998, petitioner filed a timely petition,
pro se, for relief under the Pennsylvania Post Conviction Relief
Act ("PCRA").  Petitioner also filed a motion, through Attorney

---

[16]    It appears that Attorney Dunham, of the Center for Legal
Education, Advocacy & Defense Assistance, represented petitioner pro bono in
this matter.  As described below, on May 26, 1998 petitioner later requested
the appointment of the Center for Legal Education, Advocacy & Defense
Assistance to represent him, which request was denied.

Dunham, seeking a stay of execution previously issued by Governor Ridge and requesting the appointment of the Center for Legal Education, Advocacy & Defense Assistance to represent him.

The Commonwealth did not oppose the motion for stay of execution. However, it did oppose petitioner's request for specific counsel.  The court granted the motion for stay of execution and appointed John DiSantis, Esquire from the Chester County Conflict Counsel panel.

On November 12, 1998 Attorney DiSantis filed an amended PCRA petition on petitioner's behalf.  Several continuances were requested by petitioner and were granted, and an evidentiary hearing was held on July 13, 2000.

On September 15, 2000, Thomas J. Wagner, Esquire, was appointed from the Chester County Conflict Counsel panel to represent petitioner in place of Attorney DiSantis who withdrew his name from the Chester County Conflict Counsel panel.

On October 19, 2000 the trial court denied petitioner's claims in his amended PCRA petition.  Petitioner appealed that decision to the Supreme Court of Pennsylvania.  In May 2000, Christi A. Charpentier, Esquire entered her appearance and filed a brief on behalf of petitioner.  The Supreme Court of Pennsylvania affirmed the trial court's denial of petitioner's amended PCRA petition on April 29, 2005.  Commonwealth v. Hall, 582 Pa. 526, 872 A.2d 1177 (2005).

On May 25, 2005, former Pennsylvania Governor Edward G. Rendell issued a third death warrant for petitioner, scheduling

his execution for July 19, 2005.  Petitioner, through counsel, filed Petitioner's Unopposed Motion for Stay of Execution, Request for Appointment of Counsel and for *In Forma Pauperis* Status with this court on May 26, 2005.  By Order dated June 7, 2005, I stayed petitioner's execution pending filing and adjudication of his federal habeas corpus petition.  I further ordered counsel for petitioner to file a petition for habeas corpus relief by January 26, 2006.

By Order dated January 19, 2006, I granted petitioner an extension until February 17, 2006 to file his petition for federal habeas corpus relief.

As described above, on February 17, 2006, petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  By Order dated March 30, 2006, I directed respondents to file an answer to petitioner's habeas corpus petition by May 30, 2006.  Pursuant to that Order, respondents filed their answer on May 30, 2006.

On October 6, 2006, petitioner filed Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus.  On December 6, 2006, respondents filed a Memorandum in Law in Support of the Commonwealth's Answer to Petition for Writ of Habeas Corpus.  Petitioner filed a reply brief on January 8, 2007.

On May 17, 2007, oral argument in this matter was held in this court on the federal petition.

## CONTENTIONS OF THE PARTIES

### Petitioner's Contentions

Petitioner seeks relief from his conviction and death sentence on multiple grounds.  Specifically, petitioner raises the following thirteen claims:

(1)   trial defense counsel was ineffective for failing to investigate, develop, and present substantial mitigating evidence;

(2)   trial counsel was precluded from informing the jury, and the jury was never instructed, that petitioner would be ineligible for parole if he were sentenced to life imprisonment;

(3)   the trial court's instructions regarding the catch-all mitigating factor prevented the jury from considering relevant mitigating evidence that was present in this case, and the trial court's definition of the preponderance of evidence standard was inadequate;

(4)   trial counsel was ineffective, and the trial court erred, with respect to the existence of the "grave risk" aggravating factor, and the Commonwealth failed to provide petitioner with adequate notice of the "grave risk" factor;

(5)   the prosecutor engaged in numerous acts of misconduct;

(6)   trial defense counsel was ineffective by not objecting when allegedly improper victim impact testimony was presented and argued to the jury;

(7)   the trial court failed to properly instruct the jury on the nature and use of aggravating and mitigating factors;

(8)   trial defense counsel was ineffective for failure to present material and relevant evidence, which violated petitioner's right to present a defense;

(9)   trial counsel was ineffective for failing to move in limine to redact the numerous references to the victim as "white guy" in petitioner's statement to police;

(10)  the evidence was insufficient to sustain a
      conviction of Murder of the first degree;

(11)  the trial court improperly admitted incriminating
      statements made by petitioner after his arrest and
      request for counsel;

(12)  the proportionality review conducted by the
      Supreme Court of Pennsylvania violated
      petitioner's due process rights; and

(13)  the prejudicial effects of all of the cumulative
      errors in this case undermine confidence in the
      outcome at both the guilt phase and penalty phase
      of petitioner's trial.

Petitioner argues that the factual basis for the claims presented in his petition for writ of habeas corpus were properly presented to the state courts of Pennsylvania.  Petitioner further avers that any state procedural bar precluding this federal court from reviewing the merits of his claims is not supported by an adequate and independent state-law ground, or, alternatively, is available for federal review because cause and prejudice exists.

**<u>Respondents' Contentions</u>**

Respondents contend that petitioner is not entitled to relief on any of his thirteen claims.  Specifically, with respect to petitioner's first claim for ineffective assistance of counsel, respondents aver that trial counsel's investigation was not inadequate and that any failure to present information of petitioner's abusive childhood and medical and educational records was the result of petitioner's failure to inform his trial counsel of this potentially mitigating evidence.

-14-

With respect to petitioner's sixth claim that his trial counsel was ineffective for permitting improper victim impact testimony, respondents argue that statements made by witnesses did not constitute improper victim impact testimony; rather, the comments were merely passing references.  Regarding petitioner's eighth claim that trial counsel was ineffective for failing to present material and relevant evidence, respondents argue that a state-law evidentiary issue does not raise a federal constitutional question and exceeds this federal court's power for habeas review.

Regarding petitioner's ninth claim that trial counsel was ineffective for failing to move in limine to redact petitioner's statement to the police, respondents argue that trial counsel was not ineffective because the jury knew the race of the victim and the trial court conducted voir dire on the subject of racial prejudice.  Additionally, with respect to petitioner's twelfth claim regarding the proportionality review conducted by the Supreme Court of Pennsylvania, respondents assert that the Supreme Court properly conducted the review and held that petitioner's sentence was "not excessive or disproportionate to the sentence imposed in similar cases."[17]

Finally, respondents contend that petitioner's remaining claims, namely petitioner's, second, third, fourth, fifth, seventh, tenth, eleventh, and thirteenth claims, are

---

[17]     Hall, 549 Pa. at 308, 701 A.2d at 210.

-15-

procedurally barred by state law or are not exhausted, and, as a result, are not subject to federal habeas corpus review.

## **STANDARD OF REVIEW**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA")[18] imposes certain procedural requirements and standards on federal courts for analyzing federal habeas corpus petitions.  Specifically, the AEDPA limits habeas corpus relief for claims adjudicated on the merits by a state court.  28 U.S.C. §§ 2254(d)(1)-(2).

Under this deferential standard, habeas corpus relief is barred unless the state court determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §§ 2254(d)(1)-(2).  In addition, a state court's factual findings are "presumed to be correct," and the habeas corpus petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Bond v. Beard, 539 F.3d 256, 263 (3d Cir. 2008).

Furthermore, a state court decision is "contrary to" United States Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case

---

[18]     See 28 U.S.C. §§ 2254(d)(1)-(2) and (e)(1).

-16-

differently than this Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389, 430 (2000).

A state court decision is an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [habeas corpus petitioner's] case." Williams, 529 U.S. at 413, 120 S.Ct. at 1523, 146 L.Ed.2d at 430.

The AEDPA's deferential standards do not apply "unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States." Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005) (quoting Everett v. Beard, 290 F.3d 500, 508 (3d Cir. 2002)).  In cases where the AEDPA standard of review is inapplicable, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." Thomas v. Horn, 570 F.3d 105, 113 (3d Cir. 2009) (quoting Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001)).

## **FACTS**

Following is a summary of the facts underlying petitioner's conviction, as set forth by the Supreme Court of Pennsylvania in Commonwealth v. Hall, 549 Pa. at 280-281, 701 A.2d at 195-196.

On December 18, 1993, Troy Davis, Troy Green and petitioner Darrick U. Hall drove from Philadelphia, Pennsylvania to Coatesville, Chester County, Pennsylvania with the intention of committing a robbery.  Upon arriving in Coatesville at approximately 12:00 o'clock noon, petitioner and his cohorts decided to rob a laundromat located on Main Street.

Petitioner, armed with a loaded .357 caliber magnum revolver, and Mr. Green, armed with a .22 caliber revolver, entered the laundromat while Mr. Davis remained in the vehicle as the getaway driver.  Once inside, Mr. Green stayed at the front entrance and petitioner went to the cashier station at the rear of the laundromat.

Petitioner withdrew his revolver and demanded money from the cashier, victim Donald Johnson.  The victim refused to give petitioner any money and petitioner fired a shot at the victim, grazing his head.  Petitioner fired another shot at the victim from a distance of four to ten inches away, which entered the victim's brain and caused his death.

After shooting the cashier, petitioner backed out of the laundromat waiving his revolver at approximately ten to fifteen patrons.  He then fled with his cohorts to a nearby house in Coatesville.  Petitioner, Mr. Davis and Mr. Green changed clothes at the house and joked about their revolvers with the resident of the house.  On their return to Philadelphia, the three men stopped at a fast-food restaurant and changed their clothes for a second time.

-18-

Detectives from the Chester County District Attorney's Office interviewed three eyewitnesses to the robbery and shooting between December 19, 1993 and December 24, 1993.  On December 23, 1993 petitioner was identified by one eyewitnesses from a photographic array prepared by a Chester County detective.  On December 24, 1993 a second eyewitness independently identified petitioner from the same photographic array.

On December 27, 1993 an arrest warrant was issued for petitioner.  Pursuant to this warrant, Philadelphia police officers arrested petitioner on December 28, 1993 at his mother's home in Philadelphia.  After being arrested, petitioner waived his Miranda[19] rights and confessed to his participation in the robbery and shooting.  However, petitioner explained that the shooting was an accident and resulted from a struggle with the victim.  Petitioner's statement was reduced to a typewritten document by a Chester County detective, which petitioner reviewed, corrected and signed.

## DISCUSSION

### Exhaustion of State Court Remedies

"It is axiomatic that a federal habeas court may not grant a petition for a writ of habeas corpus filed by a person incarcerated from a judgment of a state court unless the petitioner has first exhausted the remedies available in the state courts."  Lambert v. Blackwell, 134 F.3d 506, 513

---

[19]   Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

-19-

(3d Cir. 1997); see also 28 U.S.C. § 2254(b)(1)(A).  The exhaustion requirement is rooted in principles of comity, and it affords state courts the first opportunity to adjudicate constitutional challenges to state convictions.  Coleman v. Thompson, 501 U.S. 722, 731, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640, 657 (1991).

　　　　To properly satisfy the exhaustion requirement, the petitioner must provide the state court with the first opportunity to hear the same claim raised in the federal habeas petition.  Picard v. Connor, 404 U.S. 270, 276, 92 S.Ct. 509, 512, 30 L.Ed.2d 438, 444 (1971).  The petitioner must invoke "one complete round of the State's established appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1, 9 (1999).  Once the issue has been raised on direct appeal, a petitioner is not required to raise it again in a state post-conviction proceeding.  Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).

　　　　The claim must be "fairly presented" to the state courts, which means the petitioner must "present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."  McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999).  "It is not enough that all the facts necessary to support the federal claim were before the state courts...."  Anderson v. Harless, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3, 7 (1982).  The "mere similarity of claims is

insufficient to exhaust." <u>Keller v. Larkins</u>, 251 F.3d 408, 413-414 (3d Cir. 2001) (quoting <u>Duncan v. Henry</u>, 513 U.S. 364, 366, 115 S.Ct. 887, 888, 130 L.Ed.2d 865, 868 (1995)).

However, petitioner is not required to cite "book and verse" to the federal Constitution in his state-law claim. <u>Picard</u>, 404 U.S. at 278, 92 S.Ct. at 513, 30 L.Ed.2d at 445 (internal quotation omitted).  The United States Court of Appeals for the Third Circuit has provided four ways in which petitioners can fairly present a federal claim to state courts without explicitly referencing the federal Constitution or federal laws:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

<u>McCandless</u>, 172 F.3d at 261 (internal quotation omitted).

### Procedural Default and the Relaxed Waiver Rule

A claim may be deemed exhausted where, although it has not been fairly presented to state courts, no state corrective processes are available, or circumstances exist that render such processes ineffective to protect the rights of the petitioner. 28 U.S.C. §§ 2254(b)(1)(B)(i) and (ii); <u>Szuchon v. Lehman</u>, 273 F.3d 299, 323 n.14 (3d Cir. 2001); <u>McCandless</u>, 172 F.3d at 260.

However, where a claim has been deemed exhausted because of petitioner's failure to comply with a state procedural

rule, such claims are considered procedurally defaulted. <u>Werts</u>, 228 F.3d at 192 & n.9.  A federal habeas court "will not review a question of federal law decided by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." <u>Jacobs v. Horn</u>, 395 F.3d 92, 117 (3d Cir. 2005) (internal quotations omitted); <u>see also</u> <u>Bronshtein v. Horn</u>, 404 F.3d 700, 707 (3d Cir. 2005).

A state court decision rests on "independent" state grounds when "resolution of the state procedural law question" does not depend on a "federal constitutional ruling." <u>Laird v. Horn</u>, 159 F.Supp.2d 58, 73 (E.D.Pa. 2001)(Dubois, J.)(internal quotations omitted), <u>aff'd</u>, 414 F.3d 419 (3d Cir. 2005).

For a state rule to provide an "adequate" basis for precluding federal review of a state prisoner's habeas claim, the rule must have been firmly established and regularly followed at the time the alleged default occurred. <u>Albrecht v. Horn</u>, 485 F.3d 103, 115 (3d Cir. 2007).  This requirement ensures that petitioner had fair notice of the need to follow the state procedural rule before barring habeas review. <u>Bronshtein</u>, 404 F.3d at 707.

A state procedural rule is considered "adequate" when it has the following attributes: "(1) the state procedural rule speaks in unmistakable terms; (2) all state appellate courts refused to review the petitioner's claims on the merits; and

(3) the state courts' refusal in this instance is consistent with other decisions." Jacobs, 395 F.3d at 117.

In this case, the Supreme Court of Pennsylvania held that certain claims raised by petitioner on PCRA appeal[20] were waived for petitioner's failure to raise them on direct appeal.[21] Hall, 582 Pa. at 536 n.5, 872 A.2d at 1183 n.5.  Pennsylvania law requires claims to be raised in post-verdict motions to preserve them for appellate review.  Commonwealth v. Gravely, 486 Pa. 194, 198-199, 404 A.2d 1296, 1298 (1979).

---

[20]    The Supreme Court of Pennsylvania held that the following claims were waived for failure to raise them on direct appeal: (1) appellant's constitutional rights were violated by the trial court's failure to inform the jury that a life sentence in Pennsylvania means a life sentence without parole; (2) the prosecutor engaged in numerous acts of misconduct during the penalty phase; (3) the Commonwealth failed to provide appellant adequate notice of the grave risk aggravator; (4) the trial court erred in instructing the jury on the requirements of 42 Pa.C.S.A. § 9711(e)(8) concerning the catch-all mitigating factor of any other mitigation evidence regarding petitioner's character, criminal record and the circumstances of the charged offenses; and (5) the trial court improperly instructed the jury on the use of aggravating and mitigating factors.

[21]    The Supreme Court of Pennsylvania also held that petitioner had failed to overcome waiver by framing the alleged errors in terms of ineffective assistance of counsel.  Hall, 582 Pa. at 536 n. 5, 872 A.2d at 1183 n.5.  The Court held that petitioner's ineffectiveness claims were "undeveloped" and were "based upon a boilerplate assertion of all prior counsel's ineffectiveness...."  Id.  In so holding, the Court applied a state procedural rule whereby the appellant must "meaningfully discuss and apply the standard governing the review of ineffectiveness claims" before he can be entitled to any relief.  Commonwealth v. Bracey, 568 Pa. 264, 273 n.4, 795 A.2d 935, 940 n.4 (Pa. 2001).

The Court acknowledged that it was not denying petitioner relief for failure to properly layer a claim of ineffective assistance of counsel on PCRA review because the applicable standard had not been clearly identified until recently.  Hall, 582 Pa. at 536, 872 A.2d at 1183 n.5.  The Court instead appears to deny relief to petitioner's ineffective assistance claims because petitioner failed to meaningfully discuss and apply Pennsylvania's well-established three-prong test for ineffectiveness identified in Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973 (Pa. 1987).  Hall, 582 Pa. at 536 n.5, 872 A.2d at 1183 n.5.  Accordingly, petitioner's failure to comply with the state procedural rule for pleading is an independent and adequate state-law ground barring relief, and petitioner's claims are procedurally defaulted.

Respondents contend that the Supreme Court of Pennsylvania's waiver renders many of petitioner's claims for habeas relief procedurally defaulted.

Petitioner argues that the procedural default is not supported by adequate state-law grounds because the waiver rule had not been firmly established and regularly followed at the time petitioner took his direct appeal.[22]

For capital cases, the Supreme Court of Pennsylvania established the practice of applying a relaxed waiver rule because of the "final and irrevocable nature of the death penalty." Commonwealth v. Zettlemoyer, 500 Pa. 16, 50 n.19, 454 A.2d 937, 955 n.19 (1982). Accordingly, the Supreme Court of Pennsylvania would not adhere strictly to the normal rules of waiver and would consider the merits of claims otherwise waived for failure to properly preserve for appellate review. Id.; see also Szuchon, 273 F.3d at 325-326. In fact, during petitioner's direct appeal, the Supreme Court of Pennsylvania applied the relaxed waiver rule to claims petitioner had failed to raise in post-verdict motions. Hall, 549 Pa. at 294 n.14,  302 n.17, 701 A.2d at 202 n.14, 207 n.17.

Petitioner was not fairly on notice that the ordinary waiver rule would apply to his capital case on direct appeal because the Pennsylvania courts did not have a firmly established

---

[22]    Petitioner appears to concede that the doctrine of waiver constitutes an "independent" state-law ground for procedural default purposes. See Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus ("Petitioner's Memorandum"), filed October 6, 2006, pages 2-4.

-24-

and regularly followed rule enforcing waiver.  Therefore, as the
United States Court of Appeals for the Third Circuit has held,
the holding that a claim has been waived for petitioner's failure
to raise it on direct appeal in a capital case is not "adequate"
to support the judgment for purposes of procedural default.
Szuchon, 273 F.3d at 327.

        However, Pennsylvania law regarding the application of
the relaxed waiver rule on post-conviction review changed prior
to the conclusion of petitioner's PCRA proceedings.

        On November 23, 1998 the Supreme Court of Pennsylvania
held that the relaxed waiver rule would no longer apply to
capital cases at the post-conviction appellate stage.
Commonwealth v. Albrecht, 554 Pa. 31, 44, 720 A.2d 693, 700
(1998).  The Court held that "the negligible benefits of relaxed
waiver at the PCRA appellate stage are more than outweighed by
the need for finality and efficient use of the resources of this
court."  554 Pa. at 45, 720 A.2d at 700.

        Following Albrecht, the Supreme Court of Pennsylvania
"deems an issue waived where the petitioner failed to present it
to the PCRA court."  Jacobs, 395 F.3d at 117.  Therefore, because
the Supreme Court of Pennsylvania no longer applies the relaxed
waiver rule to capital cases, a petitioner cannot raise a claim
for the first time on a PCRA appeal.  Albrecht, 554 Pa. at 45,
720 A.2d at 700.  Accordingly, after Albrecht the waiver rule
would be considered an "adequate" state-law ground for procedural

default purposes on habeas review because a petitioner would have fair notice of its application in capital cases.[23]

In this case, petitioner had three opportunities following the Supreme Court of Pennsylvania's decision in Albrecht to present his claims to the PCRA court. While petitioner filed his pro se PCRA petition and his amended PCRA petition before Albrecht had been decided, the PCRA court held a hearing on April 22, 1999, provided the petitioner with an opportunity to supplement his petition within forty-five days after the hearing, and, as stated above, the PCRA hearing was held on July 13, 2000. The petitioner had multiple post-Albrecht opportunities to amend his PCRA petition and to present supplemental claims to the PCRA court. The PCRA court denied petitioner's claims on October 19, 2000.

In Wilson v. Beard, 589 F.3d 651, 658 (3d Cir. 2009), the Commonwealth argued that the petitioner's claim was procedurally defaulted based on the Supreme Court of Pennsylvania's holding that petitioner failed to raise the claim in his PCRA petition and failed to seek leave to amend his PCRA petition to add the claim. The Third Circuit held that the waiver rule was not adequate for procedural default purposes because the PCRA proceedings occurred before Albrecht, and the PCRA court denied the petition months before Albrecht had been

---

[23]     The Third Circuit has not explicitly held when the waiver rule, as applied in capital cases on PCRA review, specifically became firmly established and regularly followed. Instead, the Third Circuit has only had occasion to hold that the procedural rule could not have been firmly established and regularly followed before Albrecht. See, e.g., Bronshtein, 404 F.3d at 709.

decided as well.  Id. at 656, 658; see also Jacobs, 395 F.3d at 116-119.

Here, the Supreme Court of Pennsylvania abandoned the relaxed waiver rule in capital cases before petitioner's PCRA proceedings were conducted, and Albrecht had been decided almost two-years before petitioner's PCRA petition was denied. Therefore, applying the waiver rule to petitioner's claims not raised on PCRA review constitutes an "adequate" state-law ground. Accordingly, any of petitioner's claims not raised on PCRA review, but raised for the first time to the Supreme Court of Pennsylvania on PCRA appeal, which were held to be waived, are procedurally defaulted and are not subject to federal habeas review.

## Cause and Prejudice

Petitioner argues that if his claims are procedurally defaulted, this court may consider them because he can establish cause and prejudice for the default.  Specifically, petitioner claims that he was denied effective assistance of counsel because his PCRA counsel failed to present meritorious claims for relief to the PCRA court.

A federal court may still consider the merits of petitioner's procedurally defaulted claim if a petitioner can establish cause and prejudice for his failure to comply with the state procedural rule, or that a fundamental miscarriage of justice would result, requiring excusal of the procedural default.  Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002).

A fundamental miscarriage of justice can be established only in extraordinary cases, and "petitioner must prove that it is more likely than not that no reasonable juror would have convicted him."  Werts, 228 F.3d at 193.

"Cause" for procedural default can be established where some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule.  Id.  The United States Supreme Court has held that ineffective assistance of counsel pursuant to the Sixth Amendment can constitute cause for procedural default.  Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397, 409 (1986).

A petitioner can establish the "prejudice" requirement by showing that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  Werts, 228 F.3d at 193 (internal quotations omitted).  Where ineffective assistance of counsel is the alleged "cause," prejudice occurs "where there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different."  Werts, 228 F.3d at 193 (internal quotations omitted).

Petitioner alleges, without citing any authority, that even though he has no Sixth Amendment right to PCRA counsel, he can still establish "cause" by alleging ineffective assistance of PCRA counsel "so long as the basis for the cause is presented at

-28-

the first opportunity upon removal of the impediment."[24]
Petitioner alleges that PCRA counsel, direct appeal counsel, and
trial counsel were all ineffective.  Petitioner contends that
because he presented his claims of counsel ineffectiveness to the
Supreme Court of Pennsylvania on PCRA appeal, he properly
established cause for procedural default because this was the
first opportunity he had to raise his claims of all prior
counsels' ineffectiveness.

    The United States Supreme Court has held that there is
no constitutional right to an attorney in state post-conviction
proceedings.  Coleman v. Thompson, 501 U.S. 722, 752,
111 S.Ct. 2546, 2566, 115 L.Ed.2d 640, 671 (1991).  Consequently,
a petitioner cannot make a Sixth Amendment claim for ineffective
assistance of post-conviction counsel.  Id.  Only a claim for
constitutionally ineffective assistance of counsel will establish
"cause" for procedural default.  Coleman, 501 U.S. at 753-754,
111 S.Ct. at 2566-2567, 115 L.Ed.2d at 671-672.

    In Coleman, the United States Supreme Court explained
that procedural default resulting from constitutionally
ineffective assistance of counsel is an external factor that is
imputed to the state because of the state's responsibility to
provide competent counsel pursuant to the Sixth Amendment.  Id.
However, "[i]n the absence of a constitutional violation, the
petitioner bears the risk in federal habeas for all attorney

---

[24]     Petitioner's Reply to Commonwealth's Memorandum of Law in Support
of Commonwealth's Answer to Petitioner for a Writ of Habeas Corpus, filed
January 8, 2007, page 5.

errors made in the course of the representation...."

501 U.S. at 754, 111 S.Ct. at 2567, 115 L.Ed.2d at 672.

However, after briefing was closed and oral argument was conducted, the United States Supreme Court created a narrow exception to the rule set forth in Coleman.

In Martinez v. Ryan, ___ U.S. ___, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012) the Supreme Court held that a prisoner may establish cause for the procedural default of an ineffective-assistance-of-trial-counsel claim by demonstrating the ineffectiveness of counsel in an "initial-review collateral proceeding".  The Supreme Court defined "initial-review collateral proceeding" as a collateral proceeding that "provide[s] the first occasion to raise a claim of ineffective assistance at trial." ___ U.S. at ___, 132 S.Ct. at 1315, 182 L.Ed.2d at 282.

Accordingly, while petitioner did not have a constitutional right to PCRA counsel, the alleged ineffectiveness of PCRA counsel may constitute cause for petitioner's procedural default at this stage of the proceedings.  Martinez, supra.  If petitioner has established cause I would normally consider whether petitioner has also established prejudice.

However, because the only issues that I am considering procedurally defaulted involve issues regarding petitioner's sentence hearing, and not his trial, and because I have already determined below that petitioner is entitled to a new sentencing hearing regarding claim one, I conclude that it is unnecessary to

-30-

answer the questions of cause and prejudice at this time because the only relief petitioner would obtain is a new sentence hearing which I have already found is necessary based on claim one.

Finally, petitioner does not allege, nor could he establish, that the procedural default must be excused because petitioner's conviction resulted in a fundamental miscarriage of justice.

Accordingly, petitioner's claims raised for the first time in petitioner's PCRA appeal to the Supreme Court of Pennsylvania, and which were held to be waived, are procedurally defaulted and will not be addressed on habeas review for the reasons set forth above.[25]

### Sentencing Phase Claims

### Trial Counsel's Failure to Present Mitigation Evidence

Petitioner contends in claim one of the habeas petition that he was deprived of effective assistance of counsel during

---

[25]     The following claims alleged in petitioner's habeas petition were raised for the first time in petitioner's PCRA appeal to the Supreme Court of Pennsylvania, which held they were waived, and so they are now procedurally defaulted: (1) petitioner's second claim alleging that petitioner was entitled to an instruction that a life sentence means life without parole under Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), as well as under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution; (2) petitioner's third claim that the trial court's instructions regarding the catch-all mitigating factor contained in 42 Pa.C.S.A. § 9711(e)(8) violated petitioner's Sixth, Eighth, and Fourteenth Amendment rights; (3) petitioner's fourth claim that constitutional error resulted from the trial court error and trial counsel's ineffectiveness regarding the notice petitioner received on the grave risk aggravating factor and the instructions given during the sentencing hearing on the grave risk aggravating factor; (4) petitioner's fifth claim that the prosecutor made improper statements during his closing argument at the penalty phase which violated his Sixth, Eighth, and Fourteenth Amendment rights; and (5) petitioner's seventh claim that the trial court failed to properly instruct the jury on the nature and use of aggravating and mitigating factors in violation of petitioner's Sixth, Eighth, and Fourteenth Amendment rights.

the penalty phase of trial.  Specifically, petitioner asserts that his trial counsel was ineffective because counsel failed to reasonably investigate and present significant mitigating evidence during the penalty phase of the trial regarding his abusive childhood, illnesses and injuries normally associated with developmental and cognitive delays, and his ability to adjust to a structured environment during the years he attended a disciplinary school.  Furthermore, petitioner avers that trial counsel's ineffectiveness prejudiced him.

More specifically, petitioner argues that trial counsel failed to seek out, interview, and present testimony from petitioner's family, friends, and employers, failed to request readily available medical, educational, and court records, and failed to obtain evaluations by a mental health expert.

Respondents maintain that the determination by the Supreme Court of Pennsylvania that trial counsel was not ineffective was not an unreasonable application of United States Supreme Court precedent.  Rather, respondents contend that trial counsel spoke to petitioner and his family, but was never informed of petitioner's abusive childhood or mental health problems.

Furthermore, respondents argue that trial counsel had strategic reasons for presenting only two witnesses during the penalty phase of petitioner's trial and for not presenting evidence of petitioner's school records or employment history.

-32-

Finally, respondents contend that trial defense counsel was not ineffective because counsel discussed the penalty phase of the trial with petitioner and explained that the Commonwealth would be presenting aggravating factors.  Respondents claim that trial counsel informed petitioner that he could present mitigating factors, and that petitioner remained steadfast in his refusal to testify as well as in his refusal to allow his mother or any of the other witnesses who counsel had contacted to testify as to his good character.

### *Pennsylvania Court Decisions*

In his direct appeal, petitioner claimed ineffective assistance of counsel for failure to call available witnesses during the penalty phase of petitioner's trial and failure to present evidence of petitioner's educational background and employment history.  Commonwealth v. Hall, 1995 WL 610249, at *7 (C.P. Chester 1995).  The Supreme Court of Pennsylvania affirmed the Court of Common Pleas of Chester County, holding that petitioner's claim of ineffective assistance of counsel was without merit.  Hall, 549 Pa. at 296-301, 701 A.2d at 204-206.

Specifically, the state Supreme Court concluded that trial counsel was not ineffective for failing to call witnesses during the penalty phase because: (1) "trial counsel employed a reasonable strategy in deciding not to present any of [petitioner's] male friends to testify about [petitioner's] good character since he was of the opinion that none of [petitioner's] male friends would make a good impression on the jury;" (2) the

-33-

Commonwealth would have been able to impeach witnesses Jamal Price and Alfonso Leak with evidence of prior convictions; and (3) the testimony of Wanda Turner, petitioner's girlfriend at the time of his arrest, and Arnelle Howard, the mother of petitioner's second child, would have been cumulative of the testimony given by Sandra Hall, petitioner's mother, and Ursula Jenkins, the mother of petitioner's first child.

Moreover, with respect to the testimony of Arnelle Howard, the state Supreme Court stated that "trial counsel was not ineffective for failing to interview and present Howard as a character witness." Hall, 549 Pa. at 298-301, 701 A.2d at 204-206.

Furthermore, the Supreme Court of Pennsylvania held that trial counsel had a "reasonable basis in not presenting evidence of [petitioner's] educational history" at the Glen Mills School because disclosure of the petitioner's successes would have led to the introduction of evidence that the Glen Mills School is a disciplinary school, and petitioner was placed at the school pursuant to an Order of the Court of Common Pleas of Philadelphia County. Hall, 549 Pa. at 296, 701 A.2d at 203-204.

The Supreme Court further concluded that disclosure of petitioner's educational background would have led to the introduction of the following assessment of petitioner by the Glen Mills School:

> [M]any common behavioral concerns were addressed, those being a poor-self image, a need to develop inner controls to deal with anger and hostility, a need to postpone immediate gratification, a need

> to develop respect for authority, a need to
> develop respect for the rights and property of
> others, a need to develop a higher trust level and
> interpersonal relationships, a need to improve
> relationships with family, a need to improve
> verbal communication skills, a need to learn to
> share personal feelings and need to develop social
> maturity.

Hall, 549 Pa. at 296, 701 A.2d at 203-204.

Finally, the Supreme Court determined that trial defense counsel was not ineffective for failing to present evidence of petitioner's employment history.  Hall, 549 Pa. at 297, 701 A.2d at 204.  After conducting a post-trial hearing, the trial court found that trial counsel did speak to petitioner about his employment record, and had determined that petitioner did not have substantial employment history.  Id.

Specifically, disclosure of petitioner's employment record would have led to the introduction of evidence that petitioner never held a job for longer than eight months and that petitioner was selling drugs to supplement his income while employed by an Atlantic City casino.  Id.  As a result, the state Supreme Court concluded that trial defense counsel employed a reasonable trial strategy for not presenting this evidence.  Id.

In his amended PCRA petition, petitioner raised a claim of ineffective assistance of trial counsel for failure to investigate and present substantial mitigating evidence.  Hall, 582 Pa. at 543, 872 A.2d at 1187.  The Supreme Court of Pennsylvania affirmed the Order of the PCRA court.  Hall, 582 Pa. at 548, 872 A.2d at 1190.  Specifically, the Supreme Court held that petitioner failed to demonstrate that his trial

-35-

counsel's failure to discover evidence of petitioner's abusive childhood, medical problems, and educational history was a result of an unreasonable investigation because trial counsel was never informed of this evidence by petitioner or his family members. <u>Hall</u>, 582 Pa. at 545-547, 872 A.2d at 1188-1189.

Furthermore, trial counsel testified at the PCRA hearing:

> that he discussed the penalty phase of the trial with [petitioner], explained that the Commonwealth would be presenting aggravating factors, and informed [petitioner] that he could present mitigating factors. Additionally, counsel testified that [petitioner] remained steadfast in his refusal to testify, even after he was advised by counsel that it would be in his best interest.... Indeed, Appellant informed counsel that he did not want his mother or any of the other witnesses who counsel had contacted to testify as to his good character. Notwithstanding [petitioner's] objections, trial counsel chose to call [petitioner's] mother and the mother of one of his children, both of whom essentially testified that [petitioner] had a "good heart" and was a caring person.

<u>Hall</u>, 582 Pa. at 547, 872 A.2d at 1190.

Relying on trial counsel's testimony, the state Supreme Court concluded that petitioner failed to establish that trial counsel was ineffective for failing to investigate mitigating evidence because trial counsel "essentially followed [petitioner's] wishes in not presenting additional mitigating evidence." <u>Hall</u>, 582 Pa. at 547, 872 A.2d at 1190.

### ***Legal Standard for Ineffective Assistance of Counsel***

Initially, I must consider the proper standard for assessing ineffective assistance of counsel claims alleging that

-36-

trial counsel failed to properly investigate and present mitigating evidence during a capital sentencing hearing. Following this discussion, I will examine the mitigating evidence which trial counsel actually presented at petitioner's sentencing hearing, followed by an examination of the mitigating evidence petitioner alleges was available, but not presented, at the time of the sentencing hearing.

Finally, I will conduct an analysis of whether the Supreme Court of Pennsylvania's decision (that counsel's performance was not deficient) was contrary to, or an unreasonable application of, United States Supreme Court precedent, or was based on an unreasonable determination of the facts in light of the record.

### *Strickland* Standard

A claim of ineffective assistance of counsel involves two elements which must be shown by defendant: (1) counsel's performance must have been deficient, meaning that counsel made errors so serious that he was not functioning as "the counsel" guaranteed by the Sixth Amendment; and (2) the deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984).

To establish a deficiency in counsel's performance, a convicted defendant must demonstrate that the representation fell below an "objective standard of reasonableness" based on the particular facts of the case and viewed at the time of counsel's

conduct.  <u>Strickland</u>, 466 U.S. at 688, 104 S.Ct. at 2064-2065,
80 L.Ed.2d at 693-694; <u>Senk v. Zimmerman</u>, 886 F.2d 611, 615
(3d Cir. 1989).  There is a "strong presumption that counsel's
conduct falls within the wide range of reasonable professional
assistance; that is, defendant must overcome the presumption
that, under the circumstances, the challenged action might be
considered sound trial strategy".  <u>Strickland</u>, 466 U.S. at 689,
104 S.Ct. at 2065, 80 L.Ed.2d at 694-695 (internal quotation
omitted).

To establish the second <u>Strickland</u> prong, "defendant
must show that there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding
would have been different."  466 U.S. at 694, 104 S.Ct. at 2068,
80 L.Ed.2d at 698.

Specific to counsel's duty to investigate, the United
States Supreme Court has explained that:

> [S]trategic choices made after thorough
> investigation of law and facts relevant to
> plausible options are virtually unchallengeable;
> and strategic choices made after less than
> complete investigation are reasonable precisely to
> the extent that reasonable professional judgments
> support the limitations on investigation. In other
> words, counsel has a duty to make reasonable
> investigations or to make a reasonable decision
> that makes particular investigations unnecessary.
> In any ineffectiveness case, a particular decision
> not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying
> a heavy measure of deference to counsel's
> judgments.
>
> The reasonableness of counsel's actions may
> be determined or substantially influenced by the
> defendant's own statements or actions. Counsel's
> actions are usually based, quite properly, on

> informed strategic choices made by the defendant and on information supplied by the defendant.
>
> . . .
>
> For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Strickland, 466 U.S. at 690-691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695-696.

### *Duty to Investigate Mitigating Evidence*

The United States Supreme Court's application of the Strickland standard with regard to defense counsel's duty to investigate mitigating evidence provides relevant guidance in this case.

In Williams v. Taylor, supra, the United States Supreme Court concluded that trial counsel was ineffective because his representation of the petitioner during the penalty phase of the trial did not meet professional standards and prejudiced the petitioner.  529 U.S. at 395-397, 120 S.Ct. at 1514-1516, 146 L.Ed.2d at 419-420.

The record in Williams established that trial counsel did not begin to prepare for the penalty phase until a week before the trial.  Williams, 529 U.S. at 395, 120 S.Ct. at 1514, 146 L.Ed.2d at 419.  The record also demonstrated that trial counsel presented the testimony of three witnesses during the

-39-

penalty phase: petitioner's mother, two neighbors who briefly described the petitioner as a "nice boy" and not violent, and a taped excerpt of a psychiatrist who explained that, during an earlier robbery, the petitioner removed the bullets from a gun to ensure no one was physically injured. Williams, 529 U.S. at 369, 120 S.Ct. at 1500, 146 L.Ed.2d at 403.

However, the United States Supreme Court held that trial counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing [petitioner's] nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." Williams, 529 U.S. at 395, 120 S.Ct. at 1514, 146 L.Ed.2d at 419. The Court also explained that trial counsel failed to introduce available evidence that petitioner was "borderline mentally retarded" or to seek prison records, which demonstrated petitioner's commendable acts and nonviolent behavior. Williams, 529 U.S. at 396, 120 S.Ct. at 1514, 146 L.Ed.2d at 419.

Furthermore, the United States Supreme Court in Williams explained that although not all of the additional evidence was favorable, "the failure to introduce the comparatively voluminous amount of evidence that did speak in [petitioner's] favor was not justified by a tactical decision to focus on [petitioner's] voluntary confession." Williams, 529 U.S. at 396, 120 S.Ct. at 1514, 146 L.Ed.2d at 420. The Supreme Court held that these omissions "clearly demonstrate that

trial counsel did not fulfill their obligation to conduct a
thorough investigation of the [petitioner's] background."
Williams, 529 U.S. at 396, 120 S.Ct. at 1514-1515, 146 L.Ed.2d
at 420.

　　　Finally, the Supreme Court determined that the state
supreme court's determination that petitioner was not prejudiced
was unreasonable because it failed to evaluate all of the
mitigation evidence available to trial defense counsel.
Williams, 529 U.S. at 397-398, 120 S.Ct. at 1515, 146 L.Ed.2d at
421.

　　　In Wiggins v. Smith, 539 U.S. 510, 523, 123 S.Ct. 2527,
2536, 156 L.Ed.2d 471, 485-486 (2003), the United States Supreme
Court emphasized that the focus of the inquiry regarding whether
counsel exercised reasonable professional judgment, "is not
whether counsel should have presented a mitigation case," but,
rather, "whether the investigation supporting counsel's decision
not to introduce mitigating evidence of [petitioner's] background
was itself reasonable." (emphasis in original).  The Court
further explained that "Strickland does not establish that a
cursory investigation automatically justifies a tactical decision
with respect to sentencing strategy."  Wiggins,
539 U.S. at 527, 123 S.Ct. at 2538, 156 L.Ed.2d at 488.

　　　Based on this rationale, the United States Supreme
Court in Wiggins concluded that trial counsel were ineffective
for "abandon[ing] their investigation of petitioner's background
after having acquired only rudimentary knowledge of his history

-41-

from a narrow set of sources" and "in light of what counsel actually discovered" in the records they did obtain.  <u>Wiggins</u>, 539 U.S. at 524-525, 123 S.Ct. at 2537, 156 L.Ed.2d at 487.

Specifically, the record in <u>Wiggins</u> demonstrated that trial counsels' investigation drew from three sources: (1) the results of a psychological testing, which revealed that petitioner had difficulty coping with demanding situations and exhibited features of personality disorder; (2) the presentence investigation report; and (3) records from Baltimore County Department of Social Services detailing petitioner's placements in multiple foster homes.  <u>Wiggins</u>, 539 U.S. at 523, 123 S.Ct. at 2537, 156 L.Ed.2d at 486.

Finally, after reweighing the evidence in aggravation against the totality of available mitigating evidence, the United States Supreme Court concluded that the petitioner was prejudiced by counsel's ineffectiveness.  The Supreme Court reasoned that the petitioner's sentencing jury only heard one significant mitigating factor, and "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a difference balance."  <u>Wiggins</u>, 539 U.S. at 537, 123 S.Ct. at 2543, 156 L.Ed.2d at 495.

Furthermore, counsel's duty to investigate mitigating evidence persists even in the absence of support from petitioner. In <u>Rompilla v. Beard</u>, 545 U.S. 374, 377, 125 S.Ct. 2456, 2460, 162 L.Ed.2d 360, 369 (2005), the United States Supreme Court held

-42-

"that even when a capital defendant's family members and the
defendant himself have suggested that no mitigating evidence is
available, his lawyer is bound to make reasonable efforts to
obtain and review material that counsel knows the prosecution
will probably rely on as evidence of aggravation at the
sentencing phase of trial."

Similarly, in Porter v. McCollum, the United States
Supreme Court held that although the petitioner was fatalistic
and uncooperative in trial counsel's investigation, counsel still
must "conduct *some* sort of mitigation investigation."
558 U.S. 30, 40, 130 S.Ct. 447, 453, 175 L.Ed.2d 398, 406
(2009)(emphasis in original).

In Rompilla, supra, trial counsel interviewed
petitioner and five family members and consulted with three
mental health experts in an effort to uncover mitigation
evidence.  545 U.S. at 381-382, 125 S.Ct. at 2462, 162 L.Ed.2d at
372.  The petitioner's contributions were minimal and he "was
even actively obstructive by sending counsel on false leads."
545 U.S. at 381, 125 S.Ct. at 2462, 162 L.Ed.2d at 372.  The
state postconviction court characterized trial counsel's
interviews of family members as "detailed."  Rompilla,
545 U.S. at 381-382, 125 S.Ct. at 2462-2463, 162 L.Ed.2d at 372.

Defense trial counsel in Rompilla did not seek
petitioner's education records, medical records, records of his
adult and juvenile incarcerations, or the record of petitioner's
prior conviction.  Rompilla, 545 U.S. at 382, 125 S.Ct. at 2463,

-43-

162 L.Ed.2d at 372.  However, had trial counsel obtained the record of petitioner's prior conviction, "[t]he accumulated entries would have destroyed the benign conception of [petitioner's] upbringing and mental capacity" that trial counsel gleaned from only talking with the petitioner and his family members.  Rompilla, 545 U.S. at 391, 125 S.Ct. at 2468, 162 L.Ed.2d at 378.

The United States Supreme Court in Rompilla held that this ineffective assistance of trial counsel prejudiced the petitioner because "the undiscovered evidence, taken as a whole, might well have influenced the jury's appraisal' of [petitioner's] culpability."  Rompilla, 545 U.S. at 393, 125 S.Ct. at 2469, 162 L.Ed.2d at 379. (internal quotations omitted).

The United States Supreme Court has subsequently confirmed that Williams, Wiggins, and Rompilla, supra, present the appropriate standards for evaluating whether counsel's performance was deficient at the penalty phase.  Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1406-1407 & n.17, 179 L.Ed.2d 557, 578 & n.17 (2011).  The Supreme Court additionally confirmed that Strickland requires a case-by-case analysis of the evidence available and the circumstances faced by defense counsel when evaluating the reasonableness of counsel's investigation into mitigating circumstances.  Cullen, __ U.S. at __, 131 S.Ct. at 1406-1408, 179 L.Ed.2d at 578-580.

In Cullen, the United States Supreme Court concluded that defense counsel was not ineffective in presenting sparse

-44-

mitigating evidence because his client was so unsympathetic that
counsel's decision to only call his client's mother at the
penalty phase, in an attempt to create sympathy for his client's
family, was a reasonable strategy in light of the circumstances.
__ U.S. at __, 131 S.Ct. at 1405-1406, 179 L.Ed.2d at 577.

  The Supreme Court in <u>Cullen</u> held that because of
defendant's extensive criminal past and lack of remorse,
counsel's reasonable decision to focus on creating sympathy for
defendant's family made "particular investigations unnecessary",
such as seeking mitigating evidence to "humaniz[e] the
defendant".  <u>Cullen</u>, __ U.S. at __, 131 S.Ct. at 1407-1408,
179 L.Ed.2d at 579-580 (internal quotations omitted).

  Further, the Supreme Court explained that the state
court decisions that defendant was not prejudiced were entitled
to deference because the additional available mitigation evidence
largely duplicated the evidence already presented during the
proceedings and, further, was of questionable mitigating value.
<u>Cullen</u>, __ U.S. at __, 131 S.Ct. at 1410, 179 L.Ed.2d at 582.

### *American Bar Association Guidelines*

  Another source relied upon by the United States Supreme
Court to determine whether counsel's conduct falls within the
range of prevailing professional norms is the standards
articulated by the American Bar Association.  <u>Strickland</u>,
466 U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

  The Supreme Court explained that the American Bar
Association standards are only guides.  "No particular set of

detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id.; see also Rompilla, 545 U.S. at 387-388, 125 S.Ct. at 2466, 162 L.Ed.2d at 375-376; Bond v. Beard, 539 F.3d at 288.  The ABA Guidelines are to be regarded "merely as evidence of what reasonably diligent attorneys would do." Bobby v. Van Hook, 558 U.S. 4, 8, 130 S.Ct. 13, 17, 175 L.Ed.2d 255, 259 (2009).

Specific to capital cases, the American Bar Association Standards instruct counsel for capital defendants to comply with the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). ABA Standards for Criminal Justice: Prosecution and Defense Function (3d ed. 1993), Standard 4-1.2(c).

The ABA Guidelines adopted in February 1989 are applicable in this case because they were in effect at the time trial counsel represented petitioner.  American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 1989, available at http://adwww2.americanbar.org/DeathPenalty_migrated/RepresentationProject/PublicDocuments/1989Guidelines.pdf.  See Bobby, supra.

"The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut

any aggravating evidence that may be introduced by the
prosecutor.'"  <u>Wiggins</u>, 539 U.S. at 524, 123 S.Ct. at 2537,
156 L.Ed.2d at 486 (quoting ABA Guidelines, 11.4.1(C)).

    According to the ABA Guidelines, this preparation and
investigation for the penalty phase should begin "immediately
upon counsel's entry into the case" and "should be conducted
regardless of any initial assertion by the client that mitigation
is not to be offered."  ABA Guidelines 11.8.3 and 11.4.1(C).

    During the investigation, counsel should collect
information relevant to the penalty phase including: (1) medical
history; (2) educational history; (3) employment and training
history; (4) family and social history; (5) prior adult and
Juvenile record; (6) prior correctional experience; and
(7) religious and cultural influences.  ABA Guidelines
11.4.1(D)(2)(C).  Counsel should also secure the assistance of an
expert where it is necessary for the presentation of mitigating
evidence.  ABA Guidelines 11.4.1(D)(7)(D).

    Additionally, counsel should investigate the following
witnesses and evidence: (1) witnesses familiar with, and evidence
relating to, the client's life and development, from birth to the
time of sentencing, who would be favorable to the client;
(2) expert witnesses to provide medical, psychological,
sociological or other explanations for the offenses for which the
client is being sentenced, to give a favorable opinion as to the
client's capacity for rehabilitation; (3) witnesses with
knowledge and opinions about the lack of effectiveness of the

-47-

death penalty itself; and (4) witnesses drawn from the victim's family or intimates who are willing to speak against killing the client.  ABA Guidelines 11.8.3(F).

The ABA Guidelines also provide standards regarding counsel's duty to present "all reasonably available evidence in mitigation unless there are strong tactical reasons to forego some portion of such evidence."  ABA Guidelines 11.8.6(A). Reasonably available evidence may include medical history; educational history; employment and training history; family and social history; prior correctional experience; rehabilitative potential of the client; record of prior offenses, especially where there is no record, a short record, or a record of non-violent offenses; and expert testimony concerning the impact of such evidence on the client.  ABA Guidelines 11.8.6(B).

### *Mitigation Evidence Presented at Penalty Phase*

In the case before this court, petitioner's counsel called two witnesses at the penalty phase of his trial, who testified generally to petitioner's good character and willingness to help others.  In addition, trial counsel asked the court to acknowledge petitioner's other family members and friends seated in the court room by asking them to stand and show their support for petitioner.[26]

---

[26]    See Notes of Testimony of the jury trial conducted before The Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas of Chester County, Pennsylvania on October 28, 1994 ("N.T. October 28, 1994) pages 913-914, which can be found in the state-court record forwarded to the Clerk of Court, United States District Court for the Eastern District of Pennsylvania and made part of the record in the within matter.

Petitioner's mother, Sandra Hall, testified first.  She testified that petitioner lived with her until he was twenty years old and helped take care of his two sisters.[27]  Ms. Hall explained that petitioner's father moved out of their home when petitioner was only three years old and that she never received financial support from petitioner's father.[28]  She testified that petitioner had been working since the age of nineteen and made efforts to provide additional support to her when she was in need.[29]

Ms. Hall also testified that petitioner did not complete his formal education because "he was expecting a child", and, instead, got a job in order to provide his child's mother with financial support.[30]  She described petitioner as a loving father to his two daughters, stating that he often spent time with them.[31]

Ms. Hall further described petitioner as a caring and forgiving person, recounting that petitioner "found it in his heart to forgive [his father]."[32]  Ms. Hall's testimony concluded

---

[27]    See N.T. October 28, 1994 at pages 879-880.

[28]    See Id. at page 879.

[29]    See Id. at pages 881-882.

[30]    See Id. at page 883.

[31]    See Id. at page 883.

[32]    See Id. at pages 884-885.

by explaining petitioner's remorse for his actions in the robbery and shooting, and that he realizes that he made a mistake.[33]

Ursula Jenkins, the mother of petitioner's first child, also testified during the penalty phase of petitioner's trial. Ms. Jenkins testified that she had known petitioner for seven years and that she and petitioner have a daughter together.[34] Ms. Jenkins described petitioner as sensitive and supportive, specifically, throughout her pregnancy and when she suffered the loss of her grandmother.[35]  She further explained that petitioner had a good relationship with their daughter, stating that petitioner "called her, and he would come and see her, he would come and take her places, and he would buy her things."[36] Ms. Jenkins also testified that petitioner helped her forgive her father because, similar to petitioner, her father abandoned her as a child.[37]

### ***Mitigation Evidence Available at the Time of Penalty Phase***

Petitioner contends that his trial counsel failed to reasonably investigate his life, medical, educational, and employment history, and performed no expert mental health evaluation in preparation for the penalty phase of petitioner's trial.  In support of this contention, petitioner demonstrates,

---

[33]     See N.T. October 28, 1994, at page 887.

[34]     See Id. at pages 897-898.

[35]     See Id. at pages 900-901.

[36]     See Id. at page 900.

[37]     See Id. at page 899.

through affidavits, records, and testimony, that he suffered an abusive and neglectful childhood, a history of seizures and several severe head traumas.  He also presents school records concerning his ability to adjust to a structured environment during his years in a disciplinary school.

Affidavits from petitioner's family members, family court records, medical records, and school records provide compelling evidence of petitioner's abusive and violent childhood.

Had trial defense counsel interviewed petitioner's family members and obtained these readily available records (as evidenced by them now being acquired by petitioner's counsel and made a part of the record), trial counsel presumably would have learned that the abusive relationship between petitioner's mother, Sandra Hall, and father, Eulah "Mitch" Hall, began before petitioner was born.  He also may have learned that while petitioner's mother was pregnant with petitioner, petitioner's father punched her in the stomach.[38]

According to the affidavit of Sandra Hall, the abuse of petitioner's mother continued after petitioner was born, and occurred in his presence.[39]  Several affidavits reveal that petitioner's father knocked petitioner's mother down a flight of

---

[38]     Declaration and Affidavit of Sandra Hall, Appendix to Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus ("Petitioner's Appendix"), Exhibit A.

[39]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F.

stairs, kicked her, hit and punched her, raped her, pulled knives on her and threatened to kill her.[40]  According to Ms. Hall's affidavit, on one occasion, petitioner's father kept petitioner's mother in the house and repeatedly raped and beat her until friends were able to free her.[41]

According to four of the affidavits, petitioner witnessed his father break his mother's arm and routinely abuse her.  When petitioner's mother attempted to argue or fight back, petitioner's father beat her again.  In addition to this physical abuse, petitioner's father was verbally and emotionally abusive, regularly referring to petitioner's mother as "bitch" and "whore" and insulting her in front of others.[42]

Trial counsel presumably would have also learned that in addition to the violence that petitioner witnessed between his mother and father, petitioner and his sister were also abused.[43]

---

[40]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Declaration and Affidavit of Eula Hall, Petitioner's Appendix, Exhibit B; Affidavit/Declaration of Sharon McKenzie, Petitioner's Appendix, Exhibit E; Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F; Affidavit/Declaration of Diane Howard, Petitioner's Appendix, Exhibit G; Declaration and Affidavit of Eleanor Paschall, Petitioner's Appendix, Exhibit I.

[41]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A.

[42]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Declaration and Affidavit of Eula Hall, Petitioner's Appendix, Exhibit B; Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F; Affidavit/Declaration of Diane Howard, Petitioner's Appendix, Exhibit G.

[43]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F.

According to petitioner's mother, petitioner's father beat petitioner, calling him a "faggot" when he cried.[44]  According to several affidavits, petitioner's mother was also abusive toward her children and beat them with a belt.[45]

Petitioner's mother explained that petitioner even drew a door on the wall of his room in an effort to escape from the horrors of his home.[46]  Petitioner's aunt described him as a "sad and confused child" who "became a nervous kid because of the way he had to live."[47]

In addition, affidavits of five individuals reveal that petitioner's father brought drugs into petitioner's home and used drugs in the presence of petitioner and his sister.[48]  To satisfy his addiction, petitioner's father used money that was budgeted for household expenses to buy drugs, which resulted, at times, in no electricity, heat, or adequate food in the home.[49]

---

[44]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A.

[45]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Declaration and Affidavit of Eula Hall, Petitioner's Appendix, Exhibit B;  Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F.

[46]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A.

[47]     Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F.

[48]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Declaration and Affidavit of Eula Hall, Petitioner's Appendix, Exhibit B; Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F; Declaration and Affidavit of Charles McCurry Jr., Petitioner's Appendix, Exhibit H; Declaration and Affidavit of Eleanor Paschall, Petitioner's Appendix, Exhibit I.

[49]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A.

Affidavits reveal that the violence displayed by petitioner's father toward his family ended when petitioner was five years old.  At that time, his father was arrested and convicted for aggravated assault.[50]

However, several affidavits indicate that while petitioner's father was incarcerated, petitioner's mother became involved in a second violent relationship with Steve Paschall.[51] Petitioner attempted to protect his mother when Mr. Paschall abused her, but, instead, Mr. Paschall would turn on petitioner.[52]  As a result, petitioner's mother began drinking as a way to cope with the abuse.[53]

Although the relationship between petitioner's mother and Mr. Paschall ended after eleven years, family court records indicate that the abuse continued because they shared custody of

---

[50]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Court History of Eula Hall, Petitioner's Appendix, Exhibit C.

[51]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Declaration and Affidavit of Eula Hall, Petitioner's Appendix, Exhibit B;  Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F; Affidavit/Declaration of Diane Howard, Petitioner's Appendix, Exhibit G; Declaration and Affidavit of Charles McCurry Jr., Petitioner's Appendix, Exhibit H; Declaration and Affidavit of Eleanor Paschall, Petitioner's Appendix, Exhibit I.

[52]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F; Affidavit/Declaration of Diane Howard, Petitioner's Appendix, Exhibit G; Declaration and Affidavit of Charles McCurry Jr., Petitioner's Appendix, Exhibit H.

[53]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F; Affidavit/Declaration of Diane Howard, Petitioner's Appendix, Exhibit G.

petitioner's younger half-sister.[54]  Petitioner dealt with his violent surroundings by drinking and spending as much time as possible outside of the home.[55]

Testimony in an evidentiary hearing before the trial judge indicated that petitioner's friends were also available to testify to petitioner's alleged reputation in the community for good character.  Jamal Tyson knew petitioner for ten years and was present and available to testify at the penalty phase of petitioner's trial.  Mr. Tyson was a college graduate working as a computer operator and a paralegal.  He would have testified that petitioner acted as a role model and father figure to him and his younger brother; encouraged him to stay in school and, on some occasions, escorted him to school; provided him with clothes; and helped Mr. Tyson's mother with groceries and projects around the house.[56]

An affidavit from petitioner's cousin, Donald Holloway, indicates that Mr. Holloway would have testified that petitioner looked out for him and kept him out of trouble.  Specifically,

---

[54]     Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F; Declaration and Affidavit of Charles McCurry Jr., Petitioner's Appendix, Exhibit H; Family Court records of the Court of Common Pleas of Philadelphia County, Petitioner's Appendix; Exhibit O.

[55]     Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F.

[56]     See Notes of Testimony of the evidentiary hearing before The Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas of Chester County, Pennsylvania on October 20, 1995 ("N.T. October 28, 1994") pages 4-12.

Mr. Holloway would have testifed that petitioner talked him out of using violence on at least one occasion.[57]

Had trial counsel interviewed petitioner's family members and obtained readily available medical records, trial counsel would have learned that petitioner also suffered from medical problems from an early age.  Doctors at St. Christopher's Hospital made a note in petitioner's medical chart when he was four-and-a-half months old to "watch neuro development."[58]

Furthermore, petitioner was brought to the emergency room numerous times suffering from seizures.[59]   At fourteen months old, petitioner experienced a convulsion which lasted thirty minutes.  Medical records reflect that, following the seizure, petitioner was lethargic and was not bearing weight on his right leg.  Petitioner was diagnosed with a seizure disorder after results from an Electroencephalography exam came back abnormal.[60]

In addition, petitioner suffered a series of other medical conditions.  Medical records indicate that when petitioner was eight months old, he was brought to the emergency

[57]    Affidavit/Declaration of Donald Holloway, Petitioner's Appendix, Exhibit J.

[58]    Medical records from St. Christopher's Hospital for Children, Petitioner's Appendix, Exhibit M.

[59]    Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A; Declaration and Affidavit of Eula Hall, Petitioner's Appendix, Exhibit B;  Affidavit/Declaration of Sharon McKenzie, Petitioner's Appendix, Exhibit E; medical records from St. Christopher's Hospital for Children, Petitioner's Appendix, Exhibit M.

[60]    Medical records from St. Christopher's Hospital for Children, Petitioner's Appendix, Exhibit M.

room, and his entire face was swollen.  Petitioner was also diagnosed multiple times as a young child with pneumonia and was frequently brought to the hospital because of difficulty breathing and skin rashes.  Petitioner's medical records also indicate that petitioner was not brought to many scheduled appointments.[61]

Furthermore, according to his mother's affidavit, in 1982, while petitioner was riding his bicycle he was hit by a car.  He hit his head and lost consciousness.  After the accident, petitioner suffered from severe and debilitating headaches.[62]

Petitioner's family members and friends assert that they were available and willing to testify at the penalty phase of petitioner's trial.  Eight potential witnesses (excluding petitioner's mother) stated that defense counsel never contacted them.[63]  Petitioner's mother did attest, however, that trial counsel never asked her about petitioner's upbringing.[64]

---

[61]    Medical records from St. Christopher's Hospital for Children, Petitioner's Appendix, Exhibit M.

[62]    Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A.

[63]    Declaration and Affidavit of Eula Hall, Petitioner's Appendix, Exhibit B; Declaration and Affidavit of Steve Paschall, Petitioner's Appendix, Exhibit D; Affidavit/Declaration of Sharon McKenzie, Petitioner's Appendix, Exhibit E;  Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F; Affidavit/Declaration of Diane Howard, Petitioner's Appendix, Exhibit G; Declaration and Affidavit of Charles McCurry Jr., Petitioner's Appendix, Exhibit H; Declaration and Affidavit of Eleanor Paschall, Petitioner's Appendix, Exhibit I; Affidavit/Declaration of Donald Holloway, Petitioner's Appendix, Exhibit J.

[64]    Declaration and Affidavit of Sandra Hall, Petitioner's Appendix, Exhibit A.

Petitioner also contends that trial counsel should have investigated and presented evidence of his school records to demonstrate his low intelligence and absence of parental support. Had trial counsel obtained these readily available school records, he would have learned that, in the third grade, petitioner's teacher commented that petitioner was "a hard worker but he has a problem getting along with his classmates" and needed to "avoid arguing with his classmates."  His fourth grade teacher noted that petitioner needed to "show more self confidence" and that "he seems very disturbed by the disruptiveness of his classmates."[65]

Petitioner's seventh grade teacher commented that petitioner "has been exhibiting poor behavior" and "may repeat the 7th grade unless there is a vast improvement in his grades." In 1987, petitioner missed ninety-two days of school and did not pass tenth grade.[66]  Furthermore, correctional records from December 1987, reveal that a psychological evaluation concluded that petitioner was functioning with an IQ of 73, considerably below the normative average.[67]

Petitioner argues that trial counsel should have sought the readily available records from his court placement at the

---

[65]    See Petitioner's Appendix, Exhibit N, school records from the School District of Philadelphia.

[66]    Id.

[67]    See Petitioner's Appendix, Exhibit P, Psychological Summary dated December 17, 1987.

Glen Mills School and presented evidence of his success in a
structured environment.[68]

Glens Mills School is a private juvenile placement
facility for 13 to 18 year old children.  Glen Mills has both
private placements and court-ordered placements, with the great
majority coming from the courts.  Students are placed at Glen
Mills from all over the country and around the world.  Glen Mills
provides both a regular school curriculum, as well as numerous
vocational programs.

Petitioner argues that in addition to his school
records, testimony from Scott Grau, custodian of records for the
Glen Mills School, would have indicated that he earned vocational
certificates, obtained his General Equivalency Diploma ("GED")
and was taking college preparatory classes at Glen Mills.[69]

The Glen Mills School records show that, initially,
however, petitioner lacked confidence and had difficultly sharing
his feelings.  Specifically, the records indicate:

> He is always attentive and somewhat apprehensive
> about sharing his personal feelings.  When
> [petitioner] does join the interaction, his
> comments are usually on target and indicative of
> considerable empathy and genuineness, but because
> he seldom gives input his impact is rather

---

[68]    In support of this argument, petitioner quotes <u>Skipper v. South
Carolina</u>, 476 U.S. 1, 7, 106 S.Ct. 1669, 1672, 90 L.Ed.2d 1, 8 (1986) for the
proposition that "a defendant's disposition to make a well-behaved and
peaceful adjustment to life in prison is itself an aspect of his character
that is by its nature relevant to the sentencing determination."

[69]    <u>See</u> Notes of Testimony of the evidentiary hearing conducted before
The Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas
of Chester County, Pennsylvania on September 21, 1995 ("N.T. September 21,
1995) pages 13-15; Petitioner's Appendix, Exhibit P, Glen Mills School 4th
Comprehensive Review dated December 29, 1988.

> insignificant.  Once he develops more confidence
> in himself and as he becomes more trusting of the
> other group members, it is felt that
> [petitioner's] ability to profit from this form of
> therapy will increase significantly.[70]

Petitioner's later records reflect his growth and achievements in a structured setting.  In addition to earning his GED and two vocational certificates, petitioner was elected by the Glen Mills staff to leadership positions in the school as a result of his positive adjustments.

Specifically, staff elected petitioner as a member of the Battling Bulls Club, a student government organization "that identifies positive students and their positive interaction while they are at Glen Mills" and as a unit representative, a position for which less than ten percent of the students are deemed qualified.[71]  Finally, Mr. Grau could have testified that the school administration believed that petitioner could have benefitted from further placement at the Glen Mills School to continue college preparatory courses, and even become eligible for college scholarship programs.[72]

Additionally, petitioner argues that trial counsel was ineffective for failing to further investigate or verify the information petitioner provided regarding his employment history. Had trial counsel verified petitioner's employment history, he

---

[70]    Petitioner's Appendix, Exhibit P, Glen Mills School 1st Comprehensive Report dated February 26, 1988.

[71]    See N.T. September 21, 1995, pages 11-12; Glen Mills School 3rd Comprehensive Report dated October 27, 1988, Petitioner's Appendix, Exhibit P.

[72]    See Id. at pages 19-21.

would have learned that petitioner worked in Atlantic City casinos for approximately one year, he worked as a salesperson at Olympia Sports in Philadelphia for a year, he held jobs on various assembly lines, and drove a cab for a year.[73]  He also held other additional temporary jobs, such as selling Christmas trees and  t-shirts, to earn extra money to support his daughters and his girlfriend's four other children.[74]

Finally, petitioner contends that counsel was ineffective for failing to consult with, and present testimony from, a mental health expert, who could have explained to a jury how cognitive, developmental emotional impairments impacted petitioner at the time of the incident.

In this regard, petitioner contends that counsel was also ineffective for failing to contact Charles M.J. Nester, Esquire, the public defender assigned to petitioner's case before petitioner retained private counsel.  Petitioner contends that such a contact would have revealed that Attorney Nester retained a forensic psychiatrist to evaluate petitioner.  Following the evaluation, the forensic psychiatrist recommended that petitioner undergo further testing by a psychologist.[75]

---

[73]   See Notes of Testimony of the evidentiary hearing conducted before the Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas of Chester County, Pennsylvania on October 20, 1995 ("N.T. October 20, 1995") pages 98-106.

[74]   N.T. October 20, 1995, pages 98-106.

[75]   See Affidavit/Declaration of Charles M.J. Nester, Esq., Petitioner's Appendix, Exhibit K.

On August 27, 2001, Dr. Carol Armstrong, a psychologist specializing in neuropsychology, reviewed petitioner's various medical, educational, and court records; family affidavits; transcripts from his legal proceedings; and other records, and conducted a forensic neuropsychological assessment of petitioner. She maintained that this mental health information was available, and that the administered tests were the same as, or, substantially similar to, tests available at the time of petitioner's trial.[76]

Dr. Armstrong explained that the materials she reviewed "demonstrate that [petitioner] suffered a long history of severe psychological and physical abuse and neglect, together with chronic trauma/stress which significantly impact cognitive and developmental development."[77]  Dr. Armstrong further explained that because of these emotional and mental impairments, and petitioner's medical background, including his head injuries and seizure disorder, petitioner "suffers from impairment in cognitive function, including his ability to reason, his perception and his ability to integrate information. Furthermore, petitioner suffers from impairment in his ability to engage in behavior based on thoughtful reflection, consideration of alternatives and consequences, and good judgment."[78]

---

[76]    Appendix A-HH to the Answer to Petition for Writ of Habeas Corpus, which answer was filed on behalf of respondents on May 30, 2006 (Respondents' Appendix") Appendix DD, Exhibit A ¶ 18,

[77]    Respondents' Appendix DD, Exhibit A ¶ 4,

[78]    Respondents' Appendix DD, Exhibit A ¶ 16

In conclusion, Dr. Armstrong opined "to a reasonable degree of neuropsychological certainty that, at the time of the incident for which he was convicted, petitioner was under the influence of extreme mental and emotional disturbance and that his capacity to conform his conduct to the requirements of law was substantially impaired."[79]  Dr. Armstrong further stated that no neuropsychological evaluation was performed on petitioner, but "[a] review of the background materials provided...and available at the time of [petitioner's] trial...clearly raises numerous red flags as to the possibility of brain damage."[80]

### *Trial Counsel's Deficient Performance*

Because the Supreme Court of Pennsylvania reached the merits of the issue regarding trial counsel's deficient performance in both petitioner's direct appeal and PCRA appeal, I review this issue under the deferential AEDPA standard.  See 28 U.S.C. §§ 2254(d)(1)-(2); see also Jacobs, 395 F.3d at 100.

In this case, I conclude that trial counsel inadequately prepared for the penalty phase of petitioner's trial, and that his conduct fell below professional standards. Similar to the defense counsel in Wiggins, trial counsel "abandoned [his] investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources."  539 U.S. at 524, 123 S.Ct. at 2537, 156 L.Ed.2d at 487.

---

[79]     Respondents' Appendix DD, Exhibit A ¶ 17,

[80]     Respondents' Appendix DD, Exhibit A ¶ 18.

Furthermore, "counsel can hardly be said to have made a strategic choice...when [he] has not yet obtained the facts on which such a decision could be made."  United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989).  Given the circumstances in this case, trial counsel's actions were "not colorably based on tactical considerations but merely upon a lack of diligence." Id. at 712.

Relying on the decisions of the Supreme Court of Pennsylvania, respondents argue that petitioner has not demonstrated that trial counsel was ineffective in his investigation and representation of petitioner at the penalty phase.

Initially, respondents argue that trial counsel was not ineffective in preparing for the penalty phase because petitioner thwarted trial counsel's ability to present mitigating testimony. Next, respondents assert that trial counsel's decision not to present evidence of petitioner's Glen Mills School records and testimony of petitioner's family and friends was strategic. Finally, respondents contend that trial counsel was unable to discover information regarding petitioner's abusive childhood and medical issues not because his investigation fell below prevailing professional norms, but because petitioner and his family failed to inform him of this evidence.

Respondents' first argument is unpersuasive. Respondents claim that trial counsel adequately prepared for the penalty phase and that petitioner's reliance on Rompilla is

-64-

misplaced because petitioner explicitly prohibited counsel from presenting testimony.

In this case, although trial counsel did not know of any information that the Commonwealth would probably rely on as evidence of aggravation similar to Rompilla, trial counsel was ineffective for failing to meet the prevailing professional norms with respect to investigating potential mitigating evidence. Rompilla, 545 U.S. at 387, 125 S.Ct. at 2466, 162 L.Ed.2d at 375; see also ABA Guidelines 11.4.1 and 11.8.3.  Specifically, trial counsel did not obtain the above-described readily available records and failed to adequately interview petitioner.  Trial counsel also failed to question petitioner's mother and other family members and friends concerning his abusive childhood, medical issues, and other possible mitigating evidence.

In addition, similar to Rompilla, even if trial counsel sufficiently interviewed petitioner or petitioner's mother and they were unresponsive or provided misleading information, a thorough investigation of petitioner's readily available St. Christopher Hospital records, Philadelphia public school records, and Glen Mills School records, would have revealed conflicting information.  Moreover, had trial counsel contacted petitioner's prior counsel, Attorney Nester, he would have obtained a psychological evaluation of petitioner recommending further testing.[81]  "With this information, [trial] counsel would

---

[81]    See Affidavit/Declaration of Charles M.J. Nester, Esq., Petitioner's Appendix, Exhibit K.

have become skeptical" of his impressions of petitioner and "would unquestionably have gone further to build a mitigation case." Rompilla, 545 U.S. at 391, 125 S.Ct. at 2469, 162 L.Ed.2d at 378.

Trial counsel has a duty to conduct a proper investigation of petitioner's medical, educational, and employment history in an effort to discover mitigating evidence, regardless of whether petitioner is cooperative or uncooperative. See Porter, ___ U.S. at ___, 130 S.Ct. at 453, 175 L.Ed.2d at 406; Rompilla, 545 U.S. at 377, 125 S.Ct. at 2460, 162 L.Ed.2d at 369.  In fact, trial counsel testified at the evidentiary hearing that "[petitioner] assisted me well....[U]nder the circumstances...I think he did everything that he could possibly do."[82]

In addition, there is no evidence in the record that petitioner's own statements or actions support a conclusion that trial counsel's limited investigation was reasonable or that petitioner gave trial counsel "reason to believe that pursuing certain investigations would be fruitless or even harmful." Strickland, 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 696.

Nonetheless, respondents assert that trial counsel was not ineffective because he followed petitioner's alleged

---

[82]    See Notes of Testimony of the evidentiary hearing conducted before The Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas of Chester County, Pennsylvania on October 27, 1995 ("N.T. October 27, 1995") page 80.

direction not to present additional mitigating evidence after his
mother testified.  During oral argument Gerald P. Morano,
Esquire, argued on behalf of respondents that the United States
Supreme Court decision in Schriro v. Landrigan, 550 U.S. 465,
127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), was controlling because
petitioner informed his trial counsel that he did not want to
present mitigation evidence.[83]

In Schriro, the United States Supreme Court concluded
that "it was not objectively unreasonable...to conclude that a
defendant who refused to allow the presentation of any mitigating
evidence could not establish Strickland prejudice based on his
counsel's failure to investigate further possible mitigating
evidence."  550 U.S. at 478, 127 S.Ct. at 1942,
167 L.Ed.2d at 847.

Distinguishing the case from Rompilla, where the
defendant refused to assist in the development of a mitigation
case, the Supreme Court explained that the petitioner in Schriro
informed the trial court that he did not want mitigating evidence
presented and "would have undermined the presentation of any
mitigating evidence that his attorney might have uncovered."
Schriro, 550 U.S. at 477, 127 S.Ct. at 1941-1942,
167 L.Ed.2d at 845-846.

---

[83]    Notes of Testimony ("N.T.") of the oral argument held May 15, 2007
in Philadelphia, Pennsylvania, styled "Oral Argument before the Honorable
James Knoll Gardner[,] United States District Court Judge," pages 52-54, 57,
and 60.

In Schriro, at the penalty phase of petitioner's trial, trial counsel attempted to offer testimony from the petitioner's mother and ex-wife.  However, both refused to testify at the petitioner's request.  Schriro, 550 U.S. at 469, 127 S.Ct. at 1937, 167 L.Ed.2d at 841.

Furthermore, the court questioned the petitioner in Schriro with respect to his decision to withhold mitigating evidence:

> THE COURT: Mr. Landrigan, have you instructed your lawyer that you do not wish for him to bring any mitigating circumstances to my attention?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: Do you know what that means?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: Mr. Landrigan, are there mitigating circumstances I should be aware of?
>
> THE DEFENDANT: Not as far as I'm concerned.

Schriro, 550 U.S. at 469, 127 S.Ct. at 1937, 167 L.Ed.2d at 841.

As a result, the trial judge asked the trial counsel to make a proffer of the witnesses' testimony; however, the petitioner interrupted counsel.  For example, when the trial counsel attempted to explain that the petitioner had worked a legitimate job to provide for his family, the petitioner interrupted stating, "[i]f I wanted this to be heard, I'd have my wife say it."  Schriro, 550 U.S. at 470, 127 S.Ct. at 1937, 167 L.Ed.2d at 841 (internal quotations omitted).

Finally, at the conclusion of the sentencing hearing, the trial judge asked the petitioner if he had anything to say,

to which the petitioner responded, "I think if you want to give me the death penalty, just bring it right on.  I'm ready for it." <u>Schriro</u>, 550 U.S. at 470, 127 S.Ct. at 1938, 167 L.Ed.2d at 842 (internal quotations omitted).

However, this case is highly distinguishable from <u>Schriro</u>, where the petitioner undermined the presentation of mitigating evidence by prohibiting the witnesses' testimony and interrupting counsel when he attempted to make a proffer of the witnesses' testimony.  550 U.S. at 469-470, 127 S.Ct. at 1937-1938, 167 L.Ed.2d at 841-842.  In this case, petitioner never instructed trial counsel not to present mitigating evidence, nor did he make any attempts to undermine trial counsel's presentation of mitigating evidence.

Furthermore, the trial court in <u>Schriro</u> specifically questioned the petitioner regarding his desire to withhold mitigating evidence.  550 U.S. at 469, 127 S.Ct. at 1937, 167 L.Ed.2d at 841.  However, in this case, petitioner's colloquy focused solely on whether petitioner was going to testify himself.  During the penalty phase of petitioner's trial, and after the testimony of petitioner's mother, trial defense counsel explained:

> based on my conversation with my client, and also discussions with the District Attorney here, my client has expressed to me an intention not to testify here today.  And in addition, he pretty emphatically does not want anyone else to take the witness stand and go through what his mother has gone through, other close friends, and also the mother of his daughter, does not want them to have to go through what his mother has just gone through, and he does not want them to testify.

I realize that I am counsel to him, and ultimately who I call is really my responsibility, but I will use the same analogy with the Court: I am driving the car, but it's his car, Judge, and I don't know what – I just would rather abide by his wishes at this point.

I would ask that he be colloquied on the record in regards to this, and be subject to questioning in regards to his specific desires.[84]

The court then questioned petitioner regarding his intention to testify:

THE COURT: All right, Mr. Hall, if you will come forward and take the witness stand.

THE COURT: Mr. Hall, do you understand the purpose of today's hearing?

THE DEFENDANT: Yes, ma'am, I do.

THE COURT: Are you today under the influence of any drug, alcohol, or any medication?

THE DEFENDANT: No, ma'am, I am not.

THE COURT: Okay.  Do you understand that you have the absolute right of, what we call, [allocution], to say whatever you want to say in front of this jury, who is going to decide your sentence?

THE DEFENDANT: Yes, ma'am.

THE COURT: And do you understand that they must consider whether to impose a life sentence or a death sentence?

THE DEFENDANT: Yes, ma'am, I understand.

THE COURT: And do you understand that, even though I tell them – and I will tell them – that they must not draw any adverse inference from your silence, that it may be very difficult for them not to wonder why, now, of all times, you didn't say anything?

---

[84]     N.T. October 28, 1994, pages 889-890.

THE DEFENDANT: I understand.

THE COURT: You understand that risk?

THE DEFENDANT: I understand what you are saying, yes, I do.

THE COURT: All right.  Have you had enough time to talk to your attorney, Mr. Miller, about this decision?

THE DEFENDANT: Yes, I have.

THE COURT: Okay.  Is he in any way suggesting to you that you should not testify?

THE DEFENDANT: No, ma'am.

THE COURT: Okay.  Has he made any threats to you?

THE DEFENDANT: No.

THE COURT: Has he made any promises to you.

THE DEFENDANT: No, ma'am.

THE COURT: Has the District Attorney, or anyone else from the prosecution side of the case, made any threats to you about testifying?

THE DEFENDANT: No, ma'am.

THE COURT: Or made any promises to you?

THE DEFENDANT: No.

THE COURT: Excuse me.  Mr. Miller, do you want to ask any further questions?

MR. MILLER: I can't think of any right now, your Honor.  It's just that –

MS. SANDRA HALL: Mr. Miller

MR. MILLER: May I have a moment, your Honor?

THE COURT: Certainly.
(Brief recess.)

MR. MILLER: Your Honor, may I speak to the witness?  I mean, if I could talk to him on the

-71-

witness stand, or if he could come here, just
momentarily?

THE COURT: Certainly.  You can go right up there.
There is a chair.  I will step away so I can't
hear your conversations.

MR. MILLER: That's fine, your Honor.
(Brief discussion between the defendant and
counsel held off the record.)

MR. MILLER: Thank you, your Honor.  Your Honor, my
client, as a result of me having a discussion with
him, he has changed his position with regards to
having his witnesses testify, but I don't know, I
did not discuss with him whether he has changed
his position with regards to him testifying.

THE COURT: Let me ask you this: Would you like
additional time to consider your decision about
not testifying yourself?

THE DEFENDANT: I am not going to testify at all.

THE COURT: Okay.  Now you didn't know what this
verdict was until about 6:00 last night.  So have
you thought about this since 6:00 last night,
about whether you would testify at this part of
your trial or not?

THE DEFENDANT: I have thought about it for months.

THE COURT: Okay.  Well, before you knew what the
verdict would be?

THE DEFENDANT: Yes, ma'am.

THE COURT: So you did it, if the verdict is Murder
I, you had decided you were not going to testify?

THE DEFENDANT: Yes, ma'am.

THE COURT: All right.  You may take your seat.  We
will find the jury and bring them back in for the
other witnesses' testimony.
(Witness excused.)[85]

---

[85]     N.T. October 28, 1994, pages 890-894.

Respondents' contention that petitioner did not want to provide further mitigation evidence is without merit. Specifically, respondents mischaracterize petitioner's testimony when it argues that petitioner "voluntarily waiv[ed] his right to present evidence."[86]

Rather, it is evident from petitioner's testimony that the colloquy addresses a single issue, namely, whether petitioner waived his right to testify at the penalty phase, and not whether he waived his right to present mitigating evidence.  Trial defense counsel does, however, refer to petitioner's desire to present mitigating evidence in his conversation with the court, stating that petitioner "changed his position with regards to having his witnesses testify."[87]

Accordingly, this testimony does not support an assertion that petitioner instructed his counsel not to present any mitigating evidence.  See, e.g., Schriro, 550 U.S. at 469, 127 S.Ct. at 1937, 167 L.Ed.2d at 841; Morris v. Beard, 2007 WL 1795689, at *24 n.23 (E.D.Pa. June 20, 2007) (Rodriguez, J.).

Moreover, trial defense counsel testified at the evidentiary hearing that he was no longer following petitioner's directive at the penalty phase of the trial: "by the time we got

---

[86]     Memorandum of Law in Support of the Commonwealth's Answer to Petition for Writ of Habeas Corpus, filed December 6, 2006, page 29.

[87]     See N.T. October 28, 1994, page 893.

to the sentencing phase, I didn't care what he thought.  I felt that I had to do whatever I believed, even if he disliked it."[88]

Accordingly, for the foregoing reasons, the Supreme Court of Pennsylvania conclusion that trial counsel performed adequately because "he essentially followed [petitioner's] wishes in not presenting additional mitigating evidence" was contrary to United States Supreme Court precedent, and relied on an unreasonable determination of the facts in light of the evidence presented in the state courts.  28 U.S.C. §§ 2254(d)(1)-(2); see Williams, 529 U.S. at 413, 120 S.Ct. at 1523, 146 L.Ed.2d at 430.

Next, respondents argue that trial defense counsel made a reasonable tactical decision not to present evidence of petitioner's Glen Mills School records because the introduction of the records would have led to the disclosure of an unfavorable report of petitioner.  Respondents similarly assert that the decision not to interview and present testimony from petitioner's family members and friends was also sound trial strategy.

Even applying a "heavy measure of deference to counsel's judgments" pursuant to Strickland, the record in this case does not establish that trial defense counsel's decisions were reasonable, strategic decisions informed by a thorough investigation, or that trial defense counsel's limited investigation was supported by reasonable professional judgment. See Strickland, 466 U.S. at 690-691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695-696.  Rather, "the 'strategic decision' the

---

[88]     N.T. October 27, 1995, page 87.

-74-

state court[] and [respondents] all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." Wiggins, 539 U.S. at 526-527; 123 S.Ct. at 2538; 156 L.Ed.2d at 488; see Bond, 539 F.3d at 289.

 Trial defense counsel testified that he did not seek petitioner's records from the Glen Mills School because he knew it was a disciplinary school, and the fact that he did not have these records was "not a big deal."[89]  He testified that he was not familiar with the Battling Bulls Club, and that he was unaware that petitioner held positions of responsibility, obtained certificates of achievement, and enrolled in college preparatory classes.  Rather, without reviewing petitioner's records or interviewing any staff members of the school, he characterized petitioner's experience at Glen Mills School as insignificant because "almost every black person can run fast and jump high.  They should play basketball.  So, for a black man to say that, is not anything of significance to me and to a lot of people in my opinion...."[90]

 In petitioner's direct appeal, the Supreme Court of Pennsylvania incorrectly concluded that trial counsel action's were strategically designed to exclude both the fact that the Glen Mills School is a disciplinary school and a June 9, 1988

---

[89] See N.T. October 27, 1995, page 157.

[90] Id. at pages 155-159.

-75-

report assessing petitioner as having "many common behavioral problems."[91]  The Supreme Court failed to determine whether trial counsel's decision not to seek petitioner's records from the Glen Mills School demonstrated reasonably professional judgment. Therefore, the Supreme Court of Pennsylvania's conclusion that trial defense counsel's actions were strategic decisions was contrary to United States Supreme Court precedent.  See Williams, 529 U.S. at 413, 120 S.Ct. at 1523, 146 L.Ed.2d at 430.

Furthermore, even if the Supreme Court of Pennsylvania identified Strickland as the correct governing legal principle applicable to petitioner's case, the conclusion that trial defense counsel's investigation was adequate constitutes an unreasonable application of Strickland.  See Wiggins, 539 U.S. at 527-528, 123 S.Ct. at 2538-2539, 156 L.Ed.2d at 488-489.  Trial defense counsel cannot claim that his decision to exclude petitioner's Glen Mills School records was strategic because he never sought these records or investigated any other information concerning petitioner's experience at the school.  See Bond, 539 F.3d at 289; Gray, 878 F.2d at 711-712.

---

[91]     The Glen Mills School 2nd Comprehensive Report, dated June 9, 2008, evaluated the first five months of petitioner's placement in the school. Petitioner's subsequent 3rd and 4th Comprehensive Reports demonstrate that he earned vocational certificates, obtained his GED and was taking college preparatory classes, among other accomplishments.  Regardless of the content of the reports, the focus of the inquiry regarding trial counsel's deficient performance is the reasonableness of his investigation, specifically, whether his limited investigation was supported by reasonable professional judgment. See Wiggins v. Smith, 539 U.S. at 523, 123 S.Ct. at 2536, 156 L.Ed.2d at 485-486; see also Strickland, 466 U.S. at 690-691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695-696.

Moreover, it is irrelevant that the introduction of mitigating evidence would have led to the disclosure of unfavorable information.  The United States Supreme Court has explained that:

> the failure to introduce the comparatively voluminous amount of evidence that did speak in [the defendant's] favor was not justified by [trial counsel's] tactical decision to focus on [the defendant's] voluntary confession.  Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background.

Williams, 529 U.S. at 396; 120 S.Ct. at 1514-1515, 146 L.Ed.2d at 420.  Here, petitioner's Glen Mills School records provided a wealth of relevant mitigating evidence regarding petitioner's ability to succeed in a structured environment. See Skipper, 476 U.S. at 7, 106 S.Ct. at 1672, 90 L.Ed.2d at 8.

Respondents also suggest that trial defense counsel employed a reasonable tactical strategy in not presenting testimony of petitioner's family members or friends during the penalty phase.

However, trial defense counsel's decision not to investigate potential mitigating evidence was not supported by reasonable professional judgment because the investigation did not meet prevailing professional norms.  See Rompilla, 545 U.S. at 387, 125 S.Ct. at 2465-2466, 162 L.Ed.2d at 375-376; Wiggins, 539 U.S. at 533-534, 123 S.Ct. at 2541-2542, 156 L.Ed.2d at 492-493; see also ABA Guidelines 11.4.1 and

-77-

11.8.3.  In this case, trial defense counsel only obtained rudimentary information concerning petitioner's background.

Specifically, in response to questions about what mitigating information he sought from petitioner, trial defense counsel testified at the evidentiary hearing that he merely asked petitioner about his employment history.  However, trial defense counsel testified that he found this information insignificant, and he failed to verify the information or conduct any further investigation into petitioner's employment history.[92]

Trial defense counsel did speak to petitioner's mother over the phone and in the car on the way to the courthouse.[93] Specifically, he asked petitioner's mother to prepare a written list of possible character witnesses.[94]  Trial defense counsel did not, however, provide petitioner's mother with specific types of character witnesses that she should include in the list, for example, petitioner's previous employers, clergymen, family, or friends, or to what specific information these potential witnesses should be prepared to testify.[95]

---

[92]    See N.T. October 27, 1995, pages 154-155.

[93]    Id., at page 162.

[94]    Petitioner's mother testified that she was first questioned by trial defense counsel with regard to the penalty phase of petitioner's trial after the guilty verdict was rendered, the night before the penalty phase was scheduled to begin.  See N.T. September 21, 1995, page 92.  However, the Honorable Paula Francisco Ott, in her Findings of Fact, determined that petitioner's mother was not credible in her testimony that "she did not know about the penalty phase until the day of the verdict."  Respondents' Appendix U, Findings of Fact of the Honorable Paula Francisco Ott on January 25, 1996 ("Findings of Fact, January 25, 1996"), page 22.

[95]    N.T. September 21, 1995, pages 93-94.

In concluding that he would not present testimony from any of these witnesses at the penalty phase, trial defense counsel explained that he was trying to "speed this up as quickly as possible and give [the jury] the nuts and bolts and...[not] all the little flowers and trimmings."[96]  Regardless of the content of their testimony, trial defense counsel further explained that he did not present mitigating evidence from petitioner's male friends because the "jury may look upon a black male in a negative light."[97]

Furthermore, trial defense counsel did not subpoena any witnesses to present mitigating testimony at the penalty phase of the trial and did not interview any prospective witnesses in his office.[98]  Affidavits from petitioner's family and friends indicate that trial defense counsel never contacted them in an effort to discover mitigating evidence.[99]  The trial court also found that trial defense counsel failed to contact and interview Arnelle Howard, the mother of petitioner's second child, even

---

[96]     N.T. October 27, 1995, page 88.

[97]     Id. at pages 167-169.

[98]     Id. at page 182.

[99]     Declaration and Affidavit of Eula Hall, Petitioner's Appendix, Exhibit B; Declaration and Affidavit of Steve Paschall, Petitioner's Appendix, Exhibit D; Affidavit/Declaration of Sharon McKenzie, Petitioner's Appendix, Exhibit E;  Affidavit/Declaration of Priscilla Thompson, Petitioner's Appendix, Exhibit F; Affidavit/Declaration of Diane Howard, Petitioner's Appendix, Exhibit G; Declaration and Affidavit of Charles McCurry Jr., Petitioner's Appendix, Exhibit H; Declaration and Affidavit of Eleanor Paschall, Petitioner's Appendix, Exhibit I; Affidavit/Declaration of Donald Holloway, Petitioner's Appendix, Exhibit J.

though she was available and willing to testify at the penalty phase.[100]

This case is distinguishable from <u>Cullen</u>, <u>supra</u>, wherein counsel was not ineffective for failing to present additional mitigating evidence at the penalty phase because the defendant was so unsympathetic that "the jury simply won't buy it".  __ U.S. at __, 131 S.Ct. at 1408, 179 L.Ed.2d at 580 (internal quotations omitted).  The Supreme Court held that counsel made a reasonable decision to limit his investigation and presentation of mitigation evidence to creating sympathy for the defendant's family, mainly by calling defendant's mother at the penalty phase.  <u>Cullen</u>, __ U.S. at __, 131 S.Ct. at 1405-1406, 179 L.Ed.2d at 577.  The Supreme Court held that "[t]here comes a point where a defense attorney will reasonably decide that another strategy is in order, thus 'mak[ing] particular investigations unnecessary.'"  <u>Cullen</u>, __ U.S. at __, 131 S.Ct. at 1407, 179 L.Ed.2d at 579 (quoting <u>Strickland</u>, 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695).

However, in this case, the available mitigation evidence, far from constituting a hopeless attempt to create sympathy for petitioner, included significant facts that potentially show petitioner could be rehabilitated.  Had trial defense counsel questioned petitioner or his family members about his life, educational and medical history, and obtained

---

[100]   <u>See</u> N.T. October 27, 1995, page 188; Respondents' Appendix U, Findings of Fact, January 25, 1996, page 20.

petitioner's school, medical, and court records, he would have found significant mitigating evidence that was available at the time of the penalty phase.  This information was relevant in an investigation for mitigating evidence under the prevailing professional norms as stated in the ABA Guidelines.  See ABA Guidelines 11.4.1; see also Rompilla, 545 U.S. at 387, 125 S.Ct. at 2465-2466, 162 L.Ed.2d at 375-376; Wiggins, 539 U.S. at 524, 123 S.Ct. at 2537, 156 L.Ed.2d at 486-487.

Moreover, trial defense counsel did not pursue his investigation of mitigating evidence "expeditiously" and "immediately upon counsel's entry into the case."  See ABA Guidelines 11.4.1.  At the evidentiary hearing, trial defense counsel testified that, he had only "minimized" discussions with petitioner about the penalty phase of the trial at the beginning of his representation, and that these discussions only became "specific later on."[101]

In addition, trial defense counsel decided not to present the testimony of petitioner's friends at the penalty phase after only a brief conversation with the witnesses in the hallway of the courthouse.  Specifically, the trial court found that trial counsel "met Mr. Tyson for the first time on the morning of the penalty hearing and spoke with him very briefly" and "did not conduct a full interview with Mr. Tyson about his

---

[101]    See N.T. October 27, 1995, pages 148 and 152.

knowledge of [petitioner's] background and character."[102]
Accordingly, trial defense counsel failed to meet the prevailing
standards of timeliness. See ABA Guidelines 11.8.3; see also
Williams, 529 U.S. at 395, 120 S.Ct. at 1514, 146 L.Ed.2d at 419.

Finally, respondents argue that trial defense counsel
spoke to petitioner and his family for the express purpose of
ascertaining potential mitigating evidence.  Respondents argue
trial defense counsel did not discover information regarding

---

[102]   Respondents' Appendix U, Findings of Fact, January 25, 1996,
page 21.  Respondents argue that trial defense counsel was not ineffective for
failing to call five witnesses in order to establish mitigating evidence,
including Wanda Turner, Jamal Tyson, Jamal Price, Alfonso Leak, and Arnelle
Howard.  However, petitioner's Writ of Habeas Corpus only alleges that trial
defense counsel was ineffective for failing to properly interview and call as
witnesses Jamal Tyson, Jamal Price and Arnelle Howard, and I therefore do not
address trial defense counsel's alleged failure to interview and call as
witnesses Wanda Turner or Alfonso Leak.

As I previously noted, the trial court found that trial defense
counsel failed to contact Arnelle Howard in an effort to discover mitigating
evidence and first spoke to Jamal Tyson on the morning of the penalty phase of
petitioner's trial.  See Respondents' Appendix U, Findings of Fact,
January 25, 1996, pages 20-21.  Accordingly, these findings support my
conclusion that trial defense counsel's performance was deficient for his
failure to conduct a proper and timely investigation.

With respect to Jamal Price, the trial court found that he was
also available to testify at the penalty phase.  However, trial defense
counsel did not call him as a witness because trial defense counsel did not
believe that the jury would find his testimony credible, and because he could
have been impeached with evidence of a prior conviction.  See Respondents'
Appendix U, Findings of Fact, January 25, 1996, pages 21-22.  Given these
circumstances, trial defense counsel's decision not to call Mr. Price may have
been sound trial strategy.

However, it is unclear from the record when trial defense counsel
interviewed Mr. Price, which may further support my conclusion that trial
defense counsel's investigation of mitigating evidence was not conducted
expeditiously.  See N.T. October 27, 1995, pages 164, 167-169; Notes of
Testimony of the evidentiary hearing conducted before The Honorable Paula
Francisco Ott, former Judge of the Court of Common Pleas of Chester County,
Pennsylvania on October 25, 1995 ("N.T. October 25, 1995) pages 110-111 and
143.

Nonetheless, even if trial defense counsel had interviewed Mr.
Price early in his investigation, I still conclude that trial defense counsel
was ineffective based on the overwhelming evidence establishing that his
conduct did not meet prevailing professional norms.

petitioner's abusive childhood and medical issues because petitioner and his family failed to inform trial defense counsel of these facts.

Petitioner, however, does not have "a duty to instruct counsel how to perform such a basic element of competent representation as the inquiry into a defendant's background." Bond, 539 F.3d at 288; see also Marshall v. Cathel, 428 F.3d 452 (3d Cir. 2005). In United States v. Gray, 878 F.2d 702, 712 (3d Cir. 1989), the United States Court of Appeals for the Third Circuit held that a defendant's "reluctance to subpoena witnesses...did not absolve [trial counsel] of his independent professional responsibility to investigate what information...potential witnesses possessed." 878 F.2d at 712.

Furthermore, in Bond v. Beard, 539 F.3d 256 (3d Cir. 2008), the Third Circuit addressed a similar claim of ineffectiveness of counsel for failing to adequately investigate mitigating evidence and prepare for the penalty phase of a capital trial.

In Bond, trial defense counsel introduced testimony from seven family members and friends at the petitioner's penalty phase hearing, who testified to petitioner's general good character and willingness to help others. Id. at 279. However, trial defense counsel began preparations for the penalty phase of petitioner's trial the night before it began, failed to obtain readily available school and medical records, and did not conduct

a meaningful inquiry into the petitioner's family life.  Id. at
288.

The Third Circuit explained that the Supreme Court of
Pennsylvania's conclusion that trial defense counsel's
investigation met prevailing professional standards was
unreasonable.  Id. at 289.  The Third Circuit held that "it is
difficult to call [trial counsel's] decisions 'strategic' when
they failed to seek rudimentary background information" about
petitioner.  Id.

Furthermore, the Third Circuit reasoned:

> We will not excuse this conduct on the ground that
> [petitioner] and his family members did not tell
> counsel that his background provided fertile
> territory for mitigation arguments.  Neither [the
> petitioner] nor his family] had a duty to instruct
> counsel how to perform such a basic element of
> competent representation as the inquiry into a
> defendant's background.

Id.

As I previously stated, had trial defense counsel
conducted a reasonable investigation beyond the rudimentary
knowledge of petitioner's history, he would have discovered
extensive mitigating evidence.  See Wiggins, 539 U.S. at 524-525,
123 S.Ct. at 2537, 156 L.Ed.2d at 486-487; Williams,
529 U.S. at 395, 120 S.Ct. at 1514, 146 L.Ed.2d at 419.

The Supreme Court of Pennsylvania incorrectly concluded
that trial defense counsel was not ineffective, holding that:

> trial counsel testified at length during the
> remand hearing regarding his efforts at
> ascertaining potential mitigating
> evidence....Specifically, he testified that he
> discussed the penalty phase of the trial with

> [petitioner], explained that the Commonwealth
> would be presenting aggravating factors, and
> informed [petitioner] that he could present
> mitigating factors.  Additionally, counsel
> testified that [petitioner] remained steadfast in
> his refusal to testify, even after he was advised
> by counsel that it would be in his best interest.

Hall, 582 Pa. at 547, 872 A.2d at 1190.

However, as Justice Thomas G. Saylor explained in dissent, "it should by now be regarded as well-established that the proper focus of the inquiry is on the investigation that counsel performed relative to such mitigation, and not on the actions that the capital defendant may or may not have taken on or of his own initiative."  Hall, 582 Pa. at 553, 872 A.2d at 1193.

Therefore, I conclude that the Supreme Court of Pennsylvania majority's conclusion is contrary to United States Supreme Court precedent because it fails to address the question of whether trial counsel's investigation for potentially mitigating evidence is reasonable under prevailing professional norms.  Accordingly, I conclude that trial counsel's performance was deficient even under the deferential AEDPA standard of review.  See 28 U.S.C. §§ 2254(d)(1)-(2).

### *Prejudice*

Petitioner was prejudiced by trial defense counsel's failure to investigate and present mitigating evidence at the penalty phase of trial.

To establish prejudice, petitioner must demonstrate that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have
been different." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068,
80 L.Ed.2d at 698.  "Because the jury's decision must be
unanimous" in Pennsylvania, petitioner can satisfy this standard
"if there is a reasonable probability that the presentation of
the [available mitigating evidence] would have convinced one
juror" to find that the mitigating factors outweighed the
aggravating factors.  Jermyn v. Horn, 266 F.3d 257, 309 (3d Cir.
2001); see Wiggins, 539 U.S. at 537, 123 S.Ct. at 2543,
156 L.Ed.2d at 495.

        Therefore, after weighing the totality of the
mitigating evidence that could have been presented at trial with
the aggravating evidence that was presented, the reviewing court
must determine whether there is a reasonable probability that the
jury, after hearing this mitigating evidence, would have returned
a different sentence.  Wiggins, 539 U.S. at 534, 536,
123 S.Ct. at 2542-2543, 156 L.Ed.2d at 494.

        In this case, the Supreme Court of Pennsylvania did not
reach this prong of the Strickland analysis in its review of
either petitioner's direct appeal or petitioner's PCRA appeal.
Accordingly, because the AEDPA standard of review is
inapplicable, I review this issue de novo.  See Thomas,
570 F.3d at 113.

        As previously stated, the jury found two aggravating
circumstances in this case: (1) petitioner committed the killing
while in the perpetration of a felony; and (2) during the

                              -86-

commission of the killing, petitioner knowingly created a grave
risk of death to another person in addition to the victim.  The
jury determined the aggravating factors outweighed the one
mitigating factor that the events leading up to the fatal shot
included the possibility of a struggle.

However, trial defense counsel could and should have
used evidence of petitioner's life, medical, and educational
history to establish two additional mitigating factors,
specifically that: (1) the defendant was under the influence of
extreme mental or emotional disturbance; and (2) the capacity of
the defendant to appreciate the criminality of his conduct or to
conform his conduct to the requirements of law was substantially
impaired.  42 Pa.C.S.A. §§ 9711(e)(2)-(3).  Additionally, the
jury could have considered this mitigating evidence in weighing
the catch-all factor with regard to "[a]ny other evidence of
mitigation concerning the character and record of the defendant
and the circumstances of his offense."  42 Pa.C.S.A.
§ 9711(e)(8).

Had trial defense counsel properly investigated and
presented evidence of petitioner's abusive childhood, medical
problems, and school records, the jury would have learned that
petitioner grew up in a violent home, not only witnessing his
father repeatedly beat his mother, but also suffering abuse
himself from his father, mother and his mother's boyfriend; that
he was diagnosed with a seizure disorder and experienced severe
and debilitating headaches after being hit by a car; and that he

earned academic achievements, despite his low IQ and poor high school record, but only after entering the structured and secure environment of the Glen Mills School.

Had trial defense counsel obtained petitioner's medical, school, and court records, and sought an expert evaluation of petitioner, trial defense counsel could have presented significant mitigating evidence that at the time of the incident for which petitioner was convicted, he was under the influence of extreme mental and emotional disturbance.  Expert testimony also would have demonstrated that petitioner's capacity to conform his conduct to the requirements of law was substantially impaired, and the petitioner's history raises red flags of possible brain damage.

It is recognized, however, that the introduction of this mitigating evidence may have led the Commonwealth to disclose less favorable information concerning, for example, petitioner's placement at a disciplinary school pursuant to a court Order.  However, as explained in Williams, "the failure to introduce the comparatively voluminous amount of evidence that did speak in [petitioner's] favor" could not have been justified by a decision to only present testimony of petitioner's general good character.  529 U.S. at 396, 120 S.Ct. at 1514-1515, 146 L.Ed.2d at 420.

Trial defense counsel performed an inadequate and untimely investigation into petitioner's life, medical, and educational history, and abandoned his investigation "after

having acquired only rudimentary knowledge of his history from a narrow set of sources." Wiggins, 539 U.S. at 524-525, 123 S.Ct. at 2537, 156 L.Ed.2d at 486-487; see also Williams, 529 U.S. at 395, 120 S.Ct. at 1514, 146 L.Ed.2d at 419.  Not only did trial defense counsel fail to interview petitioner's family and friends in an expeditious manner, trial defense counsel also failed to seek petitioner's readily available medical, school, and court records.  See Bond, 539 F.3d at 291-292 (citing Rompilla, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360).  As a result, trial defense counsel failed to present significant mitigating evidence.  See id.; see also Williams, 529 U.S. at 396, 120 S.Ct. at 1514-1515, 146 L.Ed.2d at 419-420; Outten v. Kearney, 464 F.3d 401, 422 (3d Cir. 2006).

Additionally, in Outten, the Third Circuit held that trial defense counsel was ineffective and, as a result, the petitioner was prejudiced because trial defense counsel failed to present significant mitigation testimony at the penalty phase, including evidence of the petitioner's family issues, neurological condition, psychological problems, and substance abuse.  464 F.3d at 419-423.

A reasonable lawyer who understood petitioner's life, medical, and educational history would not have merely presented evidence of petitioner's positive relationship with his mother and daughters and general good character in the community. Rather, a reasonable lawyer would have presented testimony of petitioner's abusive childhood, cognitive and developmental

-89-

issues associated with his seizure disorder and head injury, and his success in a structured environment.  See generally Bond, 539 F.3d at 292.

  Therefore, given the substantial amount of mitigating evidence available to trial defense counsel had he conducted an investigation in accordance with prevailing professional norms, I conclude that there is a reasonable probability that at least one juror would have found that the mitigating factors outweighed the aggravating factors in this case.  See Wiggins, 539 U.S. at 537, 123 S.Ct. at 2543, 156 L.Ed.2d at 495; Jermyn, 266 F.3d at 308; see also Rompilla, 545 U.S. at 393, 125 S.Ct. at 2469, 162 L.Ed.2d at 379.

  Because trial defense counsel's inadequate investigation and presentation of mitigating evidence at the penalty phase of petitioner's trial fell below an objective standard of reasonableness, and because petitioner suffered prejudice as a result of trial defense counsel's deficient performance, I conclude that petitioner is entitled to relief from his death sentence.  Accordingly, I grant Mr. Hall's petition for writ of habeas corpus on this issue and direct the Commonwealth to conduct a new sentencing hearing within 180 days of this Opinion and Order.

  Because I have granted petitioner a new sentencing hearing based on the ineffectiveness of trial counsel in his investigation and presentation of mitigating evidence, it is unnecessary to address petitioner's alternative arguments that

the sparse presentation of mitigating evidence violated petitioner's Eighth Amendment rights.  In addition, petitioner briefly mentioned that his Fifth and Fourteenth Amendment rights were violated.  Because petitioner failed to fully brief these issues, and because I am granting relief on other grounds, these issues will not be addressed.  See State Farm Mutual Automobile Insurance Co. v. Lincow, 715 F.Supp.2d 617, 630 n.6 (E.D.Pa. 2010)(Robreno, J.).

## **Simmons** Instruction

Petitioner contends that he is entitled to a new sentencing hearing because the trial court erred in failing to instruct the jury that a sentence of life in prison for first degree murder rendered the petitioner ineligible for parole, in violation of petitioner's rights under Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), as well as under the Sixth, Eighth, and Fourteenth Amendments.  Petitioner also alleges trial defense counsel was ineffective for failing to request such instruction.

As discussed in section VI.B., supra, petitioner first raised this claim on PCRA appeal to the Supreme Court of Pennsylvania.  Accordingly, this claim is procedurally defaulted and is barred from habeas review.  See section VI.C.

Nonetheless, although this court cannot review the merits of petitioner's claim, the relief petitioner seeks has already been granted pursuant to the grounds raised in the first claim of petitioner's habeas petition.

**Catch-All Mitigating Factor Instruction**

Petitioner argues in claims three and seven of the habeas petition that he is entitled to a new sentencing hearing because the trial court erred, and trial defense counsel was ineffective for failing to raise the errors, in charging the jury on mitigating and aggravating circumstances during the sentencing hearing.

As discussed in the sections on Procedural Default and the Relaxed Waiver Rule and Cause and Prejudice <u>supra</u>, petitioner's claims that the trial court's instruction on 42 Pa.C.S.A. § 9711(e)(8) and the trial court's definition of aggravating and mitigating circumstances violated petitioner's Sixth, Eighth, and Fourteenth Amendment rights are procedurally defaulted because petitioner raised them for the first time in his PCRA appeal to the Supreme Court of Pennsylvania.

Petitioner additionally contends that the trial court erred in defining preponderance of the evidence when explaining the burden of proof for mitigating circumstances. Petitioner alleges the trial court should have informed the jury that the standard for finding mitigating factors was whether the evidence showed the fact sought to be proved was more likely than not. Petitioner claims the trial court's instruction failed to convey that preponderance of the evidence was a less demanding standard than proof beyond a reasonable doubt.

Petitioner asserts that because the trial court failed to adequately define the burden of proof, it is reasonably likely

that the jury understood the instruction as limiting their consideration of available mitigation evidence in violation of petitioner's Fifth, Eighth, and Fourteenth Amendment rights. Petitioner further alleges trial defense counsel was ineffective for failing to object to the instruction.

Respondents contend that petitioner only raised the claim on direct appeal to the Supreme Court of Pennsylvania as a claim for ineffective assistance of trial defense counsel for failing to object to the preponderance of the evidence instruction. Accordingly, respondents contend petitioner's claim for trial court error is not exhausted and is procedurally defaulted.

However, the trial court error claim was fairly presented in petitioner's direct appeal brief. The argument regarding the preponderance of the evidence instruction appears under the header entitled "The Trial Court Erred in the Instructions to the Jury during the Penalty Phase."[103]  Petitioner addressed both the claim for trial court error and the claim for trial counsel's ineffectiveness. As further support that petitioner fairly presented his claim for trial court error, the Supreme Court of Pennsylvania addressed the merits of whether the trial court erred in the instruction. See Hall, 549 Pa. at 304-306, 701 A.2d at 208.

Because the Supreme Court of Pennsylvania addressed the merits of petitioner's claim, I review this issue under the

---

[103]    Respondents' Appendix V, Brief and Appendix for Appellant, page 1.

deferential AEDPA standard.  See 28 U.S.C. §§ 2254(d)(1)-(2);
see also Jacobs, 395 F.3d at 100.

        At the sentencing hearing, the trial court provided the
following instruction:

> The Commonwealth must prove any aggravating
> circumstances beyond a reasonable doubt.  This
> does not mean that the Commonwealth must prove the
> aggravating circumstance beyond all doubt or to a
> mathematical certainty.  A reasonable doubt is the
> kind of doubt that would cause a reasonable and
> sensible person to hesitate before acting upon a
> matter of importance in his or her own affairs.  A
> reasonable doubt must be a real doubt.  It may not
> be one that a juror imagines or makes up to avoid
> carrying out an unpleasant duty.
>
> By contrast, the defendant must prove any
> mitigating circumstance.  However, he only has to
> prove it by the preponderance of the evidence,
> that is, by the greater weight of the evidence.[104]

        The Supreme Court of Pennsylvania held that the trial
court's definition of preponderance of the evidence accurately
and correctly conveyed the burden of proof to the jury.  Hall,
549 Pa. at 305, 701 A.2d at 208.  The court held that the
instruction properly conveyed that preponderance of the evidence
means the evidence for the proposition to be proven is greater
than the weight of the evidence against the proposition.  Id.

        Although the definition was "admittedly terse," the
Supreme Court of Pennsylvania held that when the definition was
viewed in context of the entire instruction, it sufficiently
conveyed the proper meaning of petitioner's burden of proof.
549 Pa. at 305-306, 701 A.2d at 208.  Accordingly, trial defense

---

[104]     N.T. October 28, 1994, pages 928-929.

counsel was not ineffective for failing to object to a charge
that was free from error.  549 Pa. at 306, 701 A.2d at 208.

Applying the AEDPA deferential standard of review, the
Supreme Court of Pennsylvania decision is not contrary to or an
unreasonable application of United States Supreme Court
precedent.

As the Supreme Court of Pennsylvania held, the effect
of the instruction on the validity of petitioner's proceeding
must be reviewed according to the "well-established proposition
that a single instruction to a jury may not be judged in
artificial isolation, but must be viewed in the context of the
overall charge." Cupp v. Naughten, 414 U.S. 141, 146-147,
94 S.Ct. 396, 400, 38 L.Ed.2d 368, 374 (1973).  To warrant
federal habeas relief, "it must be established not merely that
the instruction is undesirable, erroneous, or even universally
condemned, but that it violated some right which was guaranteed
to the defendant by the Fourteenth Amendment." Donnelly v.
DeChristoforo, 416 U.S. 637, 642-643, 94 S.Ct. 1868, 1871,
40 L.Ed.2d 431, 436 (1974) (internal quotations omitted).

To establish a due process violation on habeas review,
the error must have constituted a "failure to observe that
fundamental fairness essential to the very concept of justice."
Donnelly, 416 U.S. at 642, 94 S.Ct. at 1871, 40 L.Ed.2d at 436
(internal quotations omitted).

Regarding petitioner's Eighth Amendment claim, the jury
"must be able to consider and give effect to any mitigating

-95-

evidence relevant to a defendant's background and character or the circumstances of the crime." Blystone v. Pennsylvania, 494 U.S. 299, 304-305, 110 S.Ct. 1087, 1082, 108 L.Ed.2d 255, 263 (1990) (internal quotation omitted).

The definition of preponderance of the evidence, which immediately followed the definition of beyond a reasonable doubt, conveyed that the defendant carried a lighter burden in proving mitigating circumstances.  The instruction made clear that a preponderance of the evidence was a lesser burden by stating it was in "contrast" to the beyond a reasonable doubt standard, and that defendant "only" needed to establish the "greater weight" of the evidence to prove mitigating circumstances.

Accordingly, petitioner has not established how the instruction undermined the fundamental fairness of his trial in violation of due process.

In addition, the state court holding was not contrary to Eighth Amendment precedent.  Petitioner has not established how the trial court's instruction on the burden of proof, which adequately conveyed that a "preponderance" is a lesser burden than beyond a reasonable doubt, limited the jury's consideration of mitigating circumstances.

Finally, the Supreme Court of Pennsylvania's holding that trial counsel was not ineffective for failing to object to a proper instruction was not an unreasonable application of Sixth Amendment precedent.  Petitioner did not establish the deficient

-96-

performance prong under <u>Strickland</u> because the trial court did not err.  466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

Accordingly, petitioner is not entitled to relief from his death sentence because the instruction on preponderance of the evidence given at the sentencing hearing was not constitutionally deficient.  Although petitioner is not entitled to relief on the grounds he raised in claims three and seven, I have nonetheless already granted petitioner the relief he was seeking - a new sentencing hearing - on the grounds raised in claim one.

### Grave Risk Aggravating Factor

In claim four of his habeas petition petitioner raises four discrete issues: (1) the trial court erred in defining the grave risk aggravating factor identified in 42 Pa.C.S.A. § 9711(d)(7); (2) the Commonwealth failed to provide petitioner adequate notice of the grave risk aggravating factor; and (3) the trial court erred in admitting expert testimony relating to a bullet ricochet theory to support the grave risk aggravating factor.  In addition, petitioner alleges (4) trial counsel was ineffective for failing to object to these errors and was ineffective for failing to rebut the expert testimony. Petitioner alleges all of these errors combined or any of them individually entitle him to a new sentencing hearing.

As discussed in the section on Procedural Default and the Relaxed Waiver Rule, <u>supra</u>, petitioner's claims (1) and (2) above, are procedurally defaulted because they were raised for

the first time on PCRA appeal to the Supreme Court of Pennsylvania, and their merits were not considered because of a waiver holding.  Accordingly, petitioner's claims that (1) the notice petitioner received regarding the grave risk aggravating factor and (2) the instructions the trial court provided on the grave risk aggravating factor were constitutionally deficient are procedurally defaulted and cannot be considered on habeas review. See section on Cause and Prejudice, supra.

### *Trial Court Error*

Petitioner fairly presented his claim for trial court error (3) above, during PCRA review.  Petitioner argues his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated because the expert testimony of the Commonwealth's witness regarding the ricochet theory was speculative and improper, and the trial court failed in its gatekeeping function to exclude this evidence pursuant to Kumho Tire Company v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).  Because the state court did not address the merits of this portion of petitioner's claim, I consider this issue de novo.  See Thomas, 570 F.3d at 113.

At the sentencing hearing, the Commonwealth pursued as an aggravating factor that "in the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense."

42 Pa.C.S. § 9711(d)(7).  As support for this factor, the
Commonwealth presented evidence that petitioner waved the gun at
other customers in the laundromat as he exited the building.  The
Commonwealth also presented testimony from a firearms examiner
expert that the bullets from petitioner's gun could have
ricocheted off of various objects in the laundromat.  The expert,
Howard Montgomery, testified during the guilt phase as follows:

> Q: Could you tell us what ricochet is?
>
> A: A ricochet is a - basically, a projectile or a
> bullet that would strike an object, a glancing
> blow, and then ricochet from that object and take
> a different direction off of a surface, this is
> what we call a ricochet.
>
> Q: And from your observations of the interior of
> the [laundromat], was there surfaces in there that
> ricochet was potentially capable?
>
> A: Well, yes, many surfaces.  You had metal
> washing machines, you had one wall, you had metal
> driers, big huge driers.  A firearm discharged
> randomly in this particular establishment, there
> was a good chance of a ricochet bouncing off a
> washing machine, off a wall, off a drier, going
> out the front window, or striking someone in the
> establishment at the time.[105]

Petitioner alleges this testimony was speculative
because it was not based on any scientific testing or experiment.
Petitioner contends that because the Commonwealth moved to
incorporate all the trial evidence for the jury to consider
during the sentencing phase, and the trial court so instructed
the jury, the jury considered this speculative evidence in

---

[105]    Notes of Testimony of the jury trial conducted before The
Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas of
Chester County, Pennsylvania on October 25, 1994 ("N.T. October 25, 1994")
pages 367-368.

finding the grave risk aggravating factor against petitioner.[106] Therefore, petitioner argues the jury could not have properly found the aggravating factor beyond a reasonable doubt, which violates petitioner's Eighth and Fourteenth Amendment rights.

Respondents contend habeas relief for improper admission of evidence is only available where the use of the evidence caused fundamental unfairness in violation of due process.  Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166, 180 (1941); Lesko v. Owens, 881 F.2d 44, 52 (3d Cir. 1989).  Because the evidence was relevant to an issue in petitioner's case, respondents aver petitioner was not denied a right to a fair trial by its admission.

Furthermore, respondents contend that the trial court had no obligation to sua sponte preclude expert testimony absent objection from opposing counsel.  In addition, respondents argue it was not error to not object to this testimony because the testimony was commonsensical, and there was evidence that the bullets had in fact fragmented and ricocheted in this case.

Pennsylvania courts follow the test for admitting expert evidence explained in Frye.  See Grady v. Frito Lay, 576 Pa. 546, 839 A.2d 1038 (Pa. 2003).[107]  Petitioner has not cited to any authority for his assertion that the trial court had

---

[106]    N.T. October 28, 1994, pages 875-876 and 933.

[107]    Because Pennsylvania courts have not adopted the United States Supreme Court's analysis outlined in Daubert and Kumho Tire Company, supra, I do not address petitioner's claim in light of these standards.

an obligation under <u>Frye</u> to sua sponte exclude expert testimony because it was speculative absent objection from opposing counsel.

Furthermore, petitioner has not established that the expert testimony was speculative.  Petitioner contends that the testimony was misleading because the shooting occurred in a back room, out of view of other persons in the laundromat, which therefore negates the risk of ricochet.  However, at trial, the Commonwealth presented evidence that petitioner had also waved the gun at customers as he exited the laundromat.  Had the gun discharged at that time, the risk of a ricochet greatly increased.

Even in the section of the laundromat where the gun was actually discharged, the risk of the bullet ricochet was not speculative.  In fact, there was evidence establishing that the bullets had deflected off of the victim's glasses, and that the fragments from this bullet punctured holes through a wooden door, a metal shelf, and a coffee can, and came to rest nineteen feet from the victim's body.[108]  Accordingly, the testimony was not based on speculation, and, in fact, is commonsensical and not unduly inflammatory.

Because the testimony is not speculative, I conclude that its admission was not error and did not violate petitioner's

_____

[108]   Notes of Testimony of the jury trial conducted before The Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas of Chester County, Pennsylvania on October 24, 1994 ("N.T. October 24, 1994") pages 299-300, 306 and 316; N.T. October 25, 1994, pages 344-345, 350-351, 372 and 380-382.

constitutional rights. Accordingly, petitioner is not entitled to relief from his death sentence on this ground.

### *Ineffective Assistance of Counsel*

In addition, petitioner claims trial counsel was ineffective for failing to object to the expert testimony, and subsequent counsel was ineffective for failing to raise the claim on direct appeal. Because petitioner cannot establish that the testimony was speculative, he also cannot establish deficient performance for failing to object to the testimony. See Strickland, supra. Therefore, petitioner is not entitled to relief for his claims for ineffective assistance of counsel.

Finally, petitioner argues trial defense counsel was ineffective for failing to rebut the Commonwealth's expert regarding the ricochet theory. Specifically, petitioner alleges trial defense counsel was ineffective for failing to call an expert witness to refute the Commonwealth's expert. Petitioner alleges trial defense counsel's decision not to call an expert witness was not informed because he did not investigate what possible expert witnesses would be available or possible ways to refute the ricochet theory.

The Supreme Court of Pennsylvania addressed the merits of petitioner's claim on PCRA appeal. The Supreme Court held that trial defense counsel was not ineffective for two reasons. First, petitioner's claim had no merit because petitioner did not establish that an expert witness existed who was available to

give testimony rebutting the Commonwealth expert's testimony on
bullet ricochet.  Hall, 582 Pa. at 542, 872 A.2d at 1187.

Furthermore, the Supreme Court held that trial defense
counsel had a reasonable strategy for failing to rebut the
ricochet theory.  582 Pa. at 542-543, 872 A.2d at 1187.  During
the PCRA hearing, trial defense counsel testified that he
believed the Commonwealth expert's testimony was a matter of
commonsense, and it would undercut his credibility with the jury
to argue that a gun randomly discharged in a laundromat did not
present the risk of a bullet ricocheting.  Id.  Accordingly, the
Supreme Court held that petitioner was unable to establish a
claim for trial defense counsel's ineffectiveness.  Id.

Because the Supreme Court of Pennsylvania has addressed
the merits of petitioner's claim, the claim is subject to the
deferential standard of review under the AEDPA.

The Supreme Court of Pennsylvania decision is not
contrary to or an unreasonable application of United States
Supreme Court precedent.  While petitioner is correct that trial
defense counsel admitted he did not investigate ways to refute
the Commonwealth expert witness's testimony regarding bullet
ricochet, trial defense counsel's decision not to investigate was
a reasonable strategic decision.

Pursuant to Strickland, "strategic choices made after
less than complete investigation are reasonable precisely to the
extent that reasonable professional judgments support the
limitations on investigation."  466 U.S. at 690-691,

104 S.Ct. at 2066, 80 L.Ed.2d at 695.   The United States Supreme Court has held that counsel has a duty to make a reasonable investigation or to make a reasonable decision that an investigation would be unnecessary.   466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.   The decision not to investigate must be assessed for reasonableness considering all the circumstances, and counsel's decision is entitled to "a heavy measure of deference...."   Id.

Trial defense counsel testified at the PCRA hearing that he was arguing to the jury that petitioner did not have specific intent to kill because the victim had control of the gun at the time it was accidentally discharged.[109]   Because he was arguing that the gun was essentially randomly discharged in the laundromat, trial defense counsel testified it would have harmed his credibility with the jury to argue that bullet ricochet creating a grave risk of death to others in the laundromat was not possible.[110]   He further testified that the concept of ricochet was a matter of commonsense, and that it would not be beneficial to his client to seek a ballistics expert to refute this theory.[111]

The Supreme Court of Pennsylvania holding that trial counsel's strategic decision was entitled to deference does not

---

[109]   Notes of Testimony of the PCRA hearing conducted before The Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas of Chester County, Pennsylvania on July 13, 2000 ("N.T. July 13, 2000") pages 42-45.

[110]   Id. at page 45.

[111]   Id. at pages 42-43.

constitute an unreasonable application of <u>Strickland</u>.  Because trial defense counsel made a reasonable decision that further investigation would be unnecessary, his performance was not constitutionally deficient.

In petitioner's habeas petition, he has produced a letter from a potential ballistics expert who explained he would have been available at the time of trial to testify.  The proposed expert explained in the letter that he would have testified that both the isolated location where the gun was discharged and the recovered ballistics evidence indicate that the bullets were not likely to ricochet.[112]

Nonetheless, trial defense counsel's decision not to call a ballistics expert was a reasonable strategy, and even if petitioner had called this proposed witness, petitioner cannot establish he was prejudiced by trial defense counsel's decision. Petitioner's proposed expert does not actually rebut the Commonwealth expert witness's testimony.  The proposed expert testimony does not refute the ricochet theory insofar as it applies to petitioner's waving his gun at other customers as he exited the laundromat.

In addition, the proposed expert's opinion that the bullets were not likely to ricochet because they fragmented upon hitting the victim's glasses does not rebut the Commonwealth's evidence that the bullet fragments were dangerous.  The Commonwealth presented evidence that the bullet fragmented after

---

[112]  Letter Report of Lester Roane, Petitioner's Appendix, Exhibit Q.

hitting the victim's glasses, and the bullet fragments went through a metal shelf, a wooden door, and a coffee can, and the fragments traveled nineteen feet from the victim's body.[113]   The bullet-fragmenting evidence is consistent with the Commonwealth expert's testimony, and it provides support for the grave risk aggravating factor pursued by the Commonwealth.   Accordingly, petitioner cannot establish that he is prejudiced because the proposed expert witness does not in fact refute the Commonwealth's evidence regarding the ricochet theory.

Although petitioner cannot establish that he is entitled to a new sentencing hearing on the grounds raised in claim four of petitioner's habeas petition, petitioner has already been granted the relief he seeks because I have determined above that the errors raised in claim one warrant a new sentencing hearing.

### Proportionality Review

The twelfth claim in petitioner's habeas petition asserts that the proportionality review of petitioner's death sentence conducted by the Supreme Court of Pennsylvania violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

Specifically, petitioner contends that both the procedure used by the Supreme Court of Pennsylvania in conducting the proportionality review, and petitioner's inability to participate in this review, violated his constitutional rights.

---

[113]     N.T. October 24, 1994, pages 299-300, 306 and 316; N.T. October 25, 1994, pages 344-345, 350-351, 372 and 380-382.

At the time of petitioner's trial, the Supreme Court of Pennsylvania was required to conduct a review of every death sentence to determine whether the penalty imposed was "excessive or disproportionate to the penalty imposed in similar cases considering both the circumstances of the crime and the character and record of the defendant," commonly referred to as proportionality review.  42 Pa.C.S.A. § 9711(h)(3)(iii); Commonwealth v. Conforti, 533 Pa. 530, 533, 626 A.2d 129, 130 (1993).  The President Judges for each county are required to update the Administrative Office of Pennsylvania Courts ("AOPC") with information pertaining to first degree murder convictions which were or could have been prosecuted under 42 Pa.C.S.A. § 9711.  Commonwealth v. Frey, 504 Pa. 428, 443, 475 A.2d 700, 707-708 (1984).

In this case, the Supreme Court of Pennsylvania conducted a proportionality review on direct appeal and held that petitioner's sentence was not excessive or disproportionate. Hall, 549 Pa. at 307-308, 701 A.2d at 209-210.

Petitioner alleges that the proportionality review must include a factual comparison of the full range of aggravating and mitigating circumstances of the defendant and the offense. Petitioner further alleges the comparison must include the entire universe of death-eligible cases, including those cases ultimately resulting in life sentences.

Petitioner contends that a defect in the AOPC database on statistics does not include this information, thereby

-107-

preventing a meaningful proportionality review.  Petitioner claims he was arbitrarily denied an entitlement of state law in violation of his due process rights.  Petitioner also alleges he was denied his Eighth Amendment right to a reliable ultimate determination of his sentence because he was denied a proper proportionality review.

In addition to challenging the statistical method generally, petitioner avers that in his case he had no notice or opportunity to meaningfully participate in the Supreme Court of Pennsylvania fact-finding concerning what constituted "similar cases."

Finally, petitioner claims all prior counsel were ineffective for failing to raise these errors.[114]

---

[114]   In his Petition for Writ of Habeas Corpus filed February 17, 2006 and Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus, which memorandum was filed October 6, 2006, petitioner alleges that all of his state-court defense counsel from trial counsel through post-conviction counsel were ineffective for not raising the issues contained in claim twelve.

I note that by including "post-conviction counsel" in the laundry list of prior counsel who were allegedly ineffective, it appears that current counsel, Cristi A. Charpentier, Esquire, may be arguing her own ineffective-ness because she was one of the counsel that represented petitioner before the Supreme Court of Pennsylvania on the last "post-conviction" proceedings in state court.

While it is unclear if Attorney Charpentier is alleging her own ineffectiveness for not raising the issues contained in claim twelve (she did not bring these issues before the Supreme Court of Pennsylvania at the earliest stage of the proceedings after her appearance in the case for petitioner), I need not address the issue of a potential conflict of interest in her further representation of petitioner because I conclude below that claim twelve is procedurally defaulted, and therefore, do not address the merits of claim twelve.

However, because I conclude that a new sentencing hearing is appropriate in this matter, and in recognition of long-standing Pennsylvania jurisprudence that requires the appointment of new counsel when an attorney has raised his or her own ineffectiveness, this issue may need to be addressed upon remand to the Pennsylvania trial court.  See Commonwealth v. Green, 551 Pa. 88, 709 A.2d 382 (1998); Commonwealth v. McBee, 513 Pa. 255, 520 A.2d 10 (1986); Commonwealth v. Gardner, 480 Pa. 7, 389 A.2d 58 (1978).

Respondents contend that petitioner was not denied his state-law entitlements because the Supreme Court of Pennsylvania performed the statutorily mandated proportionality review. Because there is no constitutional right to proportionality review, Respondents aver that petitioner is only entitled to relief if he can show - which he cannot - that the proportionality review was not undertaken in good faith. See Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

Further, respondents contend that petitioner's claim that he had no notice or opportunity to meaningfully participate in the review is not exhausted because it was raised for the first time in petitioner's habeas petition. Respondents aver that all ineffectiveness claims stemming from these errors are also not exhausted because they are being raised for the first time to this court.

Upon reviewing the record in this case, I conclude that all of petitioner's issues in claim twelve are raised for the first time in petitioner's habeas petition. Accordingly, I hold that petitioner has failed to exhaust claim twelve in the state courts.

Pursuant to Pennsylvania law, where the Supreme Court of Pennsylvania has decided the merits of a claim on direct appeal, it is considered "previously litigated" and cannot be raised for PCRA review. 42 Pa.C.S.A. § 9544(a)(2). Ordinarily, where the Supreme Court of Pennsylvania has conducted a

-109-

proportionality review, issues pertaining to the proportionality of a capital sentence are considered previously litigated. Commonwealth v. Brown, 582 Pa. 461, 491, 872 A.2d 1139, 1157 (2005).

However, the Supreme Court of Pennsylvania has explicitly held that a challenge to the method of proportionality review is not beyond the purview of the PCRA court because the method itself is not the issue that was previously litigated. Id.

Specifically, the appellant in Brown contended that the "proportionality review utilized an inaccurate database without providing Appellant's counsel notice and an opportunity to participate." 582 Pa. at 492, 872 A.2d at 1157.  The Supreme Court held that the PCRA petition was the first opportunity appellant had to raise these claims. 582 Pa. at 491-492, 872 A.2d at 1157.

Because petitioner raises identical challenges to the proportionality review conducted in his case, he could have raised these issues in the first instance to the PCRA court.  In addition, petitioner's allegations of ineffective assistance of counsel based upon these alleged errors also could have been raised on PCRA review.  Therefore, petitioner failed to exhaust the state remedies available because he raised the claim for the first time in his federal habeas petition.

Although petitioner failed to exhaust his state remedies, he would be without a state corrective process if he

were required to bring this claim in state court now.  He would
be procedurally barred from obtaining state relief because his
claim would be deemed waived under the PCRA, pursuant to
42 Pa.C.S.A. § 9544(b), and/or barred by the one year statute of
limitations under the PCRA, pursuant to 42 Pa.C.S.A. § 9545(b).
See Werts, 228 F.3d at 193-194.  Accordingly, although it would
be futile to require exhaustion, petitioner's claim is
nonetheless not subject to habeas review because it is
procedurally defaulted.  Id. at 194.

### Victim Impact Testimony

Petitioner contends in claim six of the habeas petition
that he is entitled to a new trial and a new sentencing hearing
because improper victim impact testimony was presented and argued
to the jury.

Specifically, petitioner alleges victim impact
statements were presented to the jury during the guilt phase by
both the prosecutor's opening and closing statements and in the
testimony of five witnesses.[115]  Petitioner contends that he is

---

[115]    One witness testified that the victim "seemed like a real nice
guy."  N.T. October 24, 1994, page 56.  Another witness testified that the
victim was "a nice person," and a third witness testified that the victim "was
a real nice man."  N.T. October 24, 1994, pages 176, 203.

A fourth witness testified that her young daughter, who also
witnessed the crime, "had nightmares and she – her behavior was different from
before."  N.T. October 24, 1994, page 164.  The victim's employer testified
that the victim "was a good man, an honest man, a gentleman, and a man that
was recognized in the community and loved by everyone."  Notes of Testimony
of the jury trial conducted before The Honorable Paula Francisco Ott, former
Judge of the Court of Common Pleas of Chester County, Pennsylvania on
October 26, 1994 (N.T. October 26, 1994") page 589.

In the prosecutor's opening statement, he referred to the victim
as a "father" and a "gentleman," "who was well liked in the community," and as

(Footnote 115 continued):

entitled to a new trial because evidence concerning the victim is irrelevant and inflammatory under Pennsylvania law, and its admission violates petitioner's due process rights.

Petitioner alleges he is entitled to a new sentencing hearing because victim impact testimony is neither relevant nor admissible pursuant to the capital sentencing scheme under Pennsylvania law, and its admission violated his Eighth and Fourteenth Amendment rights.

Petitioner also claims he is entitled to a new sentencing hearing because the victim impact testimony constituted invalid evidence for establishing aggravating circumstances under Pennsylvania law, in violation of the Eighth Amendment.  Furthermore, although petitioner acknowledges that victim impact evidence is not per se unconstitutional, petitioner argues its use was extensive and repetitive, thereby violating petitioner's Eighth Amendment and due process rights.

Petitioner further contends that the trial court's failure to follow the dictates of Pennsylvania's evidence law

---

(Continuation of footnote 115):

a "poor man" who "enjoyed working" in the laundromat.  Notes of Testimony of the jury trial conducted before The Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas of Chester County, Pennsylvania on October 22, 1994 ("N.T. October 22, 1994") pages 18 and 25.

In the prosecutor's closing argument, he remarked on the testimony of the witness whose young daughter had also witnessed the murder: "She's having nightmares.  And Kimberly is having nightmares about this, about this because she knew Don Johnson, and she saw the puddle of blood."  Notes of Testimony of the jury trial conducted before The Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas of Chester County, Pennsylvania on October 27, 1994 ("N.T. October 27, 1994") page 797.  Further, he commented on the testimony of one of the other witnesses, explaining that the witness "said he met Mr. Johnson for the first time that day, and he came away saying, what a nice man he was."  N.T. October 27, 1994, page 794.

violated his right to due process.  In addition, petitioner
claims his due process rights were violated because he was not
given adequate pre-trial notice that the Commonwealth planned to
present victim impact evidence.

Finally, petitioner claims he was denied effective
assistance of counsel because trial counsel failed to object to
the evidence, and direct appeal counsel failed to raise this
error.

### *PCRA Appeal*

On PCRA appeal to the Supreme Court of Pennsylvania,
petitioner contended he was entitled to relief under the Eighth
and Fourteenth Amendments because the capital sentencing scheme
in effect at the time of his trial prohibited victim impact
evidence.  Petitioner alleged that because such evidence was
presented during his sentencing hearing, the jury considered
improper aggravating evidence in returning a death sentence.
Petitioner brought an ineffective assistance of counsel claim
under the Sixth Amendment for trial counsel's failure to object
to this evidence, and all subsequent counsel for failing to raise
this error.

The Supreme Court of Pennsylvania considered the merits
of petitioner's ineffective assistance of counsel claim and held
that while the capital sentencing scheme in effect at the time of
trial precluded victim impact evidence, the comments petitioner
identified do not constitute victim impact testimony.  Hall,
582 Pa. at 540, 872 A.2d at 1185.  The Supreme Court held that

-113-

such evidence must describe qualities of the victim and be designed to show the uniqueness of the victim as an individual. Id.  However, the Court held that the statements at issue were generally unsolicited and were only made in passing.   Id.

The Court further held that even assuming that the statements were victim impact testimony, "those references were so isolated that none of them could be found to have affected the outcome of the proceedings."  582 Pa. at 540, 872 A.2d at 1186.

Finally, the Supreme Court held that the trial court instructions explaining that the statements and questions of the attorneys do not constitute evidence cured any possible prejudice that may have been caused by the prosecutor's remarks. 582 Pa. at 541 n.7, 872 A.2d at 1186 n.7.  Because there was no prejudicial error, the Court held petitioner's claims for ineffective assistance of counsel must fail.  582 Pa. at 541, 872 A.2d at 1186.

Petitioner argues that the Supreme Court of Pennsylvania did not address the merits of his constitutional claims, but to the extent it did, it was an unreasonable application of United States Supreme Court precedent because the statements are victim impact evidence pursuant to Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) and Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

Respondents argue the Supreme Court of Pennsylvania decision was not an unreasonable application of United States

Supreme Court precedent because the statements were not victim impact evidence. Respondents also contend that even if the statements were victim impact evidence, their admission did not violate petitioner's due process rights.

### *Guilt Phase Claims*

Regarding the admission of the statements at the guilt phase of trial, petitioner contends that the trial court erred in admitting the statements at issue because they were prejudicial and inflammatory, thereby violating petitioner's due process rights.

Petitioner raises this argument for the first time in his habeas petition. Because petitioner failed to fairly present his due process claim to the state courts, it has not been properly exhausted. Petitioner's claim is also procedurally defaulted, thereby barring federal habeas review. See section on Procedural Default and the Relaxed Waiver Rule, supra.

### *Sentencing Phase Claims*

Regarding the admission of the statements at the penalty phase of trial, petitioner contends the jury was instructed to consider the guilt phase statements after the Commonwealth successfully moved to incorporate the evidence put forth at trial.[116] Petitioner contends his due process and Eighth Amendment rights were violated because Pennsylvania law prohibits the admission of victim impact evidence at a capital sentencing hearing.

---

[116]   N.T. October 28, 1994, pages 875-876 and 933.

The deferential standard of review identified in the AEDPA applies to petitioner's ineffective assistance of counsel claim.  However, because the Supreme Court of Pennsylvania only addressed the merits of petitioner's ineffectiveness claim, I consider the merits of the Eighth and Fourteenth Amendment claims de novo.

Prior to the 1995 amendment to 42 Pa.C.S.A. § 9711(a)(2), which explicitly made evidence concerning the victim and the impact of his death on his family admissible, victim impact evidence could not be introduced during the penalty phase of a capital case.  See Commonwealth v. Fisher, 545 Pa. 233, 268, 681 A.2d 130, 147 (1996).

The question of whether the statements at issue were inadmissible because they constitute victim impact evidence under Pennsylvania law is a question of state law.  The United States Supreme Court has made clear that federal habeas "relief does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475, 480, 116 L.Ed.2d 385, 396 (1991) (internal quotations omitted).

In Estelle, the Supreme Court held that the United States Court of Appeals for the Ninth Circuit had improperly examined violations of state law governing the admission of evidence on habeas review:

> We first consider whether the admission of the prior injury evidence [under California law] justified habeas relief.  In ruling that [petitioner's] due process rights were violated by the admission of the evidence, the [United States] Court of Appeals [for the Ninth Circuit] relied in

part on its conclusion that the evidence was
"incorrectly admitted...pursuant to California
law."  Such an inquiry, however, is no part of a
federal court's habeas review of a state
conviction....  Today, we reemphasize that it is
not the province of a federal habeas court to
reexamine state-court determinations on state-law
questions.  In conducting habeas review, a federal
court is limited to deciding whether a conviction
violated the Constitution, laws, or treaties of
the United States.

502 U.S. at 67-68, 112 S.Ct. at 479-480, 116 L.Ed.2d at 396.

　　　　Accordingly, the question for habeas review is whether
the admission of the statements at issue violated petitioner's
constitutional rights.  The Supreme Court has held that the
Eighth Amendment does not present a bar to victim impact evidence
at capital sentencing hearings, and states are free to devise
capital sentencing schemes and procedures that define and utilize
such evidence.  Payne, 501 U.S. at 824-825, 111 S.Ct. at 2608,
115 L.Ed.2d at 735.  The due process clause remains the outer
boundary for the admissibility of such evidence, and its
admission only rises to a constitutional violation where the
evidence is "so unduly prejudicial that it renders the trial
fundamentally unfair."  Payne, 501 U.S. at 825,
111 S.Ct. at 2608, 115 L.Ed.2d at 735.

　　　　Accordingly, petitioner is only entitled to habeas
relief if he can establish the admission of the statements at
issue deprived him of fundamental fairness in his trial.  See
Bisaccia v. Attorney General, 623 F.2d 307, 312 (3d Cir. 1980);
see also Darden, 477 U.S. at 178-180, 106 S.Ct. at 2470-2471,
91 L.Ed.2d at 156.

-117-

In Payne, the United States Supreme Court held that evidence regarding the two murder victims and the surviving victim did not violate the defendant's Eighth Amendment rights, nor were they so unduly prejudicial that they violated the defendant's due process rights.  501 U.S. at 825-828, 111 S.Ct. at 2608-2611, 115 L.Ed.2d at 735-739.

The defendant murdered a woman and her young daughter, while seriously injuring the woman's young son, who survived the incident.  501 U.S. at 812, 111 S.Ct. at 2602, 115 L.Ed.2d at 727.  The prosecutor elicited testimony from the woman's mother, the grandmother of the surviving victim, and she explained in detail how the boy cries for his mother and his sister and tells her repeatedly how much he misses them and is worried about them. 501 U.S. at 814-815, 111 S.Ct. at 2603, 115 L.Ed.2d at 728.

The prosecutor's closing argument explained in three paragraphs how serious the surviving victim's injuries were, and how tragic the boy's life will be without his mother and sister. 501 U.S. at 815, 111 S.Ct. at 2603, 115 L.Ed.2d at 728-729. Further, in rebuttal to petitioner's closing argument, the prosecutor provided three more paragraphs of argument regarding how the victims' lives were cut short and describing how the surviving victim had suffered a terrible loss.  501 U.S. at 815-816, 111 S.Ct. at 2603, 115 L.Ed.2d at 729.

Because the Supreme Court held that these extensive statements in Payne regarding the victims were not so unduly prejudicial as to render the trial unfair, the comparatively dry

statements made in passing about the victim in this case
certainly do not rise to the level of a due process violation.
Therefore, petitioner is not entitled to relief from his death
sentence on this ground.

Regarding petitioner's ineffective assistance of
counsel claim, the Supreme Court of Pennsylvania held that even
if the statements were victim impact evidence and trial counsel
should have objected to their admission, petitioner cannot
establish that he was prejudiced.

Applying deferential review pursuant to the standards
identified by the AEDPA, the Supreme Court of Pennsylvania
decision was not contrary to, or an unreasonable application of,
Strickland.  Pursuant to Strickland, petitioner can establish
prejudice by showing that there was a reasonable probability that
the result of the proceeding would have been different had
counsel's performance not been deficient.  466 U.S. at 694,
104 S.Ct. at 2068, 80 L.Ed.2d at 698.  Because the statements
were isolated and brief, and because they were not highly
prejudicial, petitioner has not demonstrated how the reliability
of the proceedings was undermined by the admission of the
statements.  Therefore, petitioner's claims for ineffective
assistance of counsel must fail.

Further, petitioner's due process arguments that he was
entitled to advance notice before these statements were admitted
and that the trial court violated his rights by failing to adhere
to Pennsylvania law were raised for the first time in this habeas

-119-

petition.  Accordingly, they are unexhausted and are procedurally defaulted.  See section on Procedural Default and the Relaxed Waiver Rule, supra.

Accordingly, petitioner's claims for relief from his conviction and death sentence based on the grounds raised in claim six are denied.

### Guilt Phase Claims[117]

### Prosecutorial Misconduct

Petitioner contends in claim five of the habeas petition that he is entitled to a new trial and a new sentencing hearing for numerous acts of prosecutorial misconduct.

Petitioner claims the prosecutor made statements in violation of his rights pursuant to the Fifth, Sixth, and Fourteenth Amendments in his closing argument during the guilt phase.  In addition, petitioner alleges the prosecutor made improper statements during his closing argument at the penalty phase that violated his Sixth, Eighth, and Fourteenth Amendment rights.  He further alleges that trial counsel was ineffective to the extent he failed to object to these statements, and that direct appeal counsel was ineffective to the extent he failed to raise these errors.

With respect to the alleged prosecutorial misconduct at the sentencing hearing, petitioner first raised this claim on PCRA appeal to the Supreme Court of Pennsylvania, which held that

---

[117]   Although some of the following claims also contain alleged errors occurring during the sentencing phase, each claim primarily arises from alleged errors committed during the guilt phase of petitioner's trial.

the claim was waived.  See section on Procedural Default and the

Relaxed Waiver Rule, supra.  Accordingly, petitioner's claims for

prosecutorial misconduct at the sentencing hearing, and the

derivative ineffective assistance of counsel claims, are

procedurally defaulted.[118]

---

[118]   All of petitioner's claims are raised for the first time in the
PCRA appeal.  However, the facts underlying one claim had been previously
raised before the PCRA court.

In petitioner's federal habeas petition, he argued that the
prosecutor misrepresented the law regarding the grave risk of death
aggravating circumstance.  42 Pa.C.S.A. § 9711(d)(7).  Petitioner alleged his
Sixth, Eighth, and Fourteenth Amendment rights were violated because the
prosecutor argued to the jury at the penalty phase that the burden of proof to
find the aggravating circumstance was less than what was constitutionally
required.

Although petitioner had not previously raised this claim in his
PCRA petition, petitioner argued, through counsel, at the PCRA hearing that
trial counsel was ineffective for failing to object to the prosecutor's
argument regarding the grave risk of death aggravating factor in
42 Pa.C.S.A. § 9711(d)(7).  PCRA defense counsel argued that the prosecutor's
closing argument was confusing because it suggested the jury's conviction for
recklessly endangering another pursuant to 18 Pa.C.S.A. § 2705 at the guilt
phase required the jury to find the grave risk of death aggravating factor at
the penalty phase.  N.T. July 13, 2000, pages 18-19.  The PCRA court rejected
this argument and held the following:

We next consider a claim of Petitioner, not
specifically raised in the Petition, but addressed to
Mr. Miller at the PCRA hearing, that trial counsel was
ineffective for not objecting to the following statements of
the District Attorney in his penalty phase argument:

He killed, and he killed - he killed during that
robbery, and we have proven it to you, and you have
accepted that at the guilt or innocence phase.  We
have proven to you that he did more than kill that
day, and you have accepted that, because you convicted
him as well of endangering other persons.

Petitioner contends that this argument confused the jury and
lead [sic] to the erroneous belief that a conviction on
recklessly endangering another" meant they must find the
aggravator of "grave risk of death to others than the
intended victim".  This Court recognizes that these are
related but distinct concepts, but does not see how this
single statement blurs the distinction.  Therefore, trial
counsel was not ineffective for not objecting to or
responding to this portion of the Commonwealth's argument.

(Footnote 118 continued):

-121-

Regarding the alleged prosecutorial misconduct during the guilt phase of petitioner's trial, petitioner identifies numerous statements in the prosecutor's closing argument that he contends violate his right to due process.  Specifically, petitioner contends his Fifth Amendment right to be free from self-incrimination was violated when the prosecutor commented on his failure to testify during his closing argument.  Petitioner additionally contends he was deprived of due process because the prosecutor made inflammatory and prejudicial remarks during his closing argument, including mentioning that the victim will not see another Christmas, that petitioner had a "cold heart" and would have killed anyone who tried to stop him when he left the laundromat, and finally, that the jury should "send a message" by finding petitioner guilty of first degree murder.

---

(Continuation of footnote 118):

Respondents' Appendix BB, Commonwealth v. Hall, No. 29-94, at 6-7 (C.P. Chester Oct. 19, 2000) (Ott, J.)(citations omitted).

       Petitioner argued for the first time on PCRA appeal to the Supreme Court of Pennsylvania that the prosecutor's argument deprived him of due process in violation of his Sixth, Eighth, and Fourteenth Amendment rights. The Supreme Court held it was waived.

       Petitioner did not "fairly present" his federal issue to the PCRA court because he did not reference any federal rights, he did not rely on any federal cases, nor did he place the PCRA court on notice that he was asserting a federal claim.  See McCandless, 172 F.3d at 261.  He did not brief the issue, and instead he merely argued at the hearing that the prosecutor's statement was confusing and was "explosive".  N.T. July 13, 2000, pages 18-19 and 57.

       The PCRA court's Opinion evidences that petitioner did not present a federal issue because the court focused on whether the jury was confused, and did not discuss whether a federal right had been violated.

       Accordingly, although similar facts were presented to the PCRA court, petitioner's habeas claim has not been exhausted and is procedurally defaulted because petitioner's federal claim was raised for the first time on PCRA appeal, wherein the Supreme Court of Pennsylvania held it was waived.

### *Exhaustion*

Respondents argue petitioner's claims for prosecutorial misconduct are not exhausted because they were not fairly presented to the state court on direct appeal.  Respondents contend the claims for prosecutorial misconduct were framed solely as state-law violations, and consequently, the state courts did not have a fair opportunity or adequate notice to apply the controlling legal principles to the facts bearing upon petitioner's constitutional claims.

Respondents are correct that petitioner does not cite federal authority in his direct appeal brief, nor does he mention the words "due process" or the Fifth Amendment.  However, petitioner argues the state court did understand that petitioner was raising a federal constitutional right, as evidenced by the fact that the trial court's Rule 1925(a) Opinion cited to Commonwealth v. Crittenton, 326 Pa. 25, 191 A. 358 (1937). Although Crittenton does not explicitly mention due process, petitioner argues it invokes the due process analysis established by the United States Supreme Court in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

The relevant language in Crittenton for prosecutorial misconduct claims, which also appears in petitioner's direct appeal brief, is as follows:

> Where, under all the circumstances of the case, the verdict rendered is a just one, the language of the prosecuting officer which will justify a reversal may be such that its unavoidable effect would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the

> defendant, so that they could not fairly weigh in
> his behalf such circumstances of doubt,
> extenuation or degree of guilt that may be present
> in the case, and thus make them unable to render a
> true verdict.

326 Pa. at 31, 191 A. at 361 (internal quotation omitted).

In Berger, the United States Supreme Court analyzed a claim for prosecutorial misconduct by examining the probability of prejudice to the accused from the cumulative effect of improper prosecutorial actions.  The Supreme Court held that where the prosecutor engages in misconduct and fails to act impartially, the proper inquiry is whether prejudice to the accused is so highly probable that, unless evidence of guilt is overwhelming, a new trial is necessary.  Berger, 295 U.S. at 88-89, 55 S.Ct. at 633, 79 L.Ed. at 1321.

Petitioner argues that the state-law prosecutorial misconduct claim is the "substantial equivalent" of a federal due process claim.  Therefore, petitioner argues his claim has been fairly presented to the state courts even though it did not cite "book and verse" to the federal constitution.  Picard, 404 U.S. at 278, 92 S.Ct. at 513, 30 L.Ed.2d at 445 (internal quotations omitted).

The United States Supreme Court has explicitly declined to address whether a claim is "fairly presented" when the state and federal legal standards are identical, although the claim has only been presented to the state courts as a state-law claim.  Baldwin v. Reese, 541 U.S. 27, 33-34, 124 S.Ct. 1347, 1352, 158 L.Ed.2d 64, 72 (2004); see also Tome v. Stickman,

-124-

167 Fed.Appx 320, 324 (3d Cir. 2006).  While the Supreme Court has made clear that "mere similarity" of state and federal claims is insufficient to exhaust, language in Duncan suggests that state-law claims that are "virtually identical" to federal claims are likely to provide the state court an opportunity to "pass upon and correct alleged violations of its prisoners' federal rights."  513 U.S. at 365-366, 115 S.Ct. at 888, 130 L.Ed.2d at 868 (internal quotations omitted).

Third Circuit precedent has established that where the state and federal claims have nearly identical legal standards, the federal court will have received adequate notice of the legal and factual substance of the claim when the state court applied the same legal standard.  See Nara v. Frank, 488 F.3d 187, 197-198 (3d Cir. 2007); McCandless, 172 F.3d at 261; Evans v. Court of Common Pleas, Delaware County, Pennsylvania, 959 F.2d 1227, 1231 (3d Cir. 1992).

The relevant standard for prosecutorial misconduct on habeas review is "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144, 157 (1986) (internal quotations omitted).  The relevant state-law standard is whether, despite the prosecutor's improper comments, the jury was able to "fairly weigh" the evidence and render a "just" and "true verdict" without unfair "prejudice" to the defendant.

-125-

Crittenton, 326 Pa. at 31, 191 A. at 361 (internal quotation omitted).

Because the state-law inquiry requires virtually identical analysis of whether the prosecutor's conduct so impaired the jury's ability to render a fair and true verdict, the claim was fairly presented to the state courts.

Petitioner's claim is distinguishable from Duncan, wherein the United States Supreme Court held that "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."  513 U.S. at 366, 115 S.Ct. at 888, 130 L.Ed.2d at 868.  In that case, the respondent brought a state-law evidentiary claim, and the state court analyzed the claim under the state-law rules of evidence by deciding whether the evidence was more prejudicial than probative.  The state court did not consider whether the evidentiary ruling was so inflammatory as to prevent a fair trial, which is the proper analysis under due process.

Likewise, the United States Court of Appeals for the Third Circuit, relying on Duncan, held that petitioner's passing references to a "fair trial" in his state court papers did not fairly present his due process claim to the state courts. Keller v. Larkins, 251 F.3d 408 (3d Cir. 2001).  In Keller, the petitioner alleged a state-law claim that proof of uncharged bad acts should have been excluded as more prejudicial than probative

-126-

pursuant to state rules of evidence.  The Third Circuit held that petitioner's federal habeas due process claim that the evidentiary ruling undermined the fundamental fairness of the entire trial had not been fairly presented to the state courts, and so was not exhausted.  <u>Keller</u>, 251 F.3d at 414-415.

Here, petitioner did not merely make passing reference to a fair trial in his direct appeal brief.  Instead, the substance of his prosecutorial misconduct claim involved an analysis of whether the prosecutor's statements had so prejudiced the jury that he had been deprived of a fair and true verdict.  Furthermore, both the trial court's Rule 1925(a) Opinion and the Supreme Court of Pennsylvania direct appeal Opinion considered whether the prosecutor's statements so prejudiced the jury that petitioner was deprived of a fair trial.  Petitioner and the state courts cited state-law opinions wherein the analyses were virtually identical to federal constitutional analyses of prosecutorial misconduct in violation of due process.[119]

_____

[119]    <u>But see</u> <u>Dye v. Hofbauer</u>, 546 U.S. 1, 126 S.Ct. 5, 163 L.Ed.2d 1 (2005), wherein the United States Supreme Court held that a petitioner had fairly presented his due process claim based on prosecutorial misconduct where he explicitly referenced the due process clause.  In that case, petitioner's brief to the state court included the heading: "THE PROSECUTOR DENIED DEFENDANT DUE PROCESS OF LAW AND A FAIR TRIAL BY NUMEROUS INSTANCES OF MISCONDUCT," and the text of the brief cited to the Fifth and Fourteenth Amendments, including numerous United States Supreme Court cases discussing due process and prosecutorial misconduct.

While the petitioner in this case did much less to present his federal claim to the state courts, <u>Dye</u> did not state that the petitioner's actions in that case constituted a floor to fairly presenting a due process claim based on prosecutorial misconduct.  Accordingly, I do not read <u>Dye</u> as contradicting earlier Supreme Court precedent holding that a petitioner can exhaust a claim without explicitly referencing his federal rights in his state court papers.  <u>See</u>, <u>e.g.</u>, <u>Picard</u>, <u>supra</u>.

Furthermore, petitioner's allegation that the prosecutor's closing remarks violated his right to be free from self-incrimination was fairly presented to the state courts in his direct appeal brief.  Although the brief did not explicitly cite the Fifth Amendment, petitioner satisfied two of the four ways of indirectly presenting a federal claim identified in McCandless.  172 F.3d at 261.

Petitioner's direct appeal brief relied on a state case that employed federal constitutional analysis in a like fact situation.  Petitioner cited Commonwealth v. Turner, 499 Pa. 579, 582-583, 454 A.2d 537, 539-540 (1982), which analyzed the risk of jurors interpreting a defendant's exercise of his Fifth Amendment privilege as an admission of guilt.

In addition, petitioner's direct appeal brief argued that the prosecutor's closing argument contained "impermissible comment[s] concerning the Defendant's failure to testify at the trial."[120]  The language used in petitioner's brief "call[s] to mind a specific right protected by the Constitution," namely, the Fifth Amendment right against self-incrimination, thereby fairly presenting the federal issue to the state court.  McCandless, 172 F.3d at 261 (internal quotation omitted).

The Supreme Court of Pennsylvania decision here evidences that petitioner fairly presented his federal claim. The Court addressed the claim as the prosecutor's improper

---

[120]   Respondents' Appendix V, Brief and Appendix for Appellant, page 16.

comments on defendant's refusal to testify in violation of "the privilege against self-incrimination and the defendant's constitutional presumption of innocence."  Hall, 549 Pa. at 287, 701 A.2d at 199.

Accordingly, petitioner has exhausted his claim of prosecutorial misconduct arising from the prosecutor's closing argument at the guilt phase.

### *Fifth Amendment Right Against Self-Incrimination*

Turning to the merits of petitioner's claim, he contends the prosecutor's closing argument adversely commented on petitioner's failure to testify:

> What did we prove here?  What did we prove here? I am going to go over the evidence briefly, and then make some inferences to prove the specific intent to kill, especially in homicides, when there is normally two witnesses to the incident, to the murder.  The defendant, he certainly witnessed it, he was right there, and Mr. Johnson, who can't speak.  He's forever silenced.  He won't see another Christmas.[121]

Petitioner alleges that this passage urges the jury to view petitioner as a possible witness who refused to testify, and then to use this silence against him to find specific intent to kill.

A defendant's Fifth Amendment right to be free from self-incrimination has been violated where "the language was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." Untied States v. Brennan, 326 F.3d 176, 187 (3d Cir. 2003) (internal quotation omitted).  Statements merely regarding the

---

[121]    N.T. October 27, 1994, page 788.

absence of facts in the record do not necessarily comment on a defendant's failure to testify.  Id.  "Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence," a defendant's privilege against compulsory self-incrimination is violated.  United States v. Robinson, 485 U.S. 25, 32, 108 S.Ct. 864, 869, 99 L.Ed.2d 23, 31 (1988).

The Supreme Court of Pennsylvania considered petitioner's claim on direct appeal and held that the prosecutor's remarks did not adversely comment on petitioner's failure to testify.  Hall, 549 Pa. at 287, 701 A.2d at 199.  The Supreme Court held the prosecutor's comment instead explained the difficulty of proving specific intent, and it indicated that such intent needed to be inferred from the facts and circumstances surrounding the victim's death.  Id.  Furthermore, the Court held any possible prejudice had been cured by the trial court's instruction that petitioner had a constitutional right not to testify and that the jury could draw no adverse inference from his decision to exercise that right.  Id.

Applying the deferential standard established by the AEDPA, I hold that the Supreme Court of Pennsylvania decision was not contrary to or an unreasonable application of United States Supreme Court precedent.

Petitioner's arguments regarding the unconstitutional effect of the prosecutor's comments are unpersuasive.  It is not clear that the prosecutor's words even reference petitioner's

decision not to testify, but the comments certainly do not ask the jury to draw an adverse inference from petitioner's failure to testify.  Because these comments did not violate petitioner's Fifth Amendment rights, it was not error for trial counsel to fail to object to them.  See Strickland, supra.  Accordingly, petitioner is not entitled to relief from his conviction on this ground.

### Prejudicial and Inflammatory Statements in Violation of Due Process

Petitioner also contends the prosecutor's remark that the victim would not "see another Christmas" was an improper effort to garner sympathy from the jury.  Similarly, petitioner claims it was constitutional error for the prosecutor to state that "the only thing colder than the grave of Mr. Johnson, is this guy's heart."[122]

Petitioner avers the prosecutor was similarly inflaming the passions of the jury with his remark that petitioner "would have killed anyone else that tried to stop him when he left that store."[123]  Finally, petitioner contends the following statement by the prosecutor appealed to "prejudice among white suburban jurors against inner city African-Americans"[124]: "I would ask you to send a message, and that is you come out here from Philadelphia, as we have proven, and shoot someone like this

---

[122]   N.T. October 27, 1994, page 801.

[123]   N.T. October 27, 1994, page 798.

[124]   Petitioner's Memorandum, page 59 n.31.

-131-

Defendant did, once in the face and once in the back of the head, you are guilty of first degree murder."[125]

The Supreme Court of Pennsylvania addressed most of petitioner's claims on direct appeal, and held that these statements did not undermine petitioner's right to a fair trial. The court held that the reference to Christmas was a fair response to one of the reasons offered by petitioner to explain his motive for committing the crime, which was to obtain money to buy Christmas presents. Hall, 549 Pa. at 288, 701 A.2d at 199.

Regarding the prosecutor's statements about petitioner's "cold" heart, the Court held these remarks were appropriate in reference to proving malice for first degree murder. 549 Pa. at 289-290, 701 A.2d at 199. The Court concluded the prosecutor drew a reasonable inference from the evidence concerning petitioner's state of mind during the killing. Id.

Finally, the Supreme Court held that the prosecutor's "send a message" statement was accurately based on the evidence and provided a short synopsis of the crime, and that it did not ask the jury to convict petitioner simply because he was from Philadelphia. 549 Pa. at 294-295, 701 A.2d at 203. The Court further noted that, although proper in this case, parties should abstain from such exhortations in the future because of the risk that jurors will ignore their duty to decide the case based on

---

[125]    N.T. October 27, 1994, page 801.

the facts properly before them.[126]  549 Pa. at 295, 701 A.2d at 203.  The Court did not address the merits of the "he would have killed anyone else" statement.

Applying the deferential standard of review to the three statements at issue discussed above, the petitioner is not entitled to relief from his conviction.  On habeas review, prosecutorial misconduct warrants relief only where the actions undermined the fundamental fairness of the trial in violation of due process, thereby depriving petitioner of a fair trial.  Darden, 477 U.S. at 178-179, 106 S.Ct. at 2470-2471, 91 L.Ed.2d at 156; Donnelly, 416 U.S. at 643-643, 94 S.Ct. at 1871, 40 L.Ed.2d at 436-437.  The Supreme Court of Pennsylvania's decision was not contrary to or an unreasonable application of the due process precedent regarding prosecutorial

---

[126]     Petitioner argued that a subsequent Supreme Court of Pennsylvania decision, Commonwealth v. DeJesus, 580 Pa. 303, 860 A.2d 102 (2004), showed that the decision in Hall was an unreasonable application of United States Supreme Court precedent.

The Supreme Court of Pennsylvania in DeJesus held that it would be reversible error for a prosecutor to ask the jury to "send a message" with a sentence of death during the sentencing phase.  580 Pa. at 330, 860 A.2d at 118-119.

In this case, the prosecutor's statements arose during the guilt phase, whereas DeJesus only addressed the penalty phase.  In addition, the comments were strictly tied to the facts in the case and did not ask the jury to violate their sworn duty.  The statement did not urge the jury to convict petitioner based on prejudicial factors unrelated to the facts presented at trial.  Furthermore, the statement refers back to a theme in the prosecutor's closing argument that petitioner "sent a message" of "death" by directly firing a bullet at the victim's head.  See N.T. October 27, 1994, page 800.

Also, petitioner's reliance on Viereck v. United States, 318 U.S. 236, 248, 63 S.Ct. 561, 566-567, 87 L.Ed. 734, 741 (1943), wherein the prosecutor encouraged the jury to fight a war with their verdict, is inapposite.  Accordingly, I conclude that the Supreme Court of Pennsylvania's decision in this matter was not an unreasonable application of United States Supreme Court precedent.

misconduct because none of the prosecutor's statements rose to the level of denying petitioner a fair trial.

After reviewing petitioner's due process claim based on the prosecutor's statement that petitioner "would have killed anyone else that tried to stop him when he left that store", de novo, I further conclude that petitioner is also not entitled to relief from his conviction.

As the United States Supreme Court has held, "habeas relief is not available simply because the prosecutor's remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181, 106 S.Ct. at 2471, 91 L.Ed.2d at 157 (internal quotations omitted).

The prosecutor's statement relies on an inference drawn from the fact that the petitioner waved his gun at other patrons as he exited the laundromat. While petitioner may argue that this inference extends beyond what the evidence regarding his state of mind reasonably showed, it certainly did not undermine the fundamental fairness of petitioner's trial. Petitioner's conviction was based on ample evidence that he intentionally robbed and shot the victim, and this isolated statement did not deprive petitioner of a fair trial.

Petitioner is also not entitled to any relief for his ineffective assistance of counsel claims because counsel could not have been deficient for failing to object where there was no error. See Strickland, supra.

Accordingly, petitioner is neither entitled to relief from his conviction nor his death sentence from any of the issues raised in claim five.

**Failure to Present Exculpatory Statement of Co-Defendant**

The eighth claim raised in petitioner's habeas petition alleges that trial counsel failed to present exculpatory evidence in violation of petitioner's Sixth, Eighth, and Fourteenth Amendment rights, thereby entitling petitioner to a new trial and sentencing hearing.

Prior to petitioner's trial, Tyrone Green, a co-defendant, gave a statement to a detective regarding his involvement in the crime. The statement established that Mr. Green intended to help petitioner rob the victim by guarding the door of the laundromat. However, Mr. Green stated that he was not an eyewitness to the actual firing of the shots. The relevant portion of the statement is as follows:

> Darrick and I entered the cleaners, and I stood at the door at the rear of the cleaners. I watched Darrick approach the counter where the man was. I saw them wrestle over Darrick's gun. I could not hear what they were saying.... While they were fighting over the gun, a black male tried to run out the door. I stood in the doorway and displayed my .22 caliber revolver to him and told him to stop running.... When I saw Darrick Hall and the guy wrestling with Darrick['] s gun I got scared and ran out the door. As soon as I left the cleaners, I heard two shots from inside. I was on the side-walk in front of the cleaners when the shots were fired, I was not inside. I ran to my car where Troy was waiting for us.[127]

---

[127]    Respondents' Appendix HH, page 5.

In addition, Mr. Green described the first time he learned that petitioner had shot the victim:

> I first realized Darrick shot the guy when he told me when he got in the car.  It all happen [sic] so fast.  I asked Darrick what the gun shots were.  Darrick said I shot the guy.  I told him he just should have ran [sic].[128]

Petitioner contends that the confession confirmed the defense theory that the gun accidentally was discharged during a struggle.  Petitioner first alleges that the co-defendant's statement would have been admissible as a declaration against penal interest, which is an exception to the hearsay rule.[129]  See Pa.R.E. 804(b)(3).

Petitioner alternatively contends that even if the statement were not admissible under the hearsay exception, it would be admissible nonetheless because petitioner is guaranteed the right to be heard and present a complete defense to the charges against him under the due process, compulsory process, and confrontation clauses of the United States Constitution. U.S.Const. amends V, VI and XIV, § 1;  See, e.g., Crane v. Kentucky, 476 U.S. 683, 690-691, 106 S.Ct. 2142, 2146-2147, 90 L.Ed.2d 636, 645 (1986); Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

---

[128]   Respondents' Appendix HH, pages 5-6.

[129]   Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus, page 79.  Petitioner assumes that the co-defendant would have been rendered "unavailable" to testify because he would have asserted his Fifth Amendment privilege because he was still awaiting trial while petitioner's trial was pending.

Finally, petitioner avers that trial counsel was ineffective for failing to offer this statement into evidence because it supported petitioner's defense.  Petitioner claims he was prejudiced by this failure because the jury would have accorded more weight to the mitigating factor it found that the "events leading up to the fatal shot includ[ed] the possibility of a struggle."  Petitioner claims the jury would not have found the struggle to be only a "possibility" in light of this evidence.  Petitioner further alleges that all subsequent counsel were ineffective for failing to raise trial counsel's error.

The Supreme Court of Pennsylvania considered this claim during petitioner's PCRA appeal.  The court did not decide whether the statement was admissible.  The court held that even assuming the co-defendant's statement was admissible, petitioner could not establish his ineffective assistance of counsel claim because he was not prejudiced by the error.  <u>Hall</u>, 582 Pa. at 539, 872 A.2d at 1185.

At the guilt phase, the Supreme Court held the statement was not necessarily exculpatory because Mr. Green had not witnessed the shots.  582 Pa. at 539, 872 A.2d at 1184.  At the penalty phase, the Court held that petitioner had not established how the statement would have altered the jury's consideration of the mitigating factor it already found, especially because Mr. Green admitted he had not been present when the fatal shot was fired.  582 Pa. at 539, 872 A.2d at 1184-1185.  Therefore, the state Supreme Court held that petitioner

-137-

did not establish how he was prejudiced by the omission of Mr. Green's statement, and that the ineffective assistance of counsel claim was without merit.   582 Pa. at 539, 872 A.2d at 1185.

Petitioner claims the Supreme Court of Pennsylvania's decision is unreasonable because Mr. Green's statement established that he witnessed the struggle for the gun until just moments before the shots were fired.  Petitioner argues that the Supreme Court "ignored a critical portion of Mr. Green's statement" because it "failed to consider" that Mr. Green saw petitioner and the victim struggling and then heard the shots "as soon as" he left the laundromat.[130]  Because Mr. Green witnessed the struggle "right up to the point the shots were fired," petitioner argues that the Green statement constitutes "strong verifying circumstantial evidence that the shooting was the result of a struggle."[131]

Respondents argue that the Supreme Court of Pennsylvania's decision was not an unreasonable application of clearly established United States Supreme Court precedent because petitioner failed to establish how he had been prejudiced from trial counsel's failure to admit this statement.  Respondents claim that it was conceded at trial that some type of struggle occurred prior to the actual shooting.  To the extent that petitioner's claim is based on the admissibility of Mr. Green's

---

[130]   Petitioner's Memorandum, page 82.

[131]   Id.

statement, respondents contend this is a question of state law and does not raise a federal question for habeas corpus review.

Alternatively, respondents argue that Mr. Green's statement is not admissible under the declaration against penal interest hearsay exception because exculpatory portions of a statement are not included in the exception.  See Commonwealth v. Brinkley, 505 Pa. 442, 453-454, 480 A.2d 980, 986 (1984).  In addition, due process does not require the admission of Mr. Green's statement because Chambers, supra, is distinguishable from this case.

Applying the AEDPA deferential standard of review, I hold that the Supreme Court of Pennsylvania decision is not contrary to, or an unreasonable application of, United States Supreme Court precedent in Strickland.

Petitioner is unable to establish that there is a reasonable probability that the outcome of the proceeding would have been different had Mr. Green's statement been admitted. Under Strickland, where petitioner has failed to establish prejudice, the court need not consider whether trial counsel's performance was deficient.  466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699.

The primary question at trial was whether petitioner fired the shots, particularly the fatal shot, with specific intent to kill.[132]  The prosecution concedes, and the evidence it presented supports the conclusion, that petitioner and the victim

---

[132]    See N.T. October 22, 1994, pages 28-29 and 32.

engaged in some type of struggle preceding the first shot. For example, the Commonwealth's expert witnesses acknowledged that the victim's hands were on the muzzle of the gun at some point.[133] Furthermore, the prosecutor's closing argument claims that the victim "pushed" the gun because he "instinctively tried to save his life."[134]

The linchpin issue was what happened when the gun was actually discharged, particularly with respect to the fatal shot, which the Commonwealth argued was the second shot fired. Mr. Green's statement does not address the critical moment because he admits that he had already run out of the laundromat at the time the shots were fired.

Petitioner claims that Mr. Green's statement supports the defense's theory that the shooting was an accident and the result of a struggle. However, the statement sheds no light on the mens rea of petitioner, and further, it potentially leads to the inference that the shooting was not an accident.

Contrary to petitioner's assertions, Mr. Green's statement only addresses the actual shooting after it had occurred. Mr. Green claimed he asked petitioner what the shots were after petitioner had already exited the laundromat, and he alleged that petitioner said "I shot the guy."[135] Mr. Green's statement makes no mention of an accidental shooting, and it does

---

[133]   N.T. October 25, 1994, pages 373, 408-409.

[134]   N.T. October 27, 1994, pages 792 and 799.

[135]   Respondents' Appendix HH, page 6.

not connect the earlier struggle to the crucial moment when the gun was discharged.

The statement does not in fact contradict the Commonwealth theory that petitioner fired the shots with specific intent to kill, and therefore petitioner has failed to establish prejudice from trial counsel's failure to admit it at trial.  In addition, Mr. Green's statement merely supports the mitigating factor that the jury already found: "events leading up to the fatal shot including the possibility of a struggle."  Therefore, petitioner has also failed to show prejudice at the sentencing hearing.

Accordingly, the decision of the Supreme Court of Pennsylvania that the result of the guilt and sentencing phases would not have been different even if Mr. Green's statement had been admitted, was not unreasonable.  Thus, petitioner is not entitled to a new trial or a new sentencing hearing based upon these alleged errors.

**Failure to Move In Limine to Redact Petitioner's Confession**

The ninth claim raised in petitioner's habeas corpus petition alleges that trial counsel was ineffective for failing to move in limine to redact petitioner's confession, because the statement referred to the victim as "white guy" ten times. Petitioner claims subsequent counsel was ineffective for failing to raise this error on direct appeal.  Petitioner alleges that he is entitled to a new trial and a new sentencing hearing because his Sixth, Eighth, and Fourteenth Amendment rights were violated.

-141-

Following petitioner's arrest, he provided the Chester County Detectives with a statement regarding his involvement in the crime.  In that statement, which was read to the jury at trial, petitioner referred to the victim as "white guy."[136]  The trial court instructed the jury to consider the evidence presented at trial during the sentencing hearing.[137]

Petitioner contends that references to the victim's race were irrelevant, inflammatory, and prejudicial.  Petitioner argues that trial defense counsel explicitly recognized the potential for racial bias in this case during pre-trial proceedings,[138] and that he had no strategic reason for failing to redact the statement.  Because the United States Supreme Court acknowledged that there is a "unique opportunity for racial prejudice to operate but remain undetected" in capital cases, petitioner alleges that trial defense counsel was ineffective for failing to move to redact the references to the victim's race in petitioner's statement.  Turner v. Murray, 476 U.S. 28, 35, 106 S.Ct. 1683, 1687, 90 L.Ed.2d 27, 35 (1986).

Respondents contend that it was not error for trial defense counsel to allow the phrase into evidence.  Respondents aver that race was not a central issue in the case.  Respondents argue that the jury already knew the race of the victim from

---

[136]   N.T. October 26, 1994, pages 542-552.

[137]   N.T. October 28, 1994, pages 875-876 and 933.

[138]   Notes of Testimony of the pre-trial hearing conducted before The Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas of Chester County, Pennsylvania on July 7, 1994 ("N.T. July 7, 1994") pages 10-11.

autopsy photographs, and that the trial court had already conducted voir dire with the jury on the subject of racial prejudice.

Furthermore, respondents aver that the phrase was relevant because it was important for the jury to hear the exact words of petitioner in order to decide the appropriate weight to accord the statement.  Finally, to the extent petitioner is making a claim for an evidentiary error, the proper standard of review is whether the evidence rendered the trial fundamentally unfair in violation of due process, which respondents claim it had not.

The Supreme Court of Pennsylvania addressed the merits of petitioner's claim on PCRA appeal and held that even assuming deficient performance, petitioner had not established prejudice from trial defense counsel's error.  Hall, 582 Pa. at 541, 872 A.2d at 1186.

The Supreme Court of Pennsylvania explained that in Turner, the United States Supreme Court held that a defendant is allowed to question potential jurors regarding racial bias in a capital case when the defendant and victim are of different races.  Id.  In this case, trial defense counsel had in fact conducted voir dire of the jury on the issue of racial bias.  Id. Therefore, the Court held that petitioner could not establish prejudice because the jury had already been questioned on their racial attitudes in compliance with Turner.  Id.

-143-

Petitioner contends that the Supreme Court of Pennsylvania's decision failed to address the merits of his actual Sixth Amendment claim. Petitioner claims that regardless of whether the jury had been questioned on the issue of racial bias, he is challenging trial defense counsel's stewardship of the evidence. Petitioner claims that Turner is irrelevant regarding what evidence should be introduced in an interracial capital case. Instead, he argues that his actual claim is that trial defense counsel was ineffective for failing to move to exclude irrelevant and racially inflammatory evidence. Therefore, petitioner alleges that his claim is subject to de novo review.

Alternatively, petitioner contends that if I find the merits of his claim to have been addressed, the decision of the Supreme Court of Pennsylvania's was unreasonable.

Because it is unclear from the face of the state court decision whether the merits of petitioner's constitutional claims were addressed in light of federal law, I will address petitioner's claim de novo. Jacobs, 395 F.3d at 100 (internal quotations omitted).

It should be noted that while petitioner claims that the central holding in Turner is irrelevant to his actual Sixth Amendment claim, it remains unclear why he cited Turner in his PCRA appeal brief and his federal habeas corpus petition. Turner is the only case which he cites to support his claim. Nonetheless, petitioner's true claim appears to challenge only

-144-

trial defense counsel's decision not to seek to exclude
potentially inflammatory and prejudicial evidence.

As discussed above, a claim of ineffectiveness of trial
defense counsel requires petitioner to prove that he was
prejudiced by his counsel's deficient performance.  The court
must examine the "totality of the evidence" to determine whether
petitioner has established prejudice.  Strickland, 466 U.S. at
695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698.  The United States
Supreme Court has provided the following guidance for considering
the prejudicial effect of an error:

> Some errors will have had a pervasive effect on
> the inferences to be drawn from the evidence,
> altering the entire evidentiary picture, and some
> will have had an isolated, trivial effect.
> Moreover, a verdict or conclusion only weakly
> supported by the record is more likely to have
> been affected by errors than one with overwhelming
> record support.  Taking the unaffected findings as
> a given, and taking due account of the effect of
> the errors on the remaining findings, a court
> making the prejudice inquiry must ask if the
> defendant has met the burden of showing that the
> decision reached would reasonably likely have been
> different absent the errors.

Strickland, 466 U.S. at 695-696, 104 S.Ct. at 2069,
80 L.Ed.2d at 698-699.

Petitioner alleges that the reference in his confession
to the victim as "white guy" was "unnecessarily inflammatory and
could arouse race-based fear in both white and black jurors."[139]
However, petitioner must establish that the result reached by the

---

[139]     Petitioner's Reply to Commonwealth's Memorandum of Law in Support
of Commonwealth's Answer to Petitioner for a Writ of Habeas Corpus, page 32.

jury would reasonably likely have been different absent the admission of this phrase.

It is unclear that the phrase "white guy" necessarily is racially inflammatory or prejudicial. Even assuming that the phrase is inflammatory, its use was confined to the direct and cross-examination of the detective who recorded petitioner's confession. The phrase was not used by the prosecution to support an inference that petitioner had a race-based reason for the robbery and murder. Moreover, there is no evidence, nor did either side argue, that petitioner's crimes were racially motivated.

Furthermore, during the cross-examination of the detective, trial defense counsel potentially undermined its prejudicial effect by creating doubts about the accuracy of the statement. Trial defense counsel established that the statement incorrectly listed the time it had been taken.[140] He further established that the words not in quotation marks were only the detective's summary of what petitioner had told him, and that the phrase "white guy" had not been in quotation marks in the statement.[141] Although the detective contended that the phrase was nonetheless not his phrase, trial defense counsel had already established that the statement was not wholly reliable and accurate.

---

[140]    N.T. October 25, 1994, page 570.

[141]    Id. at pages 566-572.

Petitioner is unable to establish that there is a reasonable probability that the result of the proceedings would have been different had the phrase been excluded.  Pursuant to Strickland, the phrase likely had an isolated, trivial effect on the trial, instead of a pervasive effect that would have altered the entire evidentiary picture.  Because the record strongly supports the verdict, the passing references to petitioner's description of the victim as "white guy" hardly were prejudicial enough to undermine confidence in the proceedings.

Petitioner has not articulated the basis for the alleged violation of his Eighth and Fourteenth Amendment rights.  Petitioner fails to even mention these issues in his memorandum of law.  Accordingly, because he has not adequately briefed these alleged constitutional violations, I decline to address them.  See State Farm Mutual Automobile Insurance Co., 715 F.Supp.2d at 630 n.6.

Therefore, I conclude petitioner is not entitled to a new trial on this claim.  Because it is similarly unclear how the jury's consideration of mitigating and aggravating circumstances would have been altered, petitioner is not entitled to a new sentencing hearing on this ground.

### Sufficiency of the Evidence

The tenth claim raised in petitioner's habeas corpus petition alleges that petitioner is entitled to a new trial and sentencing hearing because his due process rights were violated

-147-

where the evidence was not sufficient to sustain a conviction for murder of the first degree.

Specifically, petitioner alleges that his due process rights were violated because the Commonwealth presented evidence that a struggle before the shooting occurred, and that the Commonwealth had no evidence of specific intent to kill. Petitioner alleges that because all the evidence was consistent with defendant's and co-defendant's statements that the shooting was an accident, he could not have been convicted beyond a reasonable doubt, which violates his due process rights pursuant to Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 2788-2789, 61 L.Ed.2d 560, 573-574 (1979).

### ***Exhaustion***

Respondents contend petitioner did not exhaust this sufficiency-of-the-evidence claim because he did not "fairly present" his due process claim to the state courts.  Instead, petitioner raised this claim on direct appeal as a state-law claim challenging the sufficiency of the evidence.  Therefore, respondents argue, the state courts did not have a fair opportunity to address petitioner's federal due process claim.

As noted by the Third Circuit, the test for sufficiency of the evidence is the same under both Pennsylvania law and federal due process.  Evans, 959 F.2d at 1232.  Both require the court to examine whether any rational trier of fact could have found that every element of the crime was proven beyond a

reasonable doubt.  See Jackson, supra; Commonwealth v. Ratsamy, 594 Pa. 176, 181 n.2, 934 A.2d 1233, 1236 n.2 (2007).

In Evans, the Third Circuit held that petitioner fairly presented his due process claim even though he had only raised the claim in terms of sufficiency of the evidence in state court. 959 F.2d at 1231-1233.  A claim for sufficiency of the evidence is the "substantial equivalent" of a federal due process claim. Id. at 1233.  In addition, the Third Circuit in Evans held that a petitioner's due process claim had also been exhausted because the assertion of the state-law claim "call[s] to mind a specific right protected by the Constitution."  Id.; see also McCandless, supra.

In this case, petitioner's brief in support of his direct appeal cites the identical due process standard identified in Jackson, which is "whether, viewing all the evidence in the light most favorable to the Commonwealth as verdict winner, a jury could find every element of a crime beyond a reasonable doubt."[142]  Because the standard is identical, "[n]either federal-state comity nor judicial economy would be better served by requiring [petitioner] to return to the state courts simply because [his state court briefs] do not include a 'see also' citation to Jackson v. Virginia." Johnson v. Mechling, 541 F.Supp.2d 651, 665 (M.D.Pa. 2008) (Jones, III., J.).

---

[142]  Respondents' Appendix V, Brief and Appendix for Appellant, page 11.

Accordingly, although respondents are correct that petitioner relied on state law in his direct appeal brief, the Third Circuit has already determined that a Pennsylvania sufficiency-of-the-evidence claim presents the substance of a federal due process claim to the state courts for exhaustion purposes.  Therefore, I hold petitioner has exhausted his available state remedies regarding his due process claim regarding sufficiency.

### *Supreme Court of Pennsylvania Decision*

The Supreme Court of Pennsylvania addressed the merits of petitioner's claim on direct appeal and held that the evidence was sufficient to support the jury's first degree murder verdict.  Hall, 549 Pa. at 279-282, 701 A.2d at 195-197.  In considering the claim, the Court provided a detailed review of the record, which is summarized extensively in the Facts section, above, at the beginning of this Opinion.  The state Supreme Court determined that the record established the following:

> At approximately 10:00 a.m. on December 18, 1993, Troy Davis, Tyrone Greene and appellant departed Philadelphia by automobile for Coatesville in Chester County, Pennsylvania with the intent of committing a robbery in Coatesville. Appellant and his cohorts arrived in Coatesville at approximately 12:00 noon.  Upon arriving in Coatesville, the three men decided to rob a laundromat on Main Street.  Appellant and Greene proceeded into the laundromat while Davis waited in the car as the getaway driver.  Appellant, armed with a loaded .357 caliber magnum revolver, went to the cashier's area in the rear of the laundromat while Greene, armed with a .22 caliber revolver, stayed near the front entrance to the laundromat.  Appellant withdrew his revolver and demanded that the victim give him the money from the laundromat.  After the victim refused to give

-150-

appellant the money, appellant fired a shot which grazed the victim's head.  Appellant then fired another shot from a distance of approximately four (4) to ten (10) inches which entered the back portion of the right side of the victim's head and traversed through the victim's brain causing instantaneous death.  When appellant fired the fatal shot, his .357 caliber revolver was in double action firing mode, which would require nine pounds of pressure on the trigger to activate the hammer in order to fire a round.

After shooting the victim, appellant backed out of the laundromat waving his revolver at ten (10) to fifteen (15) people in the laundromat. Appellant then fled in the getaway car to a house in Coatesville where appellant and his cohorts changed clothes and joked about their weapons with the man who resided at the house.  The three men eventually left the Coatesville house and returned to Philadelphia where they changed clothes once again at a fast-food restaurant.

Between December 19, 1993 and December 24, 1993, detectives in the Chester County District Attorney's Office interviewed three eye witnesses to the murder.  On December 23, 1993, one of the witnesses identified appellant from a photographic array of eight (8) black males prepared by a Chester County detective.  On December 24, 1993, a second eyewitness, independently from the first eyewitness, identified appellant from the same photographic array.

On December 27, 1993, an arrest warrant was issued for appellant's involvement in the murder and robbery.  At approximately 6:50 a.m. on December 28, 1993, officers of the Philadelphia Police Stakeout Unit arrested appellant at his mother's home in Philadelphia.  The Philadelphia police transported appellant to the Philadelphia Police Administration Building where appellant was processed and turned over to the Chester County detectives.  After waiving his Miranda[] rights, appellant was questioned by the Chester County detectives in the Philadelphia Police Administration Building.  Appellant then made a statement in which he confessed to his participation in the robbery and murder. Appellant, however, contended that the shooting was an accident which occurred during a struggle with the victim.  Appellant's statement was

-151-

> reduced to a typewritten document by a Chester
> County detective.  Appellant ultimately reviewed,
> corrected and signed the typewritten document.

549 Pa. at 280-281, 701 A.2d at 195-196 (citations omitted).

The Supreme Court of Pennsylvania stated that in first degree murder cases, the Commonwealth must prove that: (1) defendant acted with a specific intent to kill; (2) a human being was unlawfully killed; (3) the person accused did the killing; and (4) the killing was done with deliberation.  Hall, 549 Pa. at 281-282, 701 A.2d at 196; see 18 Pa.C.S.A. § 2502(d). The Court further stated that specific intent to kill can be proven where a defendant knowingly applies deadly force to another, and death caused by the use of a deadly weapon upon a vital part of a victim's body is sufficient to establish specific intent.  549 Pa. at 282, 701 A.2d at 196.

The state Supreme Court determined the evidence was sufficient to support petitioner's conviction for Murder of the first degree:

> Here, the evidence presented at trial showed
> that appellant entered the laundromat with a
> loaded revolver, which is clearly a deadly weapon.
> After the victim declined appellant's demand for
> money, appellant pointed the revolver at a vital
> part of the victim's body.  At the time appellant
> killed the victim, the revolver was four to ten
> inches away from the victim's head.  Also, two
> eyewitnesses identified appellant as the person
> who emerged from the rear of the laundromat after
> the shots were fired which killed the victim and
> that appellant waved the revolver at them in his
> attempt to flee the scene.  Moreover, appellant
> admitted to shooting the victim.

549 Pa. at 282, 701 A.2d at 196-197.

### ***Merits Analysis***

Petitioner alleges that the Supreme Court of Pennsylvania's decision was an unreasonable application of Jackson because it failed to assess all of the evidence established at trial.  Petitioner avers that the Commonwealth produced no evidence that he acted with specific intent to kill. Petitioner claims that no witnesses testified that they saw petitioner intentionally shoot the victim, and that petitioner and Mr. Green both claimed the shooting was the result of a struggle.

Furthermore, petitioner alleges that the Commonwealth's ballistics expert and medical examiner both testified that the evidence demonstrated that the victim had his hands on the gun at some point.  In addition, petitioner contends that a Chester County detective who investigated the crime scene testified that he saw cuts on the hands of the victim.  Petitioner asserts that the Supreme Court failed to take account of this contrary evidence.

Because the state court has addressed the merits of petitioner's claim, I apply the deferential standard of review pursuant to the AEDPA.

I hold that the Supreme Court of Pennsylvania's decision was not contrary to, or an unreasonable application of, United States Supreme Court precedent, nor did the state court make an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

-153-

The due process guaranteed by the Fourteenth Amendment mandates that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince at trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson, 443 U.S. at 316, 99 S.Ct. at 2787, 61 L.Ed.2d at 571.

A reviewing court must uphold the conviction where, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573.

The court must examine all the evidence, and the prosecution may meet its burden by relying entirely on circumstantial evidence. Id.; United States v. Bobb, 471 F.3d 491, 494 (3d Cir. 2006). In reviewing the conviction, the court does not re-weigh the evidence or determine the credibility of the witnesses. Jackson, 443 U.S. at 318-319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573. Instead, the court must credit all available inferences in favor of the prosecution. United States v. Gambone, 314 F.3d 163, 170 (3d Cir. 2003).

This standard places an "extremely high" burden on a defendant, United States v. Lore, 430 F.3d 190, 203 (3d Cir. 2005) (internal quotations omitted). A reversal because of insufficient evidence should be confined to cases where the

prosecution's failure is "clear".  <u>United States v. Jimenez</u>,
513 F.3d 62, 81 (3d Cir. 2008) (internal quotations omitted).

On habeas corpus review, the court must apply "the
substantive elements of the criminal offense as defined by state
law."  <u>Jackson</u>, 443 U.S. at 324 n.16, 99 S.Ct. at 2792 n.16,
61 L.Ed.2d at 577 n.16.  Under Pennsylvania law, a defendant can
be convicted for Murder of the first degree where the prosecution
proves that: (1) a human being was unlawfully killed; (2) the
person accused did the killing; and (3) the killing was done in
an intentional, deliberate, and premeditated manner.
<u>Commonwealth v. LaCava</u>, 542 Pa. 160, 171, 666 A.2d 221, 226
(1995).  "The specific intent to kill needed to support a first-
degree murder conviction can be proven by use of a deadly weapon
upon a vital part of the victim's body."  <u>Id.</u>

Because petitioner concedes that he unlawfully killed
the victim, petitioner essentially only contends that the
Commonwealth did not prove that he killed with specific intent.

The Supreme Court of Pennsylvania correctly found that
specific intent can be proven through circumstantial evidence.
Even though the Commonwealth did not present any eyewitnesses to
the actual shooting, specific intent can be proven under
Pennsylvania law by the Commonwealth's evidence that petitioner
pointed a loaded gun and fired inches away from the victim's
head, which is a vital part of the victim's body.  <u>LaCava</u>, <u>supra</u>.

In addition, contrary to petitioner's contentions, the
Commonwealth's evidence that the victim and petitioner engaged in

-155-

a struggle prior to the fatal shooting does not negate specific intent.  Specific intent is "gauged at the moment of the killing and may be formed in a split second".  Commonwealth v. Sherwood, 603 Pa. 92, 109 n.21, 982 A.2d 483, 494 n.21 (2009).

The Commonwealth's expert evidence established that the circumstances at the moment of the fatal shot, which entered the back of the victim's head, evinced petitioner's deliberate and intentional act.  Furthermore, evidence regarding petitioner's demeanor following the shooting is consistent with the conclusion that petitioner acted with specific intent.  The Supreme Court properly examined all the evidence, crediting all inferences in favor of the Commonwealth.

Accordingly, I conclude that respondents have more than established that any rational trier of fact could have found the essential elements of first degree murder beyond a reasonable doubt.  Moreover, the Supreme Court of Pennsylvania's decision was not an unreasonable application of Jackson.  Therefore, petitioner is not entitled to relief from his conviction on the grounds of insufficiency of the evidence.

### Suppression of Post-Arrest Statements

The eleventh claim in petitioner's habeas corpus petition alleges trial court error and ineffective assistance of defense counsel at the suppression hearing, which resulted in the admission of petitioner's confession at trial.

First, petitioner alleges that his Fifth and Fourteenth Amendment rights were violated because he made a request for

counsel as he was being arrested, and then he subsequently made incriminating statements during a custodial interrogation outside the presence of counsel that were used against him at trial.

Second, petitioner contends that his Sixth Amendment right to effective counsel was violated because trial defense counsel was unprepared for the motion to suppress and failed to call witnesses who would have established that he made a request for an attorney during arrest.  Because these two grounds require separate analyses, each will be addressed in turn.

### *Waiver of Miranda Rights*

Petitioner alleges his waiver of his Miranda rights was not knowing, intelligent, and voluntary because although he requested an attorney, he was denied his Fifth Amendment right to an attorney during a custodial interrogation.

Petitioner contends that on the morning of December 28, 1993 he was arrested by the Philadelphia Police Stakeout Unit. During his arrest, petitioner alleges, he asked to call his attorney, and he requested that both his girlfriend, Wanda Turner, and mother, Sandra Hall, call his attorney.

At the time, Attorney Noah Gorson represented petitioner on a separate matter.  Petitioner alleges that his mother called Attorney Gorson later that day.  Attorney Gorson subsequently called the Philadelphia police and requested to speak with petitioner.  Petitioner claims that Attorney Gorson's request was denied, but he was assured that the police would not

question petitioner.  Petitioner alleges he was questioned, nonetheless.

Respondents claim that petitioner properly waived his Miranda rights while being questioned by Chester County detectives in the Philadelphia Police Administration Building. Respondents contend that petitioner proceeded to give a confession, which the trial court properly decided not to suppress.  Petitioner alleges that this waiver was not valid because he was denied the right to speak with Attorney Gorson pursuant to the Fifth Amendment.

### *Trial Court Findings of Fact*

At the request of the Supreme Court of Pennsylvania, the trial court conducted post-trial evidentiary hearings on the issue of ineffective assistance of counsel during the guilt and penalty phases of the trial.  The trial court made numerous factual findings which are relevant to petitioner's right-to-counsel claim.

The trial court found that the following facts establish that although petitioner requested his mother to contact Attorney Gorson as he was being arrested, this request was not made in the presence of the arresting officers, nor was the request communicated to the arresting officers:

* * *

2.  At the time of this arrest, Defendant was represented by Noah Gorson, Esquire, on a pending federal criminal matter. (N.T. 10/20/95, pp. 39-40, 44-45).

-158-

3.  Defendant initially believed that he was being
re-arrested by federal agents of the Bureau of
Alcohol, Tobacco and Firearms on that matter.
(N.T. 10/20/95, pp. 39-40.).

4.  As Defendant was leaving his home, he asked
his mother to call his attorney.  (N.T. 10/20/95,
p. 41).

5.  Wanda Turner was Defendant's girlfriend at the
time and was present with him at his mother's home
when Defendant was arrested by the police.  (N.T.
9/21/95, pp. 42-43).

6.  At the time of Defendant's arrest, as
Defendant was being led from the house by the
police, Ms. Turner heard Defendant tell his mother
to call someone.  (N.T. 9/21/95, pp. 45, 46).

7.  On December 28, 1993, Ms. Turner did not
advise Detective Schneider, or any other police
officer, that Defendant had requested the
assistance of counsel at the time of his arrest
and that such request was refused.  (N.T. 9/21/95,
p. 62).

. . .

11.  Sandra Hall (Defendant's mother) testified on
September 21, 1995, concerning the arrest of her
son and her call to Mr. Gorson, and that testimony
was consistent with her testimony at trial.  (N.T.
9/21/95, pp. 84-89).

. . .

13.  Philadelphia police officer Christopher Binns
was one from among the group of police officers
who entered Defendant's home on the morning of
December 28, 1993, at approximately 6:30 a.m., for
the purpose of arresting him.  (N.T. 10/25/95, pp.
161-163).

14.  While Defendant was in the presence of
Officer Binns, he never asked to call or to speak
with an attorney.  (N.T. 10/25/95, pp. 164-165).

. . .

16.  Philadelphia police officer George Flood was
one from among the officers who arrested Defendant

on the morning of December 28, 1993.  (N.T.
10/25/95, p. 187).

17.  While Defendant was in the presence of
Officer Flood, he never asked to call or to speak
with an attorney.  (N.T. 10/25/95, pp. 189-190).[143]

Furthermore, the trial court found that the following
facts established petitioner had not requested an attorney when
he was providing his confession to Chester County Detective David
Grandizio, nor was his confession the result of a deal for a
lenient sentence:

21.  Commonwealth Exhibit C-3 is the Miranda
warnings card, the contents of which
Detective Grandizio read to Defendant on
December 28, 1993 [before the interrogation
began].  Detective Grandizio read the warnings
contained on that card to Defendant, word for
word.  Detective Grandizio then placed Mr. Hall's
response to those warnings on the card itself.
(N.T. 10/27/95, pp. 22-24).

22.  After Detective Grandizio read the Miranda
warnings to Defendant, Defendant began to cry and
made a statement that it was an accident, a
mistake and that he didn't mean to do it.  (N.T.
10/27/95, p. 64).

23.  When asked if he wished to talk, Defendant
responded by saying, "It was an accident.  It was
a mistake.  I didn't mean to do it.  I'll talk."
Those words were handwritten on the Commonwealth
Exhibit C-3 by Detective Grandizio.  However, the
initials D.H. and the signature of Darrick Hall
were affixed to Commonwealth Exhibit C-3 by
Defendant himself.  (N.T. 10/27/95, pp. 24-25).

24.  At no time through the conclusion of reading
the Miranda card did Defendant request to talk to
an attorney, or mention an attorney, or mention
that he was represented by an attorney on pending
federal charges, or mention Attorney Gorson, or in
any other fashion indicate a wish to consult with

---

[143]  Respondents' Appendix U, Findings of Fact, January 25, 1996, pages
2-4.

or be represented by counsel.  (N.T. 10/27/95, p. 52).

25.  During the questioning, Defendant did not ask to speak with an attorney and did not tell Detective Grandizio that he did not wish to make a statement.  (N.T. 10/27/95, p. 29).

26.  Defendant did not ask to consult with or be represented by an attorney during the course of the time in which he was making his statement to Detective Grandizio.  (N.T. 10/27/95, p. 61).

27.  During the course of the interview with Defendant, Detective Grandizio was not aware that any attorney was trying to contact Defendant. (N.T. 10/27/95, p. 60).

28.  Detective Grandizio never made a specific promise of a certain period of incarceration, or of 7 ½ to 15 years incarceration, in order to induce Defendant to give a statement (N.T. 10/27/95, p. 26).

. . .

31. Detective Grandizio did not promise Defendant leniency nor did he make promises to Defendant in order to induce him to give a statement (N.T. 10/27/95, p. 26).

. . .

43.  Defendant's testimony concerning the circumstances of making the statement to Detective Grandizio and the content of that statement were not credible.  (N.T. 10/20/95, pp. 41-64, 112-135; N.T. 10/25/95, pp. 6-26).[144]

### *Direct Appeal*

On direct appeal, petitioner claimed that the trial court erred by failing to grant the motion to suppress petitioner's confession.  Petitioner claimed that he was

_____

[144]   Respondents' Appendix U, Findings of Fact, January 25, 1996, pages 4-9.

questioned after Attorney Gorson twice requested and was denied contact with petitioner.

Petitioner contended that, according to <u>Commonwealth v. Hilliard</u>, 471 Pa. 318, 370 A.2d 322 (1977), where counsel has expressed a desire to be present during any police interrogation, a waiver made during counsel's absence is invalid as a matter of law. Without specifying whether his claim was rooted in the Fifth or Sixth Amendment right to counsel, petitioner claimed that because Attorney Gorson was denied access to petitioner, and petitioner was never informed of counsel's availability, his waiver of the right to counsel was not knowing and voluntary.

The Supreme Court of Pennsylvania addressed this claim on direct appeal. Although the Court initially characterized petitioner's claim as an alleged violation of his Sixth Amendment right to counsel, the Court nonetheless explicitly cited the Fifth Amendment and discussed Fifth Amendment right to counsel precedent. The Court proceeded to analyze the right to counsel under both amendments. The Court held that the trial court did not err by not suppressing petitioner's confession because petitioner had not been denied the right to counsel.

Relying on the trial court factual findings, the Supreme Court of Pennsylvania held that petitioner's waiver of his <u>Miranda</u> rights was valid because petitioner himself never asked for an attorney. The Court held that at no time during the arrest did any Philadelphia police officer hear petitioner ask to call or speak with an attorney. The Court also held that at no

-162-

time during petitioner's subsequent interrogation did he request to speak to an attorney.

The Court further held that Chester County Detective Grandizio properly issued petitioner the <u>Miranda</u> warnings.  The Court held that petitioner verbally waived his <u>Miranda</u> rights and also signed the <u>Miranda</u> warnings card.

Finally, the Court held that although Attorney Gorson did call the Philadelphia Police Administration Building at the request of petitioner's mother, and he was denied contact with petitioner, Attorney Gorson was neither retained at the time of the call nor at any time thereafter relating to these charges.

Accordingly, the Court held that petitioner knowingly, intelligently, and voluntarily waived his right to have counsel present during the interrogation.  Therefore, the Court held that the trial court properly denied petitioner's motion to suppress his confession.

### *Exhaustion*

Respondents contend that petitioner's Fifth Amendment claim is not exhausted because petitioner never fairly presented this claim to state courts as required by 28 U.S.C. § 2254(b). The Commonwealth alleges that petitioner failed to raise the claim under a particular federal right on direct appeal, and that the state court interpreted petitioner's allegation as a Sixth Amendment right to counsel claim.

While respondents are correct that petitioner failed to cite either the Fifth or Sixth Amendment in his direct appeal

-163-

brief, petitioner cited cases which discussed the right to counsel under the Fifth Amendment.[145]  According to the Third Circuit, "reliance on state cases employing constitutional analysis in like fact situations" is one indirect way a petitioner may fairly present his federal claim to state courts. McCandless, 172 F.3d at 261 (internal quotation omitted).

Petitioner cited Commonwealth v. Yates, 467 Pa. 362, 357 A.2d 134 (1976), which discussed both the Fifth and Sixth Amendment rights to counsel.  Yates also contained a lengthy analysis of the Fifth Amendment and Fourteenth Amendment right to counsel during custodial interrogations based on Miranda. 467 Pa. at 368-369, 357 A.2d at 137.

Petitioner also cited Commonwealth v. Lark, 505 Pa. 126, 477 A.2d 857 (1984), which discussed Miranda rights in the context of a custodial interrogation.  The case addressed a defendant's right to remain silent and a defendant's ability to waive the right against self-incrimination, and it cited a United States Supreme Court case, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).  Lark, 505 Pa. at 133, 477 A.2d at 861.

---

[145]    Petitioner also cited Commonwealth v. Hawkins, 448 Pa. 206, 292 A.2d 302 (1972), and Commonwealth v. Hilliard, 471 Pa. 318, 370 A.2d 322 (1977).  Hawkins discussed both the Fifth and Sixth Amendment right to counsel, although it appeared to be decided on the Sixth Amendment. 448 Pa. at 211-214, 292 A.2d at 305-306.

The analysis in Hilliard is even less clear because it cites neither amendment explicitly.  It contains analysis applicable to both Fifth and Sixth Amendment right-to-counsel claims.  471 Pa. at 322-323, 370 A.2d at 323-324.  Accordingly, it is understandable that the Supreme Court of Pennsylvania ultimately addressed petitioner's claim under both amendments.

In _Malloy_, the United States Supreme Court discussed the Fifth Amendment right against self-incrimination. 378 U.S. at 6-7, 84 S.Ct. at 1492-1493, 12 L.Ed.2d at 658-659. The Fifth Amendment right to counsel identified in _Miranda_ is based upon, and is intended to protect, the right against self-incrimination outlined in _Malloy_.  _Miranda_, 384 U.S. at 464-468, 86 S.Ct. at 1622-1625, 16 L.Ed.2d at 717-720 (1966).

As further evidence that petitioner raised a Fifth Amendment claim in his direct appeal brief, the Supreme Court of Pennsylvania cited both _Malloy_ and the Fifth Amendment in addressing his right to counsel claim.  _Hall_, 549 Pa. at 285, 701 A.2d at 198.

Therefore, because the cases petitioner cited contained constitutional analysis of the Fifth Amendment right to counsel, the state court was properly on notice that petitioner was alleging a federal claim under this amendment.  I hold petitioner has fairly presented his constitutional claim to the state courts for exhaustion purposes.

### _Merits Analysis_

Because the Supreme Court of Pennsylvania addressed the merits of petitioner's Fifth Amendment claim, the deferential standard of review identified in the AEDPA applies.

In order to protect the Fifth Amendment right against self-incrimination, an individual subject to a custodial interrogation must be informed that he has a right to have counsel present.  _Miranda_, 384 U.S. at 469, 86 S.Ct. at 1625,

-165-

16 L.Ed.2d at 721.  A waiver of the right to counsel must be knowing, intelligent, and voluntary.  Edwards v. Arizona, 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378, 385 (1981).  Once the individual has requested the presence of an attorney, the interrogation must cease until the request is granted.  Miranda, 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723.

Following a request for an attorney, an individual's waiver of his rights will be deemed invalid where his request for counsel has not been granted, and the police initiated the further questioning.  Edwards, 451 U.S. at 484-485, 101 S.Ct. at 1884-1885, 68 L.Ed.2d at 386.  Where the individual, instead of the police, initiates the meeting and volunteers statements, the individual's Fifth Amendment right is not at issue because the statements were not offered in the context of a custodial interrogation, thereby rendering waiver unnecessary. 451 U.S. at 485-486, 101 S.Ct. at 1885, 68 L.Ed.2d at 387.

Petitioner fails to cite any caselaw supporting his contentions, but his legal claim appears to be the following:

> [The] Fifth Amendment right to counsel is not offense specific and once invoked prohibits interrogation of the Petitioner on any other offense.  Therefore, all of the interrogations of Petitioner that took place approximately three months [after petitioner had retained Attorney Gorson on a separate matter], on December 28, violated his Fifth Amendment right to counsel.[146]

---

[146]    Petition for Writ of Habeas Corpus, filed February 17, 2006, page 90.

-166-

Petitioner's claim appears to combine both the Fifth and Sixth Amendment right to counsel legal standards, which the United States Supreme Court has explicitly prohibited.  McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).  Accordingly, the fact that petitioner had previously retained counsel on a separate criminal matter is irrelevant to whether he invoked his Fifth Amendment right to counsel during the interrogation on December 28, 1993.

Instead, the relevant inquiry for Fifth Amendment purposes is whether petitioner requested counsel for the December 28, 1993 custodial interrogation.  McNeil, 501 U.S. at 178-179, 111 S.Ct. at 2209, 115 L.Ed.2d at 168-169.

While petitioner concedes that he executed a waiver of his Miranda rights prior to the interrogation, he contends the waiver was not valid because he had already invoked his right to counsel by requesting a lawyer upon his arrest.

If petitioner had informed the arresting officers that he wanted to contact an attorney, pursuant to Edwards his subsequent waiver of his right to counsel would be invalid because his request for counsel had not been granted.

The trial court conducted evidentiary hearings and made factual findings precisely on the question of whether petitioner requested an attorney.  The trial court found that although petitioner had asked his mother to contact Attorney Gorson, this request was not made in the presence of the arresting officers, nor was it communicated to the arresting officers or the

-167-

detectives who interviewed petitioner.  Furthermore, at no point
during his interrogation did petitioner request an attorney or
inform his interrogator that he had requested an attorney.  The
Supreme Court of Pennsylvania relied on these findings in holding
that petitioner's Fifth Amendment right to counsel had not been
violated.

Under the AEDPA, a state court's factual findings are
"presumed to be correct," and petitioner has the burden of
rebutting the presumption by clear and convincing evidence.
28 U.S.C. § 2254(e)(1).  Petitioner has failed to present such
evidence rebutting the trial court findings.  Although it is
possible to draw contrary inferences from the testimony of
petitioner, his mother, and his girlfriend, the trial court did
not credit that testimony, and the record is devoid of testimony
from any police officer or detective confirming petitioner's
request for an attorney.

Specifically, two members of the Philadelphia Police
Stakeout Unit who arrested petitioner testified that they never
heard petitioner request a lawyer.[147]  The Chester County
detective who conducted the interrogation testified that
petitioner never requested a lawyer.[148]  Two other officers who

---

[147]    N.T. October 25, 1994, pages 164 and 189-190.

[148]    N.T. October 27, 1995, pages 29, 52, and 61.

-168-

were present during petitioner's arrest also testified that they did not hear petitioner ask for an attorney.[149]

The trial court explicitly found that petitioner's testimony that he asked Detective Grandizio for an attorney, and that Detective Grandizio promised him a lenient sentence if he waived his Miranda rights, was not credible.[150]  In addition, the trial court found that petitioner's girlfriend did not inform any police officer that petitioner had requested counsel.[151]

The trial court only found petitioner's mother's claim that petitioner asked her to call Attorney Gorson credible.[152] Accordingly, I conclude that petitioner is not able to establish by clear and convincing evidence that the factual findings of the trial court or the Supreme Court of Pennsylvania are incorrect.

Furthermore, even assuming that Attorney Gorson had called the Philadelphia Police Administration Building and was incorrectly informed that petitioner was not being questioned, that fact does not undermine the validity of petitioner's waiver of his Miranda rights.

In Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), a remarkably similar case, defendant was

---

[149]   Notes of Testimony of the suppression hearing conducted before The Honorable Paula Francisco Ott, former Judge of the Court of Common Pleas of Chester County, Pennsylvania on May 23, 1994 ("N.T. May 23, 1994") pages 31 and 105;  N.T. October 25, 1994, page 456.

[150]   Respondents' Appendix U, Findings of Fact, January 25, 1996, page 9.

[151]   Id. at page 2.

[152]   Id.

arrested and was held for questioning.  In the meantime, his sister contacted the public defender's office and, at her request, a lawyer called the unit where defendant was being held. 475 U.S. at 416-417, 106 S.Ct. at 1138-1139, 89 L.Ed.2d at 418. The lawyer from the public defender's office was incorrectly informed that police would not be questioning defendant, and defendant was not aware that the lawyer was trying to reach him. 475 U.S. at 417, 106 S.Ct. at 1139, 89 L.Ed.2d at 418.

Later, defendant waived his <u>Miranda</u> rights and gave a confession.  475 U.S. at 417-418, 106 S.Ct. at 1139, 89 L.Ed.2d at 418.  Defendant subsequently moved to suppress the confession, claiming that the waiver was invalid because the police deprived him of information essential to knowingly waive his Fifth Amendment rights.  475 U.S. at 418, 421, 106 S.Ct. at 1140, 89 L.Ed.2d at 420.

The United States Supreme Court stated that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." 475 U.S. at 422, 106 S.Ct. at 1141, 89 L.Ed.2d at 421.

The Supreme Court further stated that the culpability of the police in preventing the lawyer from contacting the defendant was unrelated to the validity of defendant's waiver:

> But whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of [defendant's] election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect

-170-

a suspect's decision to waive his Miranda rights
unless he were aware of the incident.

475 U.S. at 423, 106 S.Ct. at 1142, 89 L.Ed.2d at 422.

Accordingly, I conclude that the Supreme Court of Pennsylvania's determination that petitioner's waiver of his Fifth Amendment rights was voluntary, knowing, and intelligent was not contrary to or an unreasonable application of clearly established federal law, nor was the decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Therefore, petitioner is not entitled to relief for the alleged trial court error in failing to suppress petitioner's confession.

### *Ineffective Assistance of Counsel*

Petitioner alleges he was denied effective assistance of counsel based upon the conduct of trial defense counsel at the suppression hearing.

Petitioner claims trial defense counsel admitted that he was unprepared at the beginning of the suppression hearing:

> THE COURT: I have your entry of appearance from Friday which I have entered into the file.  The first question I wanted to ask you is, have you had an opportunity to review the suppression motion that was filed by the previous attorney?
>
> MR. MILLER: Yes, I have, your Honor.  I have had an opportunity to review it. I picked it up on Saturday, this weekend.  I believe a public defender...left one with the guard here, and I picked a copy of that up and I have reviewed it. Yes, I have.
>
> I have not had an opportunity to investigate as I would like in regards to the allegations that are made within their motion.

-171-

> THE COURT: Well, as you know, it was a condition
> that you agreed upon when you asked me to allow
> you to enter the case by Friday of last week, that
> you would go forward with the suppression hearing
> today.[153]

Petitioner further contends that had trial defense counsel been prepared, he could have called petitioner's mother, Sandra Hall, and petitioner's girlfriend, Wanda Turner, who were present at the time of petitioner's arrest, and were available at the time of the suppression hearing. Petitioner avers these witnesses would establish that he requested and was denied an attorney at the time he was arrested.

In addition, petitioner alleges that had he been called as a witness at the suppression hearing, his testimony would have established that he had asked for an attorney. He also would have testified that he only waived his Miranda rights because he was offered a sentence of seven-and-a-half to fifteen years in prison in exchange for the waiver.[154]

### Direct Appeal

Petitioner raised his ineffective assistance claim on direct appeal.[155] The Supreme Court of Pennsylvania held that petitioner's claim failed because he could not establish prejudice. Hall, 549 Pa. at 291, 701 A.2d at 201.

---

[153]   N.T., May 23, 1994, page 3.

[154]   N.T., September 21, 1995, pages 40, 44 and 57.

[155]   As an initial matter, respondents contend that this claim is not exhausted because the Supreme Court of Pennsylvania cited the Sixth Amendment right to counsel, instead of the Fifth Amendment right to counsel, in summarizing petitioner's claim. However, this claim has been properly exhausted because petitioner cited state cases containing pertinent Fifth Amendment analysis.

The Supreme Court explained that the trial court heard testimony during post-trial ineffective assistance of counsel hearings from petitioner, Sandra Hall and Wanda Turner to the effect that petitioner asked his mother and girlfriend to call an attorney while he was being arrested.  Hall, 549 Pa. at 291, 701 A.2d at 201.  The Supreme Court held that the trial court found that none of the witnesses ever conveyed petitioner's request for an attorney to the Philadelphia Police officers during arrest or the Chester County detectives during interrogation.  Id.

Therefore, the Supreme Court held that the testimony of Ms. Hall and Ms. Turner would not have changed the result of the suppression hearing, and so petitioner was not prejudiced by trial counsel's failure to call these witnesses.  Id.

### Merits Analysis

Because the Supreme Court of Pennsylvania addressed the merits of the ineffective assistance of counsel claim, petitioner's claim is subject to the deferential standards of review pursuant to the AEDPA.

Petitioner contends that the Supreme Court of Pennsylvania's decision was contrary to or an unreasonable application of federal law.  Petitioner claims the court used the wrong standard for analyzing the prejudice prong of Strickland.

Petitioner alleges the proper inquiry is not whether competent counsel's efforts would have changed the result of the hearing, but rather whether confidence in the outcome of the

proceedings is undermined. Petitioner avers that there is a reasonable probability that, had these critical witnesses been presented, petitioner would have been successful on the merits of his motion to suppress.

The Supreme Court of Pennsylvania only addressed the prejudice prong, which complies with Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699.

In Wiggins, the United States Supreme Court stated that "[i]n *Strickland,* we made clear that, to establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" 539 U.S. at 534, 123 S.Ct. at 2542, 156 L.Ed.2d at 493 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698).

The United States Supreme Court further emphasized the importance of the reliability of the proceeding: "the ultimate focus of the inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular

-174-

proceeding is unreliable...." <u>Strickland</u>, 466 U.S. at 696,
104 S.Ct. at 2069, 80 L.Ed.2d at 699.

Here, the Supreme Court of Pennsylvania essentially
held that the question of whether there was a reasonable
probability that the result of the suppression hearing would have
been different had already been answered by the trial court
during the post-trial ineffective assistance of counsel hearings.
At these evidentiary hearings, petitioner had the opportunity to
present the testimony of the witnesses that he claims he should
have had the opportunity to present at his suppression hearing.
Although the trial court heard the testimony from all three
witnesses in question, the trial court nonetheless made findings
of fact that petitioner's allegations were not credible.

Specifically, the trial court found that petitioner had
informed neither his initial public defender nor his subsequent
privately retained counsel that Detective Grandizio had promised
him a deal of seven-and-a-half to fifteen years in prison in
exchange for his confession.[156]  The trial court found that
petitioner never requested counsel at any point during the
interrogation, and furthermore, that the arresting officers had
not heard or been told that petitioner requested counsel.[157]

Therefore, the Supreme Court of Pennsylvania's
conclusion that petitioner was not prejudiced because the

---

[156]   Respondents' Appendix U, Findings of Fact, January 25, 1996, pages
9-11.

[157]   Findings of Fact, January 25, 1996, pages 3-6.

-175-

testimony of these three witnesses would not have changed the result of the proceeding was neither contrary to nor an unreasonable application of Strickland.

Furthermore, the Supreme Court of Pennsylvania's decision was not unreasonable in light of the holding in Strickland that an attorney's deficient performance does not prejudice a petitioner by depriving him of a fair trial with a reliable result.  466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

Even if trial defense counsel had been successful in suppressing petitioner's confession, independent evidence presented at trial, including eyewitness identifications, established that petitioner was the person who committed the killing.  Independent evidence regarding the circumstances of the shooting, including the expert evidence describing the path of the bullet, established that the killing constituted first degree murder.

In fact, petitioner's statement was ultimately exculpatory because it was the *only* evidence clearly asserting that the killing was accidental.  Petitioner does not now contest the defense theory that the shooting was the result of a struggle and was accidental.  The confession was consistent with the overall defense theory that although petitioner committed the killing, he should only be found guilty of second degree murder.

-176-

Trial defense counsel stated that he thought the statement was "exculpatory in nature,"[158] and that he wanted it to be admitted at trial because he believed petitioner would not take the stand: "In balancing or weighing the statement, I think it's overwhelmingly pointed towards second degree murder, as opposed to first degree murder, overwhelmingly.  I, also, knew that my client, very possibly, may not take the witness stand."[159] Although ultimately unsuccessful, the statement was integral in supporting petitioner's defense theory that he should not be guilty of first degree murder.

Accordingly, it is difficult to imagine how the admission of the statement deprived petitioner of a fair trial with a reliable result.  Therefore, the Supreme Court of Pennsylvania's decision that petitioner cannot establish prejudice is not contrary to or an unreasonable application of United States Supreme Court precedent.  Petitioner is not entitled to relief based upon the alleged errors identified in claim eleven of petitioner's habeas corpus petition.

### Cumulative Effect of All Errors

The thirteenth claim in petitioner's habeas corpus petition alleges that the cumulative effect of the errors committed by the trial court, defense counsel, and the prosecutor undermined the fairness of the trial and sentencing proceedings,

---

[158]   N.T. October 27, 1995, page 79.

[159]   Id.

thereby entitling petitioner to have his conviction overturned and his death sentence vacated.

Respondents contend that petitioner's claim is not exhausted because it has never been presented to any state court, and it is raised for the first time in petitioner's federal habeas corpus petition.

Petitioner fails to explain when or how the claim for cumulative error has been presented to the state courts. Upon review of the record, it is clear petitioner raises this claim for the first time in his federal habeas corpus petition.

Although it appears the United States Court of Appeals for the Third Circuit has not explicitly addressed exhaustion in the context of a claim for cumulative error,[160] other circuits have concluded that a cumulative error claim must itself have been presented to the state courts before a habeas corpus petitioner may be entitled to relief upon it. Wooten v. Kirkland, 540 F.3d 1019, 1023-1025 (9th Cir. 2008); Jimenez v. Walker, 458 F.3d 130, 148 (2d Cir. 2006).

Furthermore, I find the reasoning of my colleague, United States District Judge C. Darnell Jones II, in Stidham v. Varano, 2009 WL 1609423, at *24-25 (E.D.Pa. Jun. 9, 2009) to be persuasive. In that case, petitioner asserted that he was entitled to relief for the cumulative effect of the alleged

---

[160]   The cumulative error claims addressed on the merits by the Third Circuit have been previously presented to the state courts, and so the issue of exhaustion had not been discussed. See, e.g., Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008) (claim for cumulative error presented to the PCRA court); Marshall v. Hendricks, 307 F.3d 36, 94 (3d Cir. 2002) (claim for cumulative error presented to the Supreme Court of New Jersey).

errors of trial counsel. <u>Stidham</u>, 2009 WL 1609423, at *24. Respondents contended that petitioner's claim was not exhausted because he never raised it before the state courts. <u>Stidham</u>, 2009 WL 1609423, at *25.

Judge Jones determined that the claim was not properly exhausted and was procedurally defaulted. <u>Id.</u>  The court further held that even if all the individual alleged errors had been properly exhausted before the state courts, petitioner nonetheless had not satisfied the exhaustion requirement with respect to his cumulative error claim. <u>Id.</u>; <u>accord</u>, <u>Prosdcocimo v. Beard</u>, 2010 WL 5676535, at *11 (W.D.Pa. Nov. 29, 2010)(Mitchell, M.J.).

Accordingly, petitioner's claim based on the cumulative effect of the alleged errors was not properly exhausted and is now procedurally defaulted, precluding federal habeas corpus review.

## **<u>CONCLUSION</u>**

For the foregoing reasons, petitioner Darrick U. Hall's Petition for a Writ of Habeas Corpus will be granted in part and denied in part.

Specifically, I grant petitioner relief from his death sentence based upon petitioner's first claim for relief. Petitioner's death sentence is vacated because trial defense counsel was ineffective in failing to investigate and present significant mitigating evidence at the penalty phase of petitioner's trial regarding petitioner's abusive childhood,

illnesses and injuries normally associated with developmental and cognitive delays, and his ability to adjust to a structured environment during the years he attended a disciplinary school.

More specifically, trial counsel failed to seek out, interview and present testimony from some of petitioner's family, friends and employers, and failed to request readily available medical, educational and court records and failed to obtain evaluations by a mental health expert.  This fell below an objective standard of reasonableness, and petitioner suffered prejudice as a result of trial counsel's deficient performance.

The Petition for a Writ of Habeas Corpus is denied in all other respects regarding petitioner's remaining twelve claims for relief.

I further conclude that petitioner is not entitled to relief from his conviction.

I stayed the execution of the writ of habeas corpus for 180 days to permit the Commonwealth of Pennsylvania to grant petitioner a new sentencing hearing, and gave the parties until November 21, 2014 to file a motion requesting a certificate of appealability under 28 U.S.C. § 2253.